UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| BRYCE THOMAS DANIELS, ) | |
| ) | |
| Daniels, ) | |
| ) | |
| v. ) | CAUSE NO.: 3:22-CV-00698 |
| ) | |
| UNIVERSITY OF NOTRE DAME, ) | |
| ) | |
| Defendant. ) | |

## DECLARATION OF CHRISTINE HOLST-HALEY

I, Christine Holst-Haley, do hereby swear that the following statements are true and correct to the best of my knowledge, information, and belief, and that I would competently testify as follows if called upon to do so:

1. I am over eighteen (18) years of age and I am fully competent to make this Declaration.

2. I am the Director of Student Services at the University of Notre Dame ("Notre Dame" or the "University") Law School. I have served in substantially the same position since September 2018, but my title is new as of August 2021; my previous titles were Program Manager of Student Services and Program Director of Student Services. Student Services at the Law School addresses student affairs matters for law students, in coordination with the University's Division of Student Affairs. We provide academic advising and support, assist with accommodations, manage student organizations, and just generally support law students. I also have responsibilities relating to readmissions, specifically by serving on the Readmission Committee and assisting students who are interested in applying for readmission understand the process.

3. I report to Dean Marcus Cole, the Dean of the Law School. I work closely with Stella Miller, the Wellness & Care Consultant to the Law School, often in the context of supporting and monitoring students of concern.

4. On November 2, 2021, Stella Miller forwarded me an email she had received the night before from a male law student ("John Doe"). In that email, John Doe disclosed that a classmate was in an "urgent mental health situation," had recently confided he had "romantic feelings" for John Doe and had told him that day that he had recently "laid down in his bed for a time with a loaded gun at his side, thinking about whether he should kill himself." John Doe reported that this classmate also "made a comment to the effect of: 'What if I killed myself and left a note saying, "I just wanted to be friends?" Would that make you believe me?'" John Doe referred to this as a "pseudo-blackmail situation" and expressed concern that his classmate was "operat[ing] under [a] delusion that things might work out between [them]." This email is attached as Exhibit A.

5. Stella and I had a meeting already scheduled for that same morning at 8 am, at which we briefly discussed the report. Neither of us were aware of who this report was about at the time. Stella told me that she was going to be meeting with John Doe at 9:30 am.

6. On November 4, 2021, I was informed by Stella and Amber Monroe (Deputy Title IX Coordinator) that a female, first-year law student ("Jane Roe") had filed a report with the Notre Dame Police Department ("NDPD") about Bryce Daniels, who was also a 1L student. I was told that Jane Roe had first reached out to Stella with concerns and then decided to make a report to NDPD, which NDPD sent to the Title IX Office and referred to the University's Threat Assessment and Management Team ("TAMT"). I was told that Jane Roe's report was that Daniels made repeated overtures to her and would not take no for an answer, claimed to others that he would

"bury" her if she reported him, and told others he was in possession of guns. I learned that there was a TAMT meeting at 2 pm on November 4, 2021, and that a No-Contact Order between the students had been imposed. I also was told that both students would be meeting with NDPD on November 5, 2021. I am not a member of TAMT and did not attend the meeting at 2 pm on November 4, 2021.

7. I was told shortly thereafter that members of TAMT had learned that the subject of the report made by John Doe to Stella to November 1, 2021, about a classmate who had threatened suicide in response to being rejected was also Bryce Daniels. I met with Dean Cole that afternoon to discuss this with him.

8. I was asked to attend a TAMT meeting in the evening of November 4, 2021. I was asked to attend because TAMT was considering recommending Daniels for immediate removal from the University and I would be serving as the Law School's point of contact for Daniels to coordinate the academic aspects of the decision.

9. At the meeting in the evening of November 4, 2021, TAMT decided to recommend an emergency removal. I recall that the TAMT members generally discussed that there were multiple incidents involving Daniels, multiple reports that Daniels had weapons, and multiple reports that others had serious concerns that Daniels could cause harm to himself and/or others. I provided information to TAMT about my experience with Daniels as a first-year law student and, after TAMT decided to recommend that Daniels be removed from the University on an emergency basis, information needed to implement the decision.

