IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| BRYCE THOMAS DANIELS<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF NOTRE DAME<br><br>Defendant. | Civil Action No. 3:22-cv-00698-PPS-JEM |

**PLAINTIFF BRYCE THOMAS DANIELS'S
REPLY IN SUPPORT OF HIS
<u>MOTION TO COMPEL PRODUCTION OF DOCUMENTS</u>**

Plaintiff, Bryce Thomas Daniels ("Plaintiff"), pursuant to Fed. R. Civ. P. 37, respectfully files this Reply in support of his Motion to Compel (Dkt. 129) and respectfully states as follows:

**BACKGROUND**

**I. Notre Dame Continues to Repeat Inflammatory Misstatements of fact in Stark Disrespect of the District Judge's Instruction of Cooling the Rhetoric.**

It is clear that Defendant University of Notre Dame ("Notre Dame") is wholly uninterested in heeding the District Judge's advice of "cooling down the rhetoric." Of course, the District Judge stated this expectation at the January 24, 2025 hearing in reference to Notre Dame repeating the same litany of readily disprovable facts that discovery has made clear do not actually exist. Plaintiff respectfully restates his prior corrections of Notre Dame's abuses below.

Notre Dame has offered no evidence except an affidavit sworn to almost two years *after* Plaintiff's removal on November 4, 2021 that a male student ("John Doe") complained of Plaintiff "threatening suicide by firearm because Mr. Doe had rejected Mr. Daniels' romantic overtures."

Dkt. 132 at 2. Rather, Plaintiff has offered *the actual statements of the student*, of which Notre Dame has been aware prior to Plaintiff's removal and at all times throughout this litigation. The email from John Doe stated that Plaintiff's relationship with him was *explicitly* "not sexual," Plaintiff "is in a very good place mentally," there were "no bad feeling[s]," that John Doe offered to "clarify the situation" to Notre Dame but for some reason that went ignored by Notre Dame, and that he and Plaintiff "are on very good terms." Dkt. 118-1 (Exhibit 2).

Notre Dame repeats that Plaintiff said he would "bury" Jane Roe. What Notre Dame fails to include, which was noted in Plaintiff's, Jane Roe's, and Jane Roe's friend's, testimonies to the Notre Dame Police Department ("NDPD"), is that none of them thought it was literal (this is why it is not mentioned in Dkt 118-1 (Exhibit 1) nor anywhere else as a conduct issue). The "bury[ing]" was, verbatim, "bury her in evidence" showing Plaintiff did nothing wrong, that Jane Roe was filing a vindictive Title IX complaint for still-unclear reasons, and that Jane Roe had threatened to bring the weight of Notre Dame's anti-male administrative structure down on him. Jane Roe was not wrong on the latter—she successfully did just that. However, for Notre Dame to maintain there was somehow a *threat* in "bury" when not a single party raised it as a threat, and in light of *Notre Dame's own conduct finding that Plaintiff had not threatened anyone*, was never a harm to anyone, and was never a harm to himself, it is disingenuous. Dkt. 118-1 (Exhibit 1).

Notre Dame's repeated contention that the Threat Assessment and Management Team ("TAMT") concluded Plaintiff was an imminent harm to himself and/or others is unlikely truthful because an advisor to, and co-decisionmaker with the TAMT, After Notre Dame completed its mission of eliminating Plaintiff for "some" cause after Jane Roe's complaint, Christine Holst-Haley, explicitly admitted to Plaintiff that:

> **if something *had* really seriously happened that you and I wouldn't be talking right now because you would have been**

2

>           arrested, right? <u>**If there was a legitimate threat of violence that would have been my expectation**</u>. **So, I'm very glad that that didn't happen.**

Dkt 118-1 (Exhibit 3). Notre Dame's own TAMT advisor and administrator knew <u>***at the time of Plaintiff's removal***</u> that there was no "legitimate threat of violence." *Id.* Christine Holst-Haley herself thinks the allegations are vindictive gossip and manipulation that she even says the reality of the situation was not "really serious." *Id.* Plaintiff cannot highlight better than Notre Dame's own administrators about how Notre Dame's operation to eliminate a male accused by a female works. Fabricate stories, seek out half-truths, retain soundbites cast in the most negative light, intentionally disabuse oneself of vindicating evidence, target the male, and full steam ahead.