10. I recall that Dr. Christine Caron Gebhardt, Assistant Vice President for Student Services, accepted the recommendation and made the formal decision to subject Daniels to

administrative withdrawal. Dr. Caron Gebhardt appointed Erin Oliver, Assistant Vice President for Institutional Equity, as her designee for purposes of Daniels's administrative withdrawal.

11. On November 5, 2021, Erin Oliver and I met with Daniels at the NDPD headquarters following his meeting with Detective Steve Stebbins. We informed him he was being administratively withdrawn from the University under its emergency action procedures. Daniels was informed that the emergency action could be appealed to the Vice President for Student Affairs.

12. During the November 5, 2021, meeting, Daniels asked to speak to me privately to discuss the academic implications of the emergency action in the form of administrative withdrawal. We discussed how the administrative withdrawal would appear on his transcript and other academic matters.

13. I also told Daniels that the allegations underlying the withdrawal were serious. I did not tell, and have never told, Daniels that I believed the allegations against him to be true, or that I believed them to be true by virtue of one of his accusers being female. I did not tell, and have never told, Daniels that he would never be a lawyer. However, I did tell Daniels that if the allegations *were* true, they could have consequences for his career.

14. I viewed providing this guidance as appropriate, given my role at the Law School and given Daniels' request to discuss the implications of these events on his future legal career. The allegations against Daniels included that he had responded to an ordinary romantic rejection from a peer by threatening suicide and repeatedly engaging with that peer, that he had repeatedly ignored another classmate's requests that he stop contacting her, that he had made references to have guns on campus, and that he had referred to "burying" or "killing" classmates who he viewed as getting in his way academically or professionally. I explained to Daniels that if these allegations

were to be considered by the Office of Institutional Equity or the Office of Community Standards ("OCS") and he was found to have engaged in this conduct, it could have significant repercussions for his legal career. Daniels told me that he did not do these things, and I told him that he would have the opportunity to contest to the merits of these allegations against him before the University found him responsible for any policy violations. Although the emergency action was non-disciplinary, my intention of raising this for Daniels' consideration was to ensure he understood the potential impacts to his legal career and the seriousness of the allegations against him.

15. I learned that after speaking with Erin Oliver and me, Daniels then spoke with Dr. Christine Conway, Director of the University Counseling Center, for approximately an hour. I learned that Daniels then voluntarily decided to go to Memorial Epworth Hospital.

16. I am aware that Daniels appealed the emergency action and the appeal was denied. I was not involved in the appeal.

17. The Law School student body was greatly concerned about their safety following Daniels' removal from campus and administrative withdrawal, which appears to have been disclosed by Daniels to at least two other Notre Dame law students. Representatives from the Student Bar Association sent me an email on November 15, 2021, stating that there were "conversations going on throughout our class and the student body regarding a situation that has created consistent concerns of campus safety regarding firearms on campus, harassment, etc." and asking that I help address "the safety of the student body." I received two emails from students on November 22, 2021, identifying Daniels by name and asking for more information about how the University was addressing the situation; one student shared that the situation was "pretty anxiety inducing." On November 23, 2021, a third student emailed me about a fourth student who did not feel safe and was scared. On November 27, 2021, a fifth student emailed me that he was "very

5

fearful for [his] safety" and worried about a school shooting. In addition, several students came into my office in November and December of 2021 to discuss their ongoing safety concerns. I would estimate that least a dozen students in total came forward to meet with me regarding their concerns about Daniels. In each of these situations, I was able to advise students that Daniels was no longer a member the University community, that Daniels was not allowed on campus, that NDPD is involved in safety decisions and would continue to monitor any situation which may require additional security measures, and that Law School students should continue to reach out to me if they had any additional questions or concerns.

18. Approximately a month after Daniels' administrative withdrawal, a student reported to me that they saw who they believed to be Daniels in the Law School. Because Daniels was subject to a No-Trespass Order, I contacted Chief Keri Kei Shibata. Five NDPD officers were dispatched to the Law School to investigate the student's report. Ultimately, it was discovered that the student in question was someone who looked very similar to Daniels. Given that the police presence at the Law School caused additional disruption and renewed student concern, I sent an email to all Law School students informing them that there was not an active threat to the Law School at that time.