On these facts, the legitimacy of Notre Dame's after-the-fact justification of "concerns" regarding self-harm and harm to others are at minimum questionable and—per the discovery evidence already provided—unlikely to be true. It is important to remember that Notre Dame's conclusory statements that Notre Dame *believed* Plaintiff was a potential harm to himself or others sufficient to justify removal are justifications offered only <u>*after*</u> this lawsuit. There is no evidence in the discovery record to indicate TAMT made those determinations <u>*at the time of removal*</u>. In fact, Christine Holst-Haley's above statement indicates TAMT indeed did not believe its now-purported categorizations of concern.

Beyond Christine Holst-Haley's statements, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

These findings were made at the time of Plaintiff's removal and starkly contradict Notre Dame's now-proffered "concerns" about Plaintiff sufficient to remove him from the school. It is worth noting this evidence *strongly* rebutting Notre Dame's proffered justifications was discovered only

*after* the District Judge permitted Plaintiff's Americans with Disabilities Act ("ADA") and Rehabilitation Act claims to proceed at the January 24, 2025 hearing.

## II. Notre Dame Improperly Substitutes in its own Factual Allegations as a Framework for the Scope of Discovery.

And of course, the dubious nature of Notre Dame's after-the-fact justifications for removing Plaintiff are centrally relevant to this litigation. This is particularly true because Notre Dame's premise in opposing Plaintiff's Motion to Compel is that there is no similarly situated female who fits these categorizations. But these categories are Notre Dame's own conclusions after the fact for its actions—not factual findings sufficient to narrow the scope of discovery.

***The scope of discovery is properly the allegations in the Sec. Am. Compl.—not Notre Dame's counterarguments.*** *See Arcangelo, Inc. v. DirectBuy, Inc.*, No. 3:13-CV-104-PPS-JEM, 2015 WL 5148513, at *3 (N.D. Ind. Sept. 2, 2015) (quoting that "[A] party is entitled to seek discovery on its theory of the facts and the law, and is not limited in discovery by the opponent's theory.") (citation omitted) (Martin, Mag. J.).

If this Court were to restrict discovery to the categories of "alleged harm to self," "alleged harm to others," and "ability to access weapon," it would necessarily be making a factual finding that Notre Dame sincerely believed those categorizations (1) at all; and (2) sufficiently to justify Plaintiff's removal. Such a factual finding is improper for this Court—especially in light of the mounting contrary evidence—particularly from Notre Dame's *own administrator* and decisionmaker at Plaintiff's TAMT removal, Christine Holst-Haley. Dkt 118-1 (Exhibit 3). Plaintiff agreed to Notre Dame conducting searches along those categories as a concession to get *some* document production—not on the belief that Notre Dame sincerely believes its after-the-fact, drawn-into-litigation justifications, especially regarding Plaintiff.

Notre Dame in conjunction with framing the lawsuit in terms of its own version of facts it *wishes* had happened, also misstates the standard of relevancy. Notre Dame believes that in order for information regarding patterns of anti-male bias to be relevant, Plaintiff "must *first* put forward some affirmative evidence he was treated less favorably than a similarly situated female student would have been." Dkt. 132 at 7 (emphasis added). This is simply incorrect under law. "Relevancy is 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'" *Martinez v. Coloplast Corp.*, No. 2:18-CV-220-JTM-JEM, 2021 WL 486927, at *1 (N.D. Ind. Feb. 10, 2021) (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)) (Martin, Mag. J.). There is no evidentiary-hearing or evidentiary-threshold requirement for discovery relevance when the issues on which information is sought are the core of the Sec. Am. Compl.

Certainly, Notre Dame's pretextual justifications for removing Plaintiff and how often Notre Dame treats males worse than females based on similar allegations are at issue in this case.

**III.     Notre Dame Accuses this Court of Legal Holdings that it has not held.**

Notre Dame also puts words into the District Judge's mouth by stating that "this Court found at the preliminary injunction hearing [that] Notre Dame clearly had more than adequate grounds, objectively speaking, to take the action it took against Mr. Daniels." Dkt. 132 at 6. Notre Dame is accusing the District Judge of making a determination of no-liability at the preliminary-injunction hearing when all the preliminary-injunction hearing found was that Plaintiff did not yet have sufficient evidence to fulfill the high bar of a preliminary injunction.