19. I am aware that OCS investigated the allegations against Daniels. I was not involved in the investigation, merits hearing, or determination in Daniels's OCS proceeding.

20. I became involved in Daniels's OCS case in June 2022 when I was assigned to be a "Community Partner" to facilitate one of the assigned Conduct Process Outcomes, after OCS had reached a decision that Daniels had violated a Standard of Conduct. OCS requested that Daniels meet with me before July 15, 2022, to engage in a conversation about his development as a successful student in the Notre Dame community. I expected that Daniels would discuss what he

had learned about why his conduct was not acceptable and how he planned to conduct himself differently in the future.

21. On June 7, 2022, Daniels emailed me stating that he had "been cleared of essentially all wrongdoing" and asked to set up a call about returning to the Law School. I responded stating that I was happy to discuss the readmission process for the fall 2023 semester, but that the readmission deadline had passed for the upcoming semester.

22. The readmission deadline for fall 2022 was April 15, 2022. One of the principles that guides the Law School's readmissions is the importance of consistent application of policy, particularly deadlines, to all applicants. This approach is necessary for purposes of fundamental fairness to all applicants, as well as the logistical and administrative burden involved in the student reenrollment process. The Law School did not consider any late applications for readmission for the fall 2022 semester.

23. In my response to Daniels' June 7, 2022, email, I also stated that I saw that OCS had asked that we do a Community Partner conversation and asked that he set that up. He scheduled a meeting with me for June 13, 2022.

24. On June 13, 2022, Margaret Morgan, Director of the Center for Student Support and Care, copied me on an email she sent to Daniels, which explained that "the Law School will manage all readmission requests according to their processes and deadlines" and "[t]he only addition to this process is the requirement of mental health clearance as a part of [Daniels's] readmission application." This email is attached as Exhibit B.

25. I met with Daniels via Zoom on June 13, 2022, for the required Community Partner meeting. Prior to that meeting, I reviewed the June 3, 2022, OCS Outcome Letter. In that letter, the OCS Hearing Panel requested that Daniels "be aware that language is powerful" with respect

7

to his use of metaphors referencing "burying" and "killing" others but did not find that this language was a policy violation. The only policy violation found by the Hearing Panel related to one interaction with the female law student who had initially reported Daniels. Although the Hearing Panel found that certain initial communications were not policy violations, they concluded that when this female student approached Daniels in the library on November 2, 2021, and stated that she did not want him to communicated with her, it was concerning that Daniels would challenge her request by responding that he was not sure he could make that promise because he might say hello as a social reflex.

26.     During my meeting with him on June 13, 2022, Daniels became antagonistic. He maintained that the statements he made to other students were not policy violations and, at one point, referred to himself as a "victim." He was not thoughtful about his role in the OCS violation and he was not willing to take accountability. Daniels also told me I did not have all the facts because OCS was in the process of updating his determination letter (Daniels denied using the term "kill" in reference to other law students, but did not deny using the term "bury" in reference to the female student).

27.     I proceeded to end the meeting because in my professional opinion, Daniels was unable to engage in a productive discussion about accountability, responsibility, and good community membership. Because Daniels did not satisfy the goals of the Community Partner meeting on June 13, 2022, I was unable to certify his completion to OCS.

28.     Prior to ending our meeting on June 13, 2021, I asked Daniels if he wanted to discuss readmission and he declined, describing the readmission process as self-explanatory.

29.     Daniels did not reschedule the Community Partner meeting until August 22, 2022. In the second Community Partner meeting, Daniels was still defensive, but less antagonistic. I

agreed to certify the OCS outcome. I certified Daniels's completion of the Community Partner meeting to OCS on August 22, 2022.

30. On July 28, 2022, I sent Daniels a letter outlining the requirements for readmission to the Notre Dame Law School. The letter is attached as Exhibit C. None of these requirements were new; rather, this letter was intended to ensure that all requirements were clearly identified in one place for Daniels. These requirements were that Daniels (1) complete all pending OCS Conduct Process Outcomes, (2) receive clearance from the University Counseling Center, and (3) appeal to NDPD to have the No-Trespass Order withdrawn. The letter also explained, as Daniels had already been instructed, that he could only be readmitted for the fall semester, that the earliest he could be readmitted was fall 2023 and the deadline to apply for readmission in fall 2023 would be April 15, 2023, that he must comply with ABA standards for degree completion, and that he must contact the Admissions Office to apply for readmission.