*The preliminary-injunction hearing was held before **any** discovery on the Title IX, ADA, or Rehabilitation Act claims*. Meaning, Notre Dame cannot say the District Judge found that the Title IX discovery materials exonerated Notre Dame of wrongdoing and therefore its actions were

5

justified because those materials *were not available* to this Court or Plaintiff then. Further, Notre Dame is accusing this Court of either subtly overruling District Judge Miller's Order on the Motion to Dismiss or itself acting as the factfinder. Both would be wholly inappropriate for this Court, and neither has this Court actually done. In the most respectful way, it is ironic Plaintiff's suit is premised on Notre Dame accusing Plaintiff of things *he* did not do, and Notre Dame's strategy is to accuse this Court of things *it* did not do.

Notre Dame also attempts to redefine this Court's legal instruction regarding Plaintiff's Title IX claim. Notre Dame *mocks* District Judge Simon's statement that we have a "full blown Title IX claim" and instead interprets Plaintiff's only available theory of relief as "a straightforward case of 'selective enforcement.'" Dkt. 132 at 6. This is starkly at odds with what the District Judge stated explicitly by clarifying the broad discoverable scope of a "full blown Title IX claim." Plaintiff will present multiple Title IX theories to the jury based on the already-gathered evidence—those are for *Plaintiff* to decide after discovery, not Notre Dame to decide *in* discovery. Certainly, many of them, as the Seventh Circuit has recognized in *Purdue*, will include evidence of patterns of anti-male bias at Notre Dame.

**IV.     Notre Dame Represents Factual Errors to this Court Regarding the to-date Discovered Evidence of Direct Discrimination, of Which There is Plenty.**

Notre Dame further reimagines the factual background here in an attempt to distinguish *Purdue*: "Nor is there any evidence that Notre Dame chose to reflexively credit a female accuser's account of events over a male accused, as was alleged in *Purdue*." Dkt. 132 at 7.

Notre Dame is factually incorrect—the discovery record here has already made clear that Notre Dame acted exactly the same way as Purdue. To be sure, however, Notre Dame is attempting to turn a Motion to Compel into a pseudo summary-judgment/evidentiary hearing which is wholly improper. However, even doing so, Notre Dame does not prevail. The *Purdue Univ.* Court found,

6

*as a matter of law*, "the strongest [fact of direct discrimination] being that [the removal decisionmaker] chose to credit Jane's account without hearing directly from her," "credit[ing] Jane based on her accusation alone," and administrators "ma[king] up their minds . . . before even talking to [the accused]" was sufficient for the issue of direct discrimination based on sex to be put before a jury. *Doe v. Purdue Univ.*, 928 F.3d 652, 669–70 (7th Cir. 2019).

Here, discovery has shown Notre Dame did the exact same thing. Notre Dame did not gather statements directly from Plaintiff's accuser but was rather briefed through an investigative report compiled by NDPD. Dkt. 52 Stebbins Decl. ¶ 30 ("I [an NDPD officer] typed up the summaries of my interviews with [the student parties]. . . ."); Dkt. 52 Stebbins Decl. ¶ 7 (admitting the people interviewed were all referred to NDPD *by Jane Roe*); Dkt. 52 Seamon Decl. ¶ 14 ("TAMT was provided information from NDPD") (stating there were no direct communications with accusers).

Additionally, Christine Holst-Haley, who was present at the TAMT meeting and provided information for TAMT to make a decision regarding Plaintiff, admitted that she had presumed the allegations against Plaintiff as true at the time of removal. Dkt. 118-1 (Exhibit 3). It is also undisputed that Plaintiff's removal decision was made final before anyone spoke to Plaintiff. Dkt. 52 Seamon Decl. ¶ 18–19 (TAMT voted to remove Plaintiff on November 4, 2021, NDPD spoke to Plaintiff only on November 5, 2021). In conclusion, it is undisputed that the behaviors identified by the *Purdue Univ.* Court as a matter of law constituting evidence of direct discrimination to warrant jury factfinding are present in this case.