31. As far as I am aware, the only readmission requirement completed by Daniels is the OCS Conduct Process Outcomes. I have not been informed that Daniels has received clearance from the University Counseling Center. The purpose of requiring clearance from the University Counseling Center prior to readmission is to ensure the student is ready to return and resume the pressures of academic life at the Law School.

32. The application deadline for the Law School's fall 2023 semester was April 15, 2023.

33. Daniels did not submit an application for readmission to the Law School for the fall 2023 semester at any time.

34. As of the date of this declaration, Daniels also has not submitted an application for readmission to the Law School for the fall 2024 semester.

35. The Law School provided Daniels with a letter that it would send to other institutions in response to requests for information about Daniels' separation from the University. The letter said, in pertinent part, that Daniels "was administratively withdrawn from the university effective November 5, 2021." The letter is attached as Exhibit D.

36. The reference to Daniels' emergency removal as an "administrative withdrawal" is consistent with University practice.

37. The Law School generally would not otherwise disclose information from Daniels' educational records to other institutions, except as explicitly directed by Daniels. While disclosure of disciplinary records is generally done through OCS, rather than the Law School, my understanding of the University's policy and practice also is that the Conduct Process Outcomes assigned to Daniels are not the sort of disciplinary outcome which is typically reported. In any event, the Law School itself would not disclose the OCS proceeding and Conduct Process Outcomes to another institution and it does not appear on Daniels' law school transcript.

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct and is based on personal knowledge.

Dated: December 19, 2023

DocuSigned by:

Christine Holst-Haley
66F29BC912DB4C7...
Christine Holst-Haley

# Exhibit A

**To:** Christine Holst-Haley[cholst@nd.edu]
**From:** Stella Miller[stella.miller@nd.edu]
**Sent:** Tue 11/2/2021 12:45:43 AM (UTC-05:00)
**Subject:** Fwd: Urgent

USDC IN/ND case 3:23-cv-00698-GSL   document 52-2   filed 12/20/23   page 12 of 20

Hi Christine,
FYI on this. I am meeting with [John Doe] this morning - at 9:30, so I unfortunately have to cut our meeting short. He said he would call the after hours line last night. Let's talk about it at 9.

See you soon,
Stella

Stella Miller, M.Ed., M.Couns.
Wellness & Care Consultant to The Law School
University of Notre Dame
3357 Biolchini Hall of Law
Notre Dame, Indiana 46556
To book an appointment: www.calendly.com/stellamiller


---------- Forwarded message ---------
From: **Stella Miller** <stella.miller@nd.edu>
Date: Mon, Nov 1, 2021 at 10:49 PM
Subject: Re: Urgent
To: [John Doe]


Hi [John Doe],
Yes, of course I can meet with you tomorrow to address the concerns you have for your classmate. Can you meet at 9:30am? I am in Biolchini 3357, just past the east reading room.

Some of the things you are describing are concerning and I encourage you to connect with the UCC after hours line (574-631-7336) to discuss your concerns and perhaps share some of the information you were not able to share in this email so that they could give you guidance based on the entire picture. When you call you can follow the voicemail instructions to reach an on call counsellor.

I look forward to speaking with you tomorrow,

Warmly,
Stella

Stella Miller, M.Ed., M.Couns.
Wellness & Care Consultant to The Law School
University of Notre Dame
3357 Biolchini Hall of Law
Notre Dame, Indiana 46556
To book an appointment: www.calendly.com/stellamiller


On Mon, Nov 1, 2021 at 9:54 PM [John Doe] wrote:

> Hi Stella,
> My name is [John Doe] and I am a [redacted]. I apologize for emailing you so late in the evening. I am wondering if you have any openings tomorrow in which you could meet with me to discuss a rather urgent mental health situation of one of my classmates. I personally am in no danger, and I do not believe this classmate is in sufficient immediate danger which

would justify my calling the campus on-call line. However, it is important that I speak to someone tomorrow, preferably in the morning, regarding this issue. I am going to give you a few of the details of the situation so that you can understand my belief that there is no imminent danger to this person. If I am incorrect in my assumption, please let me know ASAP.