Notre Dame further attempts to mislead this Court by stating that "here there is no evidence of any disparate treatment." Dkt. 132 at 7. Aside from the evidence just stated in regard to the TAMT process, there is further evidence in the conduct-review process. This Court has recognized

7

that if "Jane Doe, a female, violated various Notre Dame policies . . . and Notre Dame treated her violations differently than Mr. Daniels's violations because she is female" then that is clearly violative of Title IX. Dkt. 47 at 10. Here, *that* disparate treatment is also not in dispute. To be clear once again, Notre Dame found that Plaintiff violated Notre Dame's conduct policy by "agree[ing] to not communicate in the future, however reflexively argued that he could not promise not to accidentally say hello." Dkt. 118-1 (Exhibit 1). This was Plaintiff's sole conduct violation.

For Plaintiff, a <u>*male*</u>, saying he may *accidentally* say hello to a woman is a <u>*conduct violation*</u>. For Jane Roe, a *female*, Plaintiff's allegations when, "[c]ritically, both Daniels and Jane Roe agreed on the substance of their communication" that Jane Roe "ha[d] repeated interjected herself into my conversations with friends in private settings, called me a liar in a legally cognizable defamatory manner in aforementioned contexts, and physically prohibited me from my walkway in the Law Library until she was able to coerce me into saying what she wanted. I informed her I have no don't [sic] want to be friends with her and that she should not impede my walkway, interrupt my interactions with friends, or defame me to third parties-all of which she has done" <u>*somehow do not equal a policy violation*</u>. Dkt. 52 Ryan Decl. ¶ 34, 11.

Plaintiff *asked* Heather Ryan, the Director of the Office of Student Conduct, about how Notre Dame would use a seemingly broad policy that let Notre Dame pick and choose what it found violative. Heather Ryan tried to assuage Plaintiff's concerns that "there's a difference between discomfort and safety," and policy violations turned on the latter. **Exhibit 2**. Female Jane Roe can repeatedly physically impede and harass Plaintiff because that's only "discomfort," but male Plaintiff saying he won't say hi to her is a *safety* concern. This is patently disparate treatment, and Notre Dame's double standards for what constitutes a conduct violation for males and females is direct discrimination against Plaintiff.

8

Notre Dame also did not pursue a conduct violation against Jane Roe when Jane Roe willfully omitted interactions she had with Plaintiff that cast Jane Roe in a negative light. It was not until Heather Ryan spoke to Plaintiff that she learned about them, and only after Heather Ryan spoke to Jane Roe in April of 2022 did the conduct office hear of Jane Roe's omitted aggressions toward Plaintiff. Dkt. 52 Ryan Decl. ¶ 23–29.

If for some reason this Court wants to keep the disparate-treatment/direct-discrimination question narrowed to TAMT interactions, however, the facts also favor Plaintiff. Notre Dame argues that there are no similarly situated persons to Plaintiff because "*zero* female students met *all three* criteria"—referring to Notre Dame's conclusory, after-the-fact, and likely untruthful justifications of "harm to self," "harm to others," and "ability to access weapon." Dkt. 132 at 5. As covered in Section II of this Reply, using those categories requires a factual finding that Notre Dame actually viewed Plaintiff by these categories. Notre Dame has offered no evidence to that effect, Plaintiff has offered evidence from Notre Dame's own administrators rebutting Notre Dame's claim, and therefore the proper scope of relevancy is governed by the factual allegations of the Sec. Am. Compl.—not Notre Dame's wishlist.

Even if this Court, in an improper factual finding, buys Notre Dame's categorizations limiting who counts as a similarly situated person from Notre Dame's perspective, those facts *still* favor Plaintiff. Notre Dame claims *zero* female students investigated by TAMT were alleged to be a harm to themselves, a harm to others, and have access to weapons or the ability to inflict harm. Dkt. 132 at 5. This is simply untrue. It is further untrue that those qualities are what define "similarly situated," but that issue is appropriate for a motion for summary judgment or its opposition.

9

████████████████████████████████████████

████████████████████████████████████ **Exhibit 3**. ████████████

████████████████████████████████████

████████████████████. **Exhibit 1**. ████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████.