For the sake of brevity, I am going to gloss over some of the facts. Before I start, please know that I am currently allowing this classmate to operate under a false belief he will get what he wants. I did not make any affirmative statements to this effect, and it wasn't even intentional on my part that he develop this belief, but I chose not to dispel him of that belief for the sake of his safety:

This classmate has previously confided in me that at one point in his life, he experienced suicidal inclinations. He told me that once he tried unsuccessfully to commit suicide. When he told me this, it was not in the context of a moment of emotional distress for him - nothing about the conversation gave me reason to suspect that he was still dealing with these inclinations. However, a few weeks after this conversation, right before fall break, this classmate confided in me that he had romantic feelings for me. This was over a text message, and he asked that I not respond to that message until the end of fall break. I gave him a call near the end of the week and told him in as charitable a way as I could that I did not return his feelings and that, for both are sakes, there needed to be some space between us (my reasons for making this decision are too long to go into here, but if you think them relevant, I am happy to explain in person). Although it was difficult for him to hear, he seemed to accept my decision. When I returned to campus, he asked if we could meet in person and talk things over. Although I at first refused, he persisted, and I agreed to talk to him today. We talked around noon today, and I tried to explain to him again my decision. He adamantly pushed back against me, and it began to be clear to me that there are a lot of unhealthy emotional and psychological factors at work in this classmate's perception of me and in his desire to have a close personal relationship with me (not sexual per se).

All the above wouldn't necessarily lead me to reach out to you on such short notice. However, a couple of the things he said alerted me to how dangerous this situation is. Although I had entered the conversation with the intention of reaffirming my decision that we needed space, I abandoned that plan when he told me that, after our initial phone conversation, he had laid down in his bed for a time with a loaded gun at his side, thinking about whether he should kill himself. He also made a comment to the effect of: "What if I killed myself and left a note saying, 'I just wanted to be friends?' Would that make you believe me?" When he said that, it was not in a tone of voice that would necessarily lead me to believe he was about to go and do something reckless. However, coupled with his first statement about lying in the bed, I was fearful enough not to reaffirm my decision and allow him to operate under his own delusion that things might work out between us afterall.

As things currently stand, he is waiting on me to talk to a priest friend of his about the situation. I genuinely think he is under the impression that all will be well, and that I will change my mind once I talk to this priest. For reasons which I will disclose in person should you deem it necessary, I cannot change my decision. But since I find myself in this pseudo-blackmail position, I also am not in a position to reaffirm my decision without guidance from a professional such as yourself, or from someone else who you recommend. Like I said, I do not believe there is any danger of him doing anything rash in the next 24 hours or so. However, I am not an expert, and I would greatly appreciate the chance to talk in person with you or someone else as soon as possible.

I can meet at any time tomorrow which is convenient for you - I have one class from 11am to 12:15pm, but I am willing to skip it if necessary. Morning is preferrable. I am technically scheduled to meet with this priest in the early afternoon, but I will defer that meeting if I am unable to speak with you first. Thanks.

Respectfully,

John Doe

# Exhibit B

**To:** Bryce Daniels[bryced@sas.upenn.edu]; Christine Holst-Haley[cholst@nd.edu]
**From:** Margaret Morgan[mmorgan2@nd.edu]
**Sent:** Mon 8/15/2022 1:58:12 PM
**Subject:** Readmisison Information

Hi Bryce,

It was good to see you just now. I wanted to follow up on our conversation with just a brief email bringing Christine into the loop as well. Just as a quick summary, the Law School will manage all readmission requests according to their processes and deadlines. The only addition to this process is the requirement of mental health clearance as a part of your readmission application. Christine can help you to connect to any forms that are needed or I can assist as well -- just let me know.

As a follow up, I will also work on the temporary access to your email and let you know next steps on that.