████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████. **Exhibit 4**. ████████████████████████████████. For male Plaintiff? Notre Dame fabricated the theory that Plaintiff *could* be a danger, even though no student *actually* alleged any threats by Plaintiff, and Notre Dame's UCC found ████████████████, and was summarily removed from Notre Dame. Plaintiff submitted to evaluation at Memorial Epworth under threat by NDPD to prejudice Plaintiff's removal appeal, was found by multiple psychiatrists to have no mental-health problems, and Plaintiff still was not permitted at Notre Dame either through his appeal process in November, 2021 or via readmission in summer 2024.

Per TAMT records, ████████████████████████

████████████████████████████████████

████████████████████. **Exhibit 5**. ████████████

Plaintiff, male, owned one handgun and one inoperable single-shot shotgun which Notre Dame

found Plaintiff legally and responsibly owned and did not bring onto campus. Dkt. 52 Ryan Decl. ¶ 33. ███████████████████████████████████████████████████████

███████████████████████, and per Christine Holst-Haley was known at the time of Plaintiff's removal that Plaintiff had made *no* threats of violence. Dkt. 118-1 (Exhibit 2); **Exhibit 1**; Dkt. 118-1 (Exhibit 3). Male Plaintiff, however, was removed from school.

Notre Dame also fails to recognize that the Department of Education's 2020 Guidance applies here. That is so because Jane Roe filed a "formal complaint"—a written document alleging sexual harassment and either investigated in some capacity or signed by a Title IX Coordinator. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 FR 30026-01 at 30126–27. There is no dispute Plaintiff filed a formal complaint against Jane Roe and that Jane Roe filed a complaint against him. Dkt. 52 Oliver Decl. ¶ 9.

Filing of a formal complaint "trigger[s] the initiation of a grievance process" and all regulatory protections associated with it. *Id.* at 30126. Among the protective requirements are:

- "respondents [] face disciplinary sanctions ***only after*** a fair process determines responsibility";
- The University "objectively evaluates all relevant evidence both inculpatory *and exculpatory*, and ensures that rules voluntarily adopted by a recipient treat the parties equally";
- "Title IX Coordinators, investigators, decision-makers, and persons who facilitate informal resolutions to be free from conflicts of interest and bias and trained to serve impartially ***without prejudging the facts at issue***";
- The University "***presumes the non-responsibility of respondents until conclusion of the grievance process***"; and
- The University "includes reasonably prompt time frames for the grievance process."

*Id.* at 30053 (emphases added). Here, there is no dispute these protections were not afforded to Plaintiff. Notre Dame instead argues it had a good reason to remove Plaintiff. The point of the regulations is to prevent hasty decision-making, and given that Plaintiff was cleared of all

11

meaningful wrongdoing based solely on the persuasiveness and evidence of *his* statement, which Notre Dame had access to at the time of his removal, it seems Notre Dame intentionally subverted the regulations to reach an anti-male outcome.

The regulations contemplate balancing protections for accused parties and assuring safety when there are concerns (discovery has shown it is highly doubtful there actually were in Plaintiff's case). In order to emergency remove a student once there is a formal complaint and the respective regulatory-protective process in place, a university must "undertake[] an *individualized* safety and risk analysis." 34 C.F.R. § 106.44. As alleged in the Sec. Am. Compl., and is undisputed, the decision to remove Plaintiff was made prior anyone speaking to Plaintiff or hearing his side (which ultimately exonerated him). Dkt. 52 Seamon Decl. ¶ 18–19 (TAMT voted to remove Plaintiff on November 4, 2021, NDPD spoke to Plaintiff only on November 5, 2021). That can hardly be "an individualized safety and risk analysis" and is clear direct discrimination.

Notre Dame's characterization of who *it* thinks is and is not similarly situated is unpersuasive and as a matter of law is not permitted to reframe the facts alleged in the Sec. Am. Compl., the scope of discovery, or who Plaintiff can use as a female comparator before a jury. As such, there is ample evidence to support Plaintiff's contentions of direct discrimination sufficient to satisfy Notre Dame's completely fabricated standard that Plaintiff "must *first* put forward some affirmative evidence he was treated less favorably than a similarly situated female student would have been" in order to discover patterns of anti-male bias. Dkt. 132 at 7.

### V. Evidence of how Notre Dame has Historically Discriminated Against Males, Particularly when There are Adverse Removal Actions with Overwhelming Contrary Evidence as in Plaintiff's case, is Proportional to the needs of this case.