Thanks again Bryce, I hope that you are able to get some good rest in the days ahead and that your recovery goes as you expected in the next weeks.

Please be in touch if you have any questions at all,
Margaret


**Margaret Morgan, M. Ed., M.Div.**
*Director*
Center for Student Support and Care

University of Notre Dame | Division of Student Affairs
228 Coleman Morse | Notre Dame, Indiana 46556 USA
574-631-7833 | supportandcare.nd.edu

This email and any files transmitted with it are confidential and intended solely for the use of the individual to whom it is addressed. If you are not the named addressee you should not disseminate, distribute or copy this email. Please notify the sender immediately by e-mail if you have received this email by mistake and delete this email from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

# Exhibit C



**UNIVERSITY OF NOTRE DAME**

THE LAW SCHOOL
P. O. Box 780
Notre Dame, Indiana 46556-4639 USA

P 574-631-6627
F 574-631-3980

July 28, 2022

Bryce Daniels
238 Kimberly Hill
Palmer, TX 75152
Via email: bdaniel5@nd.edu; bryced@sas.upenn.edu

Dear Bryce,

As you know, you were withdrawn from Notre Dame Law School and the University of Notre Dame on emergency action on November 5, 2021. I am writing today to confirm that you are eligible for readmission to Notre Dame Law School in accordance with the following conditions:

1. You must complete all pending student Conduct Process Outcomes as required by the Office of Community Standards ("OCS") in their June 3, 2022 letter to you prior to applying for readmission. OCS will notify the Law School when you have satisfied this requirement.

2. As previously communicated by the Office of Student Affairs, you must receive clearance from the University Counseling Center prior to being readmitted. You may find more information about this process at https://ucc.nd.edu/returning/#lawschool.

3. Because you were withdrawn during the fall semester of your 1L year, you can only be readmitted in a fall semester per Hoynes Code section 8.3.1.2. Given that the readmission deadline for the upcoming semester has passed, the Fall 2023 semester is the earliest in which you could re-enroll.

4. You must comply with the ABA standard for degree completion (currently, requiring degree completion within 84 months after commencing law study). See also Hoynes Code section 8.3.1.3.

5. If you choose to seek readmission, the process and degree requirements applicable to you will be those in effect at the time you re-enroll. To seek readmission, you should contact the Admissions Office. You can find more information here: https://law.nd.edu/admissions/readmission/. Note that the current deadline to apply for readmission for Fall 2023 is April 15, 2023.

6. Finally, because you were issued a No-Trespass Notice by the Notre Dame Police Department at the time you were withdrawn from the University, if you are ultimately readmitted to the Law School, you will need to appeal the order by sending an email to the Vice President for Campus Safety & University Operations at safety@nd.edu requesting to have that No-Trespass Notice withdrawn. You will not be able to finalize your enrollment and to return to campus unless the No-Trespass Notice is withdrawn.

While these conditions have been previously communicated to you by various University or Law School officials, I understand that this communication has been piecemeal over the past several months. This letter is intended to ensure that you are aware of all of these requirements and deadlines.

Finally, please note that your readmission is not guaranteed. The Law School will consider your readmission application in light of the circumstances of your withdrawal, including the potential impact that your return may have on the Law School and University community.

Sincerely,

*Christine Holst-Haley*

Christine Holst-Haley
Director of Student Services
Notre Dame Law School

CC:   Margaret Morgan, Director of Student Support and Care
      Heather Ryan, Director of Community Standards

# Exhibit D



P.O. Box 780 Notre Dame, Indiana 46556
*tel* **(574) 631-6627**  *fax* **(574) 631-3980**  *email* **ndlaw@ND.EDU**

March 1, 2022

To Whom It May Concern:

Bryce Daniels was enrolled at the University of Notre Dame Law School in the Fall of 2021. He was administratively withdrawn from the university effective November 5, 2021. If you'd like further information regarding the circumstances of his withdrawal, please contact Margaret Morgan, Director of the Center for Student Support and Care, at (574) 631-7833.

Thank you,

Jennifer R. Fox
Registrar
The Law School
1101 Eck Hall of Law
University of Notre Dame
jenniferfox@nd.edu
574.631.6895