As a touchstone reminder—Notre Dame does not dispute that the TAMT records of *females* are relevant and proportional to this case. Notre Dame is therefore asking this Court to draw a distinction of relevance and proportionality along the line of sex.

The first manner in which Notre Dame argues justifies treating the records of males different than the records of females is that "[a] third party can easily identify the subject of, for example, a dated TAMT record that describes a person's public behavior or other known crisis." Dkt. 132 at 9. This is not unique to males. The "public behavior" aspect is also by definition what TAMT investigates. Every single student TAMT case is a matter of students exhibiting public behaviors that TAMT investigates and decides whether to issue removal recommendations (all of which are *always* enacted, so a recommendations is functionally the removal itself).

This Court has at its access here the TAMT records of the *female* students that Notre Dame agrees have relevant and proportional significance to this case. The Court can see for itself that the nature of these reports are public behaviors and that even in Notre Dame's opinion, its redaction (responsive to the Protective Order) is sufficient to de-identify at least *female* students.

FERPA's protection of situational PII that is not a name, address, or social-security number is clearly stated.

> (f) Other information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty; or

34 C.F.R. § 99.3. The protection is for information that would link reasonable people in the school community—*without personal knowledge*—with the specific person in question. Meaning, to the

13

extent Notre Dame believes "high profile" figures will be identifiable because of the already-known *publicity* of these "high profile" figures being reported on, § 99.3(f) does not apply.

In a case against Ohio State, the plaintiff sought redacted documents concerning any sexual misconduct investigations at the university from 2010 to the then-present (2015). *See Doe v. Ohio State Univ.*, No. 15-2830, 2015 WL 6082606, at *1 (S.D. Ohio Oct. 16, 2015). The court rejected the university's overbreadth argument and ordered the production of documents. *Id.* at *2. The court concluded that, "if The Ohio State University has a pattern and practice that treats males unfairly in sexual misconduct investigations, then the school has a significant problem in this litigation. Determining whether such a problem exists necessitates looking at the data and the context surrounding that data." *Id.*

Here, once again, Notre Dame does not dispute that the TAMT records of female students are proportional and safe to disclose for FERPA purposes. Notre Dame argues that "[i]f a student's previous mental health crisis, even if resolved, is made public available, that student may encounter, for example, strained personal relationships or difficulty with employment." Dkt. 132 at 10. Notre Dame admits throughout its supplemental responses that it feels completely comfortable because of the standing protective order that *female* students' records are appropriately protected. Dkt. 127 (throughout). It is entirely unclear how *male* students would be treated any differently than *female* students, whose records Notre Dame has willingly disclosed.

One possible explanation is that in reviewing *all* of the records before offering the females' records to Plaintiff, Notre Dame found something in the males' records that was not good for it. However, that does not make the records of male students investigated by TAMT undiscoverable.

Lastly, this Court has already weighed in on how to appropriately protect students and their information—"they can be anonymized, of course." **Exhibit 6** (February 2, 2024, Hearing

14

Transcript 6:21–7:3). That is precisely what Notre Dame up to this point (and at the point of the February 2, 2024, hearing) has done, and it has not yet created any issues. "[W]e operate in a public sphere, not in a 'star chamber' kind of sense." *Id.*

## CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that this Court (i) compel Notre Dame to produce documents responsive to Supplemental Request for Production No. 1 and the accompanying summarization of such information responsive to Supplemental Request for Production No. 2 and (ii) grant such other relief as the Court deems just and proper.

Date: March 24, 2025              Respectfully submitted,

                                  _____
                                  Bryce Thomas Daniels
                                  5505 Seminary Rd.
                                  Unit #317N
                                  Falls Church, VA 22041
                                  Tel: 214.909.2108
                                  bryced@sas.upenn.edu

                                  *Plaintiff pro se*

15

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2025, I sent via USPS Express Certified Mail the foregoing document to be filed with the clerk of court and via email to the following counsel of record:

STEPHEN M. JUDGE
SOUTHBANK LEGAL
100 E Wayne Street, Suite 300
South Bend, IN 46601
Tel: 574-968-0760
sjudge@southbank.legal

*Attorney for the University of Notre Dame*

                                                                         _____
                                                                         Bryce Thomas Daniels

                                                                         *Plaintiff pro se*