# Exhibit 13

Note date - 10/4/21

Created by CHOLST

I got a call from Community Standards letting me know that Bryce missed a required
COVID surveillance test and needed to meet with OCS to address it. He has been
resistent to meeting and been demanding in his communication with OCS. OCS is going to
list me as a point of contact for Bryce if he wants to discuss the conduct process in
more detail and how it does (and doesn't) affect his time at NDLS. I told OCS that was
fine with me and thanks for the heads up.


Note date - 11/4/21

Created by CHOLST

I recieved information from Stella Miller and Amber Monroe in Title IX about a pending
Title IX case that has been started against Bryce. The allegations were made by
another 1L student, who contacted NDPD.

CONFIDENTIAL

DEF0000159

# Exhibit 14



| UNIVERSITY OF NOTRE DAME | **POLICY ON DISCRIMINATORY HARASSMENT, SEXUAL HARASSMENT, AND OTHER SEX-BASED MISCONDUCT** | Responsible Executive: Provost, Vice President of Human Resources, Vice President for Student Affairs Responsible Office: Office of Institutional Equity Issued: November 19, 2013 Revised: August 13, 2020 |
|---|---|---|

## 1. INTRODUCTION

The University of Notre Dame strives to maintain a community characterized by a respect for others. At a minimum, this means a community that is free from harassment. Harassment includes Discriminatory Harassment, Sexual Harassment, and Other Sex-Based Misconduct, as defined below. At Notre Dame, our goal is to promote respectful behavior and interactions. Our culture of respect means that no type of harassment is tolerated. Upon receiving a report of alleged violations of this Policy, the University will take prompt action, including a review of the matter and, where appropriate, an investigation and other appropriate action to stop the alleged misconduct. The University is also dedicated to responding quickly and thoroughly to all reported or alleged violations of this Policy, and to enforcing the Non-Retaliation Policy to protect those who report and/or are involved in an investigation of conduct prohibited by this Policy.

## 2. POLICY STATEMENT

The University of Notre Dame does not tolerate Discriminatory Harassment, Sexual Harassment, or Other Sex-Based Misconduct (as defined in this Policy) by or against any member of its community, nor will it tolerate sexual or discriminatory harassing conduct that affects job or educational benefits or that interferes with an individual's work or academic performance, or that creates an intimidating, hostile, or offensive work or educational environment. All such conduct is expressly prohibited, and individuals who engage in conduct prohibited by this Policy may be subject to disciplinary action, up to and including termination or dismissal.

## 3. SCOPE

This Policy applies to all faculty, staff, and students. This Policy applies to any allegation of Discriminatory Harassment, Sexual Harassment, or Other Sex-Based Misconduct that is made in the context of an educational program or activity or that otherwise affects the University's work or educational environment. However, the University's investigation may be limited where the alleged conduct occurred outside the context of the University's programs or activities, or work or educational environment.

Nothing in this Policy restricts the University's right to address and take appropriate action with respect to conduct that, while not meeting the definitions of conduct prohibited by this Policy, is nevertheless inconsistent with the University's value of respect for others.

Academic freedom and the associated protections of tenure are fundamental to the scholarly enterprise. Because the University remains committed to the principles of academic freedom as articulated in Article IV/Section 2/Academic Freedom and Associated Responsibilities of

Faculty, protections of academic freedom will be considered in any applications of this Policy. Vigorous discussion and debate are fundamental to the University and this policy is not intended to stifle teaching or research methods or infringe upon academic freedom.

## 4. RESPONSIBLE PARTY

The Assistant Vice President of the Office of Institutional Equity (or designee) is responsible for implementing and monitoring compliance with this Policy on behalf of the University. This includes coordination of training, education, communications and administration of the reporting and response procedures concerning suspected or alleged violations of this Policy.

Any inquiries regarding conduct prohibited by this Policy may be directed to the Assistant Vice President of the Office of Institutional Equity / Title IX Coordinator:

Assistant Vice President, Office of Institutional Equity & Title IX Coordinator
100 Grace Hall
University of Notre Dame
Notre Dame, IN 46556
574-631-0444
equity@nd.edu

Some types of harassment and related misconduct may be criminal in nature and can also be reported to the Notre Dame Police Department, 911 (emergencies) or 574-631-5555 (non-emergencies).

## 5. DEFINITIONS

| | |
|---|---|
| **Complainant** | An individual who is alleged to have been directly affected by a violation of this Policy. |
| **Consent** | Informed, freely given agreement, communicated by clearly understandable words or actions, to participate in each form of sexual activity. Consent cannot be inferred from silence, passivity, or lack of active resistance. A current or previous dating or sexual relationship is not sufficient to constitute consent, and consent to one form of sexual activity does not imply consent to other forms of sexual activity. By definition, there is no consent when there is a threat of force or violence or any other form of coercion or intimidation, physical or psychological. A person who is the object of sexual aggression is not required to physically or otherwise resist the aggressor; sexual contact without informed, freely given consent is sexual misconduct. There is no consent when the individual in question is under the legal age of consent. The legal age of consent in Indiana is 16.<br><br>Intoxication is not an excuse for failure to obtain consent. |
| **Formal Complaint** | A document filed by a complainant or signed by the Title IX |

| | Coordinator alleging Sexual Harassment against a respondent and requesting that the University investigate the allegation. |
|---|---|
| **Incapacitation** | A physical or mental state such that a person lacks the ability to make a knowing and deliberate choice to engage in the sexual interaction. For the purposes of this Policy, a person who is asleep or unconscious is incapacitated, without exception. A person may also become incapacitated due to other factors, which may include the use of alcohol and/or drugs to such a degree that the person no longer has the ability to make a knowing or deliberate choice to engage in the sexual interaction. Engaging in sexual activity with a person whom you know, or should reasonably know, to be incapacitated constitutes a violation. If there is a question about whether the complainant was incapacitated, the relevant standard is whether the respondent knew, or a sober, reasonable person in the respondent's position should have known, that the complainant was incapacitated and therefore could not consent to the sexual activity. |
| **Respondent** | An individual who is alleged to have violated this Policy. |

## 6. DISCRIMINATORY HARASSMENT

**Discriminatory Harassment** is (1) unwelcome conduct (2) that is based on an individual's or group's race, color, national origin, ethnicity, religion, genetic information, age, disability, or veteran status and (3) that interferes with performance, limits participation in University activities, or creates an intimidating, hostile, or offensive University environment when viewed from the perspective of both the individual and a reasonable person in the same situation.

Discriminatory Harassment may include the following types of misconduct, when such misconduct concerns one or more of the characteristics listed above:
- Verbal abuse, slurs, derogatory comments or insults about, directed at or made in the presence of an individual or group.
- Display or circulation of written materials or pictures that are offensive or degrading.
- Damage to, trespass on or unauthorized use of property, such as spraying or scratching of a motor vehicle, damage or theft of property.
- Physical contact, or threatening language or behavior.
- Other conduct that interferes with an individual's performance; limits participation in University activities; or otherwise creates an intimidating, hostile, or offensive University environment.

## 7. SEXUAL HARASSMENT

**Sexual Harassment** as defined and prohibited in this Policy includes conduct on the basis of sex that satisfies one or more of the following:
- An employee or agent of the University conditioning the provision of an aid, benefit, or service on an individual's participation in unwelcome sexual conduct.
- Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education program or activity.

- Sexual Assault, which is defined as any sexual intercourse by any person upon another without Consent. It includes oral, anal and vaginal intercourse or penetration, to any degree, with any part of the body or other object. It is also referred to as "non-consensual sexual intercourse."
- Fondling, which is defined as touching of the private body parts (*i.e.*, genitals, buttocks, and/or breasts) of another person for the purpose of sexual gratification, without Consent.
- Incest, which is defined as sexual intercourse between persons who are related to each other within the degrees wherein marriage is prohibited by law.
- Dating Violence, which is defined as physical violence or the threat of physical violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with an individual, and the existence of such a relationship shall be determined based on factors such as the length and type of relationship, and frequency of interaction between the persons involved.
- Domestic Violence, which is defined as physical violence or the threat of physical violence committed by a current or former spouse or intimate partner of an individual, by a person with whom the individual shares a child in common, by a person who is cohabiting with or has cohabitated with the individual as a spouse or intimate partner, by a person similarly situated to a spouse of the individual under applicable domestic or family violence laws.
- Stalking, which is knowingly or intentionally engaging in a course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to fear for his or her safety or the safety of others or suffer substantial emotional distress.

## 8. OTHER SEX-BASED MISCONDUCT

**Other Sex-Based Misconduct** may include, but is not limited to, any of the offenses listed below.

- Any sexual touching with any part of the body or other object, however slight, by any person upon another, without Consent.
- Unwelcome conduct that is either based on an individual's or group's sex, sexual orientation, or gender identity, or that is sexual in nature, and that interferes with performance, limits participation in University activities, or creates an intimidating, hostile, or offensive University environment when viewed from the perspective of both the individual and a reasonable person in the same situation.
- Exposing one's own or another person's private parts without Consent.
- Recording video or audio, photographing, disseminating, or transmitting intimate or sexual utterances, sounds or images without Consent of all parties involved.
- Allowing others to view sexual acts (whether in person, through electronic means, or via a video camera or other recording device) without the Consent of all parties involved.
- Engaging in any form of voyeurism.
- Sex-based cyber-harassment.
- Prostitution or the solicitation of a prostitute.

To the extent that alleged conduct is prohibited as Sexual Harassment as defined above, such conduct is excluded from the prohibition on Other Sex-Based Misconduct.

## 9. REPORTING AND RESPONSE PROCEDURES FOR VIOLATIONS OF THIS POLICY

This Policy seeks to encourage all members of the Notre Dame community to report and address incidents of Discriminatory Harassment, Sexual Harassment, and Other Sexual Misconduct. The Procedures for Resolving Allegations of Discriminatory Harassment, Sexual Harassment, and Other Sexual Misconduct as issued and updated by the Office of Institutional Equity, describe the necessary steps for resolving concerns of violations of this Policy.

All University community members are expected to provide truthful information. If an investigation reveals that an individual has provided deliberately false information and/or made an accusation in bad faith or with a view to personal gain or to intentionally harm another in connection with an incident, disciplinary action may be taken. This provision does not apply to information provided in good faith, even if the facts alleged are not later substantiated.

## 10. CONTACTS

| Subject | Office or Position | Telephone Number | Office Email or URL |
|---|---|---|---|
| Policy Clarification | Office of Institutional Equity | 574-631-0444 | equity@nd.edu |
| Web Address for this Policy | | http://policy.nd.edu | |

# Exhibit 15



**UNIVERSITY OF
NOTRE DAME**

**Procedures for Resolving
Concerns of
Discriminatory Harassment,
Sexual Harassment, and
Other Sex-Based Misconduct**

Updated 11.04.20

## 1. INTRODUCTION

The University of Notre Dame strives to maintain a community characterized by a respect for others. At a minimum, this means a community that is free from harassment. The University's Policy on Discriminatory Harassment, Sexual Harassment, and Other Sex-Based Misconduct ("the Policy") outlines various forms of prohibited conduct. The University will process potential violations of the Policy by University students and employees (including faculty and staff members) in accordance with the reporting and response procedures set forth below.

Section 2 outlines generally applicable procedures that pertain to Sexual Harassment, Discriminatory Harassment, and Other Sex-Based Misconduct. Section 3 describes the procedures applicable for Alternative Resolution, which, under certain circumstances, may be available to address allegations of Sexual Harassment, Discriminatory Harassment, and Other Sex-Based Misconduct. The procedures applicable to claims of conduct constituting Sexual Harassment under the Policy are outlined below in Section 4. The procedures applicable to claims of Discriminatory Harassment and Other Sex-Based Misconduct under the Policy for student Respondents are outlined below in Section 5.A. The procedures applicable to claims of Discriminatory Harassment and Other Sex-Based Misconduct under the Policy for staff and faculty Respondents are outlined below in Section 5.B.

Any changes to this procedures document will take immediate effect and will be applicable to all pending cases.

## 2. PROCEDURES THAT APPLY GENERALLY

### A. How to Report Violations of the Policy

#### 1. Reporting to the University

The University encourages its students, faculty, and staff to report all violations of the Policy. The University is committed to eliminating misconduct, and to do so, the University must be informed of any conduct that violates the Policy. Any person may report conduct prohibited by the Policy, in person, by mail, by telephone, by email, or by online form to the Office of Institutional Equity using the contact information listed below or by any other means that results in the Office of Institutional Equity receiving the person's report. A person may make a report at any time, including during non-business hours.

You may report to the Office of Institutional Equity by calling 574-631-0444, emailing equity@nd.edu, or using the online incident reporting form at speakup.nd.edu.

The University has designated the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator, to handle all inquiries regarding its efforts to comply with and carry out its responsibilities under Title IX and other laws pertaining to equal opportunity and access. This includes the handling of alleged violations of the Policy by University students, faculty, or staff. The Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator may be contacted as follows:

> Erin N. Oliver
> Assistant Vice President, Office of Institutional Equity & Title IX Coordinator
> 100 Grace Hall
> University of Notre Dame
> Notre Dame, IN 46556
> 574-631-0444
> equity@nd.edu

## 2. Reporting to Law Enforcement

In addition to reporting violations to the University, an individual has the option to pursue a criminal complaint with an appropriate law enforcement agency. In such cases, Complainants may (a) notify proper law enforcement authorities, including on-campus and local police (as described below); (b) be assisted by campus authorities in notifying law enforcement authorities if the Complainant so chooses; or (c) decline to notify law enforcement authorities. The University encourages members of the University community to report all violations of the Policy. If the incident occurred on Notre Dame property, the Notre Dame Police Department, a duly authorized police agency in the state of Indiana, is an appropriate agency with which to file a report. On-campus incidents may also be reported to the St. Joseph County Police Department. In the South Bend area, the local law enforcement agencies include the South Bend, St. Joseph County, and Mishawaka police departments. The Notre Dame Police Department (911 from a campus phone, or 574-631-5555 from a cell phone) can assist with contacting the appropriate agency. Reported violations of the Policy allegedly committed by a student, faculty, or staff member that are reported to the Notre Dame Police Department will also be referred to the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee), who will follow-up and investigate as appropriate. Similarly, where the University receives a report from another police agency of an alleged violation of the Policy, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) and the Notre Dame Police Department will follow-up and investigate as appropriate. The University's process and procedures are distinct from the criminal investigation as a result of the University's obligation under Title IX and other laws pertaining to equal opportunity and access to ensure that it is providing an environment free from discrimination for all members of the University community.

If a Complainant wishes to pursue a criminal complaint, the Complainant may choose to temporarily defer the University's administrative investigation by making a formal written request to the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee), which may temporarily delay the investigation and the University's ability to respond. However, the University may choose not to defer its investigation and procedures, where it determines a deferral would be inappropriate, taking into consideration the University's obligation to maintain an environment free from Sexual Harassment,

Discriminatory Harassment, and Other Sex-Based Misconduct. At any time, the Complainant may choose to rescind the deferral by making a formal written request to the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee), electing to resume the University's investigation. The University will maintain documentation of the date of deferral. Information obtained through the criminal investigation may be considered in the University's investigation. Where the University is aware that an individual is pursuing a criminal complaint, a member of the Notre Dame Police Department will request that the St. Joseph County Prosecutor's Office keep the University informed and immediately advise of its decision whether to prosecute the complaint. The University will maintain documentation of the date of the request to the Prosecutor's Office. In cases where the Prosecutor's Office declines prosecution, a member of the Notre Dame Police Department will work with the Prosecutor's Office to notify the Complainant of the Prosecutor's decision.

In addition to having the option of pursuing a criminal complaint, a Complainant may also have the option of exploring whether he or she might be entitled to an order of protection, restraining order, or other similar orders issued by a criminal or civil court. For more information about such orders, including the University's responsibilities concerning such orders, members of the University community should contact the Notre Dame Police Department or the Family Justice Center of St. Joseph County.

### B. Group Accountability

In addition to investigating and addressing behavior of individuals, the University reserves the right to investigate and hold accountable the collective behavior of groups of individuals, including but not limited to student clubs, organizations, teams, and residential communities.

### C. Confidential Resources and Information About Privacy

#### 1. Confidentiality

Notre Dame recognizes that confidentiality is important. Breaches of confidentiality compromise the University's ability to investigate and resolve claims of Policy violations. Notre Dame will attempt to protect the confidentiality of the process to the extent reasonably possible. Investigators, mediators, members of Hearing Boards or Equity Panels, and any others participating in the process on behalf of the University shall keep the information obtained through the process confidential. All other participants in the process (including the Complainant, Respondent, Advisors, and witnesses) are encouraged to respect the confidentiality of the proceedings and circumstances giving rise to the dispute and to discuss the matter only with those persons who have a genuine need to know.

While Notre Dame is committed to respecting the confidentiality of all parties involved in the process, it cannot guarantee complete confidentiality. Examples of situations in which confidentiality cannot be maintained include:

- When the University is required by law to disclose information (such as in response to a subpoena or court order);
- When disclosure of information is determined by the Office of Institutional Equity and/or the department necessary for conducting an effective investigation of the claim; and

- When confidentiality concerns are outweighed by the University's interest in protecting the safety or rights of others.

### 2. Confidential Resources

If a student, staff, or faculty member wishes the details of an incident to be kept confidential, the student, staff, or faculty member can speak with:

- Counselors, including at the University Counseling Center and Wellness Center;
- Health providers, such as University Health Services and local hospitals;
- Off-campus rape crisis resources, such as S-O-S, the rape crisis center for St. Joseph County; and
- Vowed religious (priests, deacons, and religious sisters and brothers) working within Campus Ministry and who are operating in that role.

These individuals will honor confidentiality unless there is an imminent danger to the person involved or to others. In addition, disclosure during the Sacrament of Reconciliation (confession) will not be revealed by the priest for any reason, which is a sacred obligation protected by law.

### 3. Parameters of Privacy and Confidentiality for Investigations; Mandatory Reporting Obligation

In all instances and to the extent possible, the University will protect the privacy of all parties to a report of Sexual Harassment, Discriminatory Harassment, and Other Sex-Based Misconduct. That said, with the exception of those Confidential Resources listed above, all University employees, including faculty and staff, are considered mandatory reporters. Employees who receive information about any suspected or potential Sexual Harassment, Discriminatory Harassment, and Other Sex-Based Misconduct, whether from the student, faculty, or staff involved or from a third party, must report the information to the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee).

Employees may provide support and assistance to a Complainant, witness, or Respondent; but, mandatory reporters cannot promise confidentiality or withhold information about Sexual Harassment, Discriminatory Harassment, and Other Sex-Based Misconduct.

### 4. Parameters of Privacy and Confidentiality Related to Crime Alerts Issued by the University

In an effort to provide timely notice to the Notre Dame community, and in the event of a serious crime that occurs on campus and poses a serious, ongoing threat to members of the Notre Dame community, a mass email Crime Alert will be sent to all students, faculty, and staff on campus and is posted on the Notre Dame Police Department website, and may also be posted in residence halls and various other buildings on campus. Crime Alerts and any updates will be drafted and disseminated in a way that protects the confidentiality of Complainants. Such alerts and updates shall not include identifying information about the Complainant in any publicly-available recordkeeping to the extent permitted by law.

### D. Availability of Counseling, Medical and Pastoral Resources

#### 1. Counseling Resources

##### a. *Resources Available to Students, Faculty, and Staff*

The Family Justice Center of St. Joseph County (fjcsjc.org) is a collaboration of civil, legal, medical, and social services which supports individuals affected by domestic violence. The Family Justice Center can be reached by calling 574-234-6900 and its office is located at 533 North Niles Avenue in South Bend. S-O-S of the Family Justice Center (fjcsjc.org/sos) is staffed by trained professionals and volunteer advocates who are available 24 hours a day. The staff can provide confidential counseling and recovery services, as well as support and information about communication with the police, family and friends. S-O-S Volunteer Advocates provide emotional support and information on the phone and in person at area hospital Emergency Departments around the clock. Specially trained professionals offer confidential counseling, group therapy, information, and referrals. The S-O-S Advocate acts as a liaison between the individual and the legal process, and can accompany the individual to court, if desired. The 24-hour telephone number for the S-O-S is 574-289-4357.

The Rape, Abuse and Incest National Network (RAINN) (rainn.org) is an anti-sexual violence organization that partners with more than 1,100 local rape crisis centers across the country. Among its programs, RAINN has two resources available globally: (1) the National Sexual Assault Online Hotline (https://ohl.rainn.org/online/), a secure web-based hotline that provides live and confidential help through an interface similar to instant messaging; and (2) the National Sexual Assault Hotline (800-656-HOPE), which provides free, confidential services 24 hours a day, seven days a week.

##### b. *Additional Resources Available to Faculty and Staff*

LifeWorks, the Employee Assistance Program for Notre Dame, provides referrals to professionals who provide confidential counseling and support on a wide range of issues. The service is available 24 hours a day, seven days a week, and can be reached at 888-267-8126 or online at https://www3.nd.edu/~hr/lifeworks/eap.shtml.

##### c. *Additional Resources Available to Students*

The University Counseling Center, which is staffed by trained professionals and counselors, offers specialized support and assistance. Current students may seek counseling at any time, even years after the incident.  The confidential services of the UCC are available to any student who may need support or assistance.  The Counseling Center can be reached at 574-631- 7336 (24 hours). In addition, a Walk-In Crisis Service is available to students in Saint Liam Hall, Monday-Friday, 9 a.m. – 5 p.m. For further information, go to ucc.nd.edu.

#### 2. Medical Resources

It is especially important for individuals who have been sexually assaulted or subjected to other Sexual Harassment, Discriminatory Harassment, or Other Sex-Based Misconduct that involves

physical contact to seek immediate and appropriate medical treatment. Such treatment is also important to preserve evidence in the event the individual later files criminal charges, or seeks to obtain an order of protection. The two hospitals in the South Bend area are St. Joseph Regional Medical Center (sjmed.com) and Memorial Hospital (qualityoflife.org). While both hospitals offer emergency care and evidence collection, St. Joseph has a specially trained sexual assault team available 24 hours a day, seven days a week. Under Indiana law, the tests and procedures at the hospitals are free of charge if treatment is sought within 120 hours of the assault. The evidence gathered in this examination will be maintained by the hospital and will not be provided to the police unless the individual reports the assault to the police. Any decision about whether or not to talk to the police is up to the individual.

Faculty and staff may visit the Notre Dame Wellness Center (574-634-9355), which is equipped to provide confidential and professional medical care to faculty and staff. Students may visit University Health Services, which is open 24 hours a day during the academic year and is equipped to provide confidential and professional medical care to students. University Health Services can be reached in Saint Liam Hall, 574-631-7567. While the Notre Dame Wellness Center and University Health Services staff are unable to perform procedures related to the collection of evidence for the purposes of pursuing criminal prosecution, they can provide assistance and support when an individual requests or requires transportation to the hospital.

### 3. Pastoral Resources

Vowed religious (priests, deacons, and religious sisters and brothers) working within Campus Ministry and who are operating in that role are confidential resources. In addition, an individual's disclosure during the sacrament of confession will not be revealed by the priest for any reason, which is a sacred obligation protected by law. Campus Ministry can be reached at 574-631-7800 or at campusministry.nd.edu.

## E. Direct Communication With the Alleged Offender in Cases That Do Not Involve Sexual Harassment

In cases involving Discriminatory Harassment or Other Sex-Based Misconduct, the impacted party may speak directly with the alleged offending person to address his or her concerns and obtain an appropriate resolution, if he or she feels comfortable doing so. Sometimes, an effective manner of addressing offensive behavior is to politely and calmly advise the person, verbally or in writing, that his or her behavior or language is offensive and unwelcome, and to request that the person stop uttering such words or engaging in such behavior.

While this approach may be effective to eliminate the offensive behavior, individuals who choose to address the alleged offender directly must also promptly report the offensive behavior to the Office of Institutional Equity, which will direct the report as appropriate. Such reporting will enable the University to decide whether there is an impact to the community (such as egregious conduct or a pattern of inappropriate behavior) that warrants University to take steps to maintain a respectful environment free from harassment. An individual who directly addresses his or her concerns with the alleged offending person must also notify the Office of Institutional Equity if they did not obtain a satisfactory outcome through their discussions.

## F. Supportive Measures

The following information is provided to encourage reporting to the University of conduct prohibited by the Policy. Following receipt of a report, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) will promptly and confidentially contact the Complainant to discuss the supportive measures available and will consider the Complainant's wishes with regard to those supportive measures.

### 1. Interim Measures

The University offers a wide range of resources for Complainants and Respondents, to provide support and guidance throughout the initiation, investigation, and resolution of a report under the Policy. Upon receipt of a report, the University may take interim measures to address concerns regarding safety and well-being and to facilitate the parties' continued access to University programs and activities. These measures may be remedial and/or protective (designed to address safety and well-being and continued access to employment and educational opportunities). Interim measures, which may be temporary or permanent, may include no-contact directives, changes in class or work schedules, academic modifications and support, changes in University-owned living arrangements, or any other reasonably available measures that the University deems appropriate. Interim measures are available under all resolution processes and may be implemented prior to the initiation of the process. Interim measures will be administered by the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee). The University will maintain the confidentiality of any interim measures provided, to the extent practicable, and will promptly address any violation of interim measures.

The University encourages reporting of violations of interim measures as soon as possible. Individuals may report such violations in accordance with the reporting procedures outlined in Section 2.A.1, above. Upon receiving a report of any violations of the terms of Interim Measures, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) will review the information to determine the appropriate means to address the alleged behavior. An individual found responsible for violating an Interim Measure may be subject to Sanctions, as defined in Section 4 below.

### 2. No Contact Orders

When the name of a Respondent has been identified, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) will, where appropriate, issue No Contact Orders to both the Respondent and the Complainant.

Unless otherwise stated in writing, a Complainant or Respondent who is issued a No Contact Order by the University may not have contact, either directly, indirectly, or through third parties, with specific individuals for a specified period of time. "Third parties" include friends, family, attorneys, and other individuals acting on behalf of a Complainant or Respondent who has been issued a No Contact Order. "Contact" includes, but is not limited to, email, social media, instant messaging, text messaging, phone calls, voicemail, or direct visits. Unintentional contact and contact as outlined below in Section IV is not considered a violation of the No Contact Order.

The University encourages reporting of violations of No Contact Orders as soon as possible. Individuals may report such violations in accordance with the reporting procedures outlined in Section 2.A.1, above. Upon receiving a report of any violations of the terms of No Contact

USDC IN/ND case 3:22-cv-00698-GSL document 164-2 filed 01/09/26 page 17 of 155

USDC IN/ND case 3:22-cv-00698-RLM-JEM document 21-5 filed 11/08/22 page 9 of 32

Orders, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) will review the information to determine the appropriate means to address the alleged behavior. An individual found responsible for violating a No Contact Order may be subject to Sanctions, as defined in Section 4 below.

No Contact Orders are separate and distinct from court-administered actions such as protective orders and restraining orders. Questions about court-administered actions should be directed to local law enforcement.

### 3. Assignment of a Resource Coordinator

After a report of Sexual Harassment is received by the Assistant Vice President of the Office of Institutional Equity (or designee), a Complainant will be offered a Resource Coordinator ("RC"). If a report identifies the name of a Respondent, a RC will also be offered to the Respondent. RCs are trained Notre Dame employees who will serve as resource persons to the Complainant and Respondent to identify, explain, and navigate University processes and available support services. This can include referrals to counseling, educational support, pastoral care, and medical treatment, and information about University and legal processes.

### G. Retaliation

The University strongly encourages the reporting of any incident of Sexual Harassment, Discriminatory Harassment, or Other Sex-Based Misconduct and takes such reports very seriously. Any actual or threatened retaliation will be addressed by the University pursuant to its Non-Retaliation Policy. Students, faculty, and staff are encouraged to report concerns about retaliation to the Office of Institutional Equity as soon as possible.

### 1. Addressing Student Concerns About Other Violations

At times, students are hesitant to report misconduct to University officials because they are concerned that they themselves, or witnesses to the misconduct, may be found responsible for other policy violations (e.g, parietals or alcohol violations). These behaviors are not condoned by the University, but the importance of addressing Sexual Harassment, Discriminatory Harassment, and Other Sex-Based Misconduct outweighs the University's interest in addressing lesser violations. Accordingly, in these cases, the University will not refer reporting and participating students to the University Conduct Process to address lesser policy violations (e.g. parietals or alcohol violations).

Students who feel unsafe in a residence hall after parietals should leave the hall, regardless of the time, without concern for a parietals violation. A student will not be found responsible for a violation of the University's undergraduate residence hall visitation (parietals) policy if the violation is related to an incident of Sexual Harassment, Discriminatory Harassment, or Other Sex-Based Misconduct.

### H. Administrative Leave, Emergency Removal, and Information About Student Respondent's Enrollment, Transcript, and Degree

In cases involving a student or staff Respondent, the University may, after undertaking an individualized safety and risk analysis and determining that there is an immediate threat to the

Procedures for Resolving Concerns of Discriminatory Harassment, Sexual Harassment and
Other Sex-Based Misconduct

Page 8

physical health or safety of any individual arising from the allegations of sexual harassment justifies removal, remove a Respondent on an emergency basis from participating in some or all University activities. After any such removal, the Respondent will have an opportunity to challenge the decision. The University may place a non-student staff Respondent on administrative leave, pending any investigation under this Policy.

In cases involving a faculty Respondent, the faculty Respondent member may be removed consistent with the procedures under the Academic Articles.

Generally, in cases involving a student Respondent, the student Respondent may not withdraw or take a leave of absence from the University after the University receives a report of an alleged violation of the Policy. The University reserves the right to proceed with an appropriate resolution process regardless of a Respondent's request for a withdrawal or for a leave of absence from the University. At any time, the University may place an administrative hold on the Respondent's University academic transcript, make a transcript notification, or withhold the award of the Respondent's degree. In cases where the University permits a Respondent to withdraw from the University after receiving a report of an alleged violation of University policy (including while the resolution process is pending), this withdrawal may be considered permanent and the Respondent's academic transcript may be held or noted "withdrawal pending investigation." Even if a Respondent withdraws from the University, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) may decide to proceed with a resolution process. At the conclusion of a resolution process, the Respondent's transcript will be updated with the appropriate notation or removal of notation as prescribed by the University's Conduct Records Reporting Policy.

## I. Requests for Anonymity and/or No University Resolution Process

In the event that a Complainant requests anonymity or requests that a matter not be referred to the Sexual Harassment Procedures or Procedures for Discriminatory Harassment and Other Sex-Based Misconduct, or to Alternative Resolution, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) will make a determination about whether the request can be granted. The decision will be based on a review of factors, including, but not limited to, patterns of behavior involving the Respondent, a group of individuals, and/or a specific location; threats of future sexual or other violence by the Respondent; the use of a weapon; whether the Complainant is a minor; and/or other risks to the University community.

If a Complainant request that a matter not be referred to the Sexual Harassment Procedures or the Procedures for Discriminatory Harassment and Other Sex-Based Misconduct, or to Alternative Resolution, and the University agrees to such request, the Complainant will be notified in writing that he/she has six months from the date of the decision of the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) to request that the matter be referred back to a formal process.

If the University is able to agree to a Complainant's request for anonymity, the University's ability to meaningfully investigate the incident or impose Sanctions on the alleged Respondent(s) may be limited.

In some cases, based on this review, the University may not be able to agree to the Complainant's request in order to adhere to its obligation to provide a safe, non-discriminatory environment. If the University determines that it is unable to agree to a Complainant's request that a matter not be referred to a process outlined in these procedures, the Complainant will be notified in writing prior to the commencement of any formal process.

If the University is unable to agree to a Complainant's request for anonymity, the Complainant will be notified in writing prior to the University initiating a resolution process and the University will, to the extent possible, share information only with people responsible for handling the University's response.

### J. Initial Assessment

After receiving a report of Sexual Harassment, Discriminatory Harassment, or Other Sex-Based Misconduct, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) will gather information about the reported conduct and respond to any immediate health or safety concerns.

The Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee), and where appropriate a Student Affairs administrator, will also assess the nature and circumstances of the report to determine whether the reported conduct is within the scope of the Policy, whether the reported conduct raises a potential Policy violation, and the appropriate manner of resolution under these procedures. This will include, when possible, a discussion of the Complainant's expressed preference for manner of resolution and any barriers to proceeding. It will also take into consideration the University's obligation to maintain an environment free from harassment.

At the conclusion of the initial assessment:

- If the report alleges conduct that falls within the Policy, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) will inform the Complainant of what processes are available and the applicable procedures; or
- If the report does not fall within the Policy, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) will refer the report to an appropriate entity to address the concerns or close the matter.

Depending on the content alleged in the report, the matter may be handled through the Sexual Harassment Procedures or the Procedures for Discriminatory Harassment and Other Sex-Based Misconduct. In either situation, it is possible that Alternative Resolution, described in Section 3 below, may also be available.

### 1. Consolidation of Reports

The Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) has the discretion to consolidate or separate multiple reports of Discriminatory Harassment, Other Sex-Based Misconduct, or Formal Complaints of Sexual Harassment into a single Investigation or multiple Investigations, where the allegations of a Policy violation arise out of the same facts or circumstances. Consolidation might involve multiple Complainants and

a single Respondent, multiple Respondents, and/or conduct that is temporally or logically connected. Consolidation may occur under the Sexual Harassment Procedures and the Procedures for Discriminatory Harassment and Other Sex-Based Misconduct.

Where the University receives a report of alleged Sexual Harassment, along with additional report(s) of alleged Discriminatory Harassment or Other Sex-Based Misconduct, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) also has the discretion to determine whether or not to investigate and resolve the report(s) of alleged Discriminatory Harassment or Other Sex-Based Misconduct in consolidation with the alleged Sexual Harassment pursuant to the Sexual Harassment Procedures.

## 2. Moving to or from Different Procedures

If, during the course of a proceeding under the Sexual Harassment Procedures, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) determines that the conduct alleged does not constitute Sexual Harassment under the Policy or if the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) otherwise determines that the Sexual Harassment Procedures are inapplicable, the matter may be referred to the Procedures for Discriminatory Harassment and Other Sex-Based Misconduct.

Similarly, if, during the course of a proceeding under the Procedures for Discriminatory Harassment and Other Sex-Based Misconduct, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) determines that the conduct alleged does constitute Sexual Harassment or otherwise determines that the Sexual Harassment Procedures are applicable, the matter may be referred to the Sexual Harassment Procedures.

Finally, if the requirements for participating in Alternative Resolution are otherwise met, including both parties' agreement to participate in Alternative Resolution, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) may refer the matter from either the Sexual Harassment Procedures or the Procedures for Discriminatory Harassment and Other Sex-Based Misconduct to Alternative Resolution. Likewise, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) may refer a matter from Alternative Resolution to either the Sexual Harassment Procedures or the Procedures for Discriminatory Harassment and Other Sex-Based Misconduct, if applicable.

## 3. ALTERNATIVE RESOLUTION

Alternative Resolution is a voluntary, remedies-based, and educational process that is designed to allow a Respondent to accept responsibility for repairing harm and acknowledge harm to the Complainant or to the University community. The goal of Alternative Resolution is to address allegations of harmful and/or prohibited conduct, identify ways that individuals and/or the community have been impacted, and develop a resolution to address the impact and prevent future behavior.

### A. Circumstances When Alternative Resolution May Be Appropriate

Alternative Resolution may be available under either the Sexual Harassment Procedures or the Procedures for Discriminatory Harassment and Other Sex-Based Misconduct. Alternative Resolution, however, may not be appropriate for all forms of alleged Policy violations, and the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) retains the discretion to determine which cases are or are not appropriate for Alternative Resolution.

Alternative Resolution is available only after the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) reviews the matter to confirm that it would be appropriate for Alternative Resolution.

Alternative Resolution may be used only with the voluntary, informed consent of both parties. Before obtaining such consent, the University will notify the parties of the allegations at issue and the requirements of Alternative Resolution, including any limitations on pursuing a resolution under either the Formal Proceedings of the Sexual Harassment Procedures or the Procedures for Discriminatory Harassment and Other Sex-Based Misconduct.

At any time prior to agreeing to a resolution in Alternative Resolution, either a Complainant or a Respondent may request to end Alternative Resolution and proceed under either the Formal Proceedings of the Sexual Harassment Procedures or the Procedures for Discriminatory Harassment and Other Sex-Based Misconduct, as applicable.

Alternative Resolution may also only be conducted under the supervision of University-sanctioned, trained professionals, and following a determination by the University that the matter at hand is appropriate for a restorative approach.

Alternative Resolution is not available to resolve allegations that an employee engaged in Sexual Harassment against a student.

In cases involving allegations of Sexual Harassment, Alternative Resolution is not available without the filing of a Formal Complaint.

### B. Forms of Alternative Resolution

Alternative Resolution may include, but is not limited to, one or more of the following approaches:

- Mediation: A facilitated conversation between two or more individuals, most often the Complainant, the Respondent, and/or other community members. Depending on stated interests, the participants may sometimes work towards the development of a shared agreement, although working towards an agreement is not always the intended outcome.
- Indirect Mediation: An indirect conversation individually with the Complainant, the Respondent, and/or other participants to discuss experiences and perspectives and explore interests while working towards meeting expressed needs. This process does not require direct interaction between the parties or the parties and other participants, but rather, independently, with a facilitator. In some cases, such as alleged sexual assaults, mediation will not be appropriate, even on a voluntary basis.

- Restorative Conference: A facilitated interaction where the individuals who have been impacted can come together with an individual(s) who assumes responsibility for addressing the impact (to the extent possible). A conference may include multiple members of the community to explore individual and community impact, harm, obligations, and opportunity for repairing them.
- Accountability Conference: A facilitated interaction between the Respondent and University faculty and/or staff designed to provide accountability, structured support, and the development of a learning plan. The focus is to balance support and accountability for an individual who has acknowledged their obligation to address impact and willingness to engage in an educational process.

Depending on the form of Alternative Resolution, it may be possible for a Complainant to maintain anonymity in Alternative Resolution.

Additional measures that may be agreed to as a result of Alternative Resolution may include:

- Educational programming and/or training;
- Regular meetings with an appropriate University individual, unit, or resource;
- Extension of a No Contact Order;
- Restriction from participation in facets of the work or educational environment;
- Restriction from participation in particular events;
- Completion of an educational plan with regular meetings with a conversation partner or other appropriate University staff or faculty member;
- Completion of a development plan with oversight from Human Resources or a supervisor, as appropriate;
- Commitment to regular conversations with Human Resources or a supervisor, as appropriate; and/or
- Counseling sessions.

### C. Alternative Resolution Agreements

Some forms of Alternative Resolution will result in a written agreement. Any agreements reached in Alternative Resolution must be approved by the Assistant Vice President of Institutional Equity and Title IX Coordinator (or designee).

If the Assistant Vice President of Institutional Equity and Title IX Coordinator (or designee) approves an agreement after the parties have voluntarily reached consensus as to its terms, the Respondent will be required to comply with the agreement. Failure to comply with the agreement may result in the matter being referred to the Sexual Harassment Procedures or the Procedures for Discriminatory Harassment and Other Sex-Based Misconduct.

### D. Referral Back to Other Procedures

If, for any reason, no resolution is reached, the matter may be referred to the Assistant Vice President of Institutional Equity and Title IX Coordinator (or designee) for further action under the Sexual Harassment Procedures or the Procedures for Discriminatory Harassment and Other Sex-Based Misconduct.

### E. Timing

The University will seek to complete Alternative Resolution within sixty calendar days following the decision to proceed with Alternative Resolution. The sixty calendar-day timeframe does not typically include academic break periods and may be affected by holidays or other extenuating circumstances. The University reserves the right to reasonably modify Alternative Resolution on a case-by-case basis due to the scope or complexity of the facts and circumstances at issue, or due to other extenuating circumstances. The University may extend any timeframe in this policy for good cause, including extension beyond sixty calendar days. Any modifications will be communicated to both parties.

## 4. SEXUAL HARASSMENT PROCEDURES

The Sexual Harassment Procedures apply when the Respondent is a student, staff, or faculty member at the University at the time of the alleged conduct and where the conduct alleged includes Sexual Harassment under the Policy.

Following the Initial Assessment, Alternative Resolution may be available in cases alleging Sexual Harassment. In such cases, prior to engaging in Alternative Resolution, the University will provide both parties with written notice of the allegations, explain the requirements and consequences of Alternative Resolution, and obtain both parties voluntary and written consent to participate in Alternative Resolution.

### A. Formal Complaint Requirement for Sexual Harassment Procedures

At the conclusion of the initial assessment, if the report alleges conduct that falls within the prohibition on Sexual Harassment in the Policy, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) will inform the Complainant that in order to proceed under the Sexual Harassment Procedures, a Formal Complaint, as defined in the Policy, is required.

The University will conduct an Investigation under the Sexual Harassment Procedures only upon the filing of a Formal Complaint alleging Sexual Harassment. A Formal Complaint may be initiated by only the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator or a Complainant participating in or attempting to participate in a University education program or activity. A Complainant may file a Formal Complaint in person at the Office of Institutional Equity, by mail at Office of Institutional Equity100 Grace Hall, Notre Dame, IN, 46556, by email at equity@nd.edu, by contacting the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator, or speakup.nd.edu.  When a Complainant submits a Formal Complaint, he or she must include a physical or digital signature to indicate that the Complainant is the person filing the Formal Complaint.

### B. Dismissal of Formal Complaints of Sexual Harassment

The Department of Education requires universities to distinguish between conduct regulated by Title IX and conduct that is not regulated by Title IX but is still prohibited by University policies or codes. Under Title IX, the University must dismiss a Formal Complaint of Sexual

Harassment or the part of the allegations in a Formal Complaint of Sexual Harassment, if applicable, where the conduct alleged:

- would not constitute Sexual Harassment as defined in the Policy;
- did not occur in the University's educational programs or activities; or
- did not occur in the United States.

The University may dismiss a Formal Complaint of Sexual Harassment if:

- a Complainant notifies the Title IX Coordinator in writing that he or she would like to withdraw the Formal Complaint or any allegations therein;
- the Respondent is no longer enrolled or employed by the University; or
- the University is prevented from gathering evidence sufficient to reach a determination.

A dismissal pursuant to Department of Education Title IX Regulations, however, does not prevent the University from investigating the matter under otherwise applicable processes in these Procedures. For example, if alleged Sexual Harassment occurs at an off-campus location (*i.e.*, outside the University's educational programs or activities) or outside of the United States, the University may still investigate the matter under the Sexual Harassment Procedures. Similarly, if alleged conduct does not constitute Sexual Harassment as defined in the Policy, the University may still investigate the matter under the Procedures for Discriminatory Harassment and Other Sex-Based Misconduct.

If the University must dismiss allegations of conduct based upon the determination that the conduct does not fall under one or more provisions of the Policy, the dismissal does not preclude the University from addressing conduct in any manner the University deems appropriate under other University policies.

### C. Notice of Investigation

Upon receipt of a Formal Complaint of Sexual Harassment, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) will provide the Complainant and the Respondent a written Notice of Investigation, containing the following information (if known):

- the conduct allegedly constituting a Policy violation, including the identities of the parties involved in the incident and the date and location of the alleged incident; and
- the alleged Policy violation(s).

This Notice of Investigation will also inform the parties of their rights under the Sexual Harassment Procedures.

If the Investigation reveals the existence of additional or different potential Policy violations, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) will issue a supplemental Notice of Investigation that includes this information.

### D. Formal Proceedings for Sexual Harassment

Where Alternative Resolution is not pursued, a Formal Complaint of Sexual Harassment will go through the Formal Proceedings under the Sexual Harassment Procedures. These Formal Proceedings involve an Investigation and could result in Sanctions against a Respondent. When a Formal Complaint of Sexual Harassment is referred to the Formal Proceedings under the Sexual Harassment Procedures, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) will appoint one or more Investigators to conduct a prompt, thorough, fair, and impartial Investigation.

As stated in Article IV/Section 2 of the University's Academic Articles regarding Academic Freedom, freedom of inquiry and freedom of expression are safeguarded by the University. The rights and obligations of academic freedom take diverse forms for the faculty, the students, and the administration; in general, however, these freedoms derive from the nature of the academic life and accord with the objectives of the University as a community that pursues the highest scholarly standards, promotes intellectual and spiritual growth, maintains respect for individuals as persons, and advances the Catholic mission. Specific principles of academic freedom supported at the University include: freedom to teach and to learn according to one's obligation, vision, and training; freedom to publish the results of one's study or research; and freedom to speak and write on public issues as a citizen.

Nothing in this policy or these procedures shall be construed to restrict academic freedom and the associated protections of tenure, or the University's educational mission. Based on the protections afforded by academic freedom, speech and other expression occurring in the context of instruction or research will not be considered prohibited conduct unless this speech or expression meets the specific definitions of Sexual Harassment, Discriminatory Harassment, or Other Sex-Based Misconduct. The University is committed to the free and vigorous discussion of ideas and issues, which the University believes will be protected by this Policy.

1. Advisors

The Complainant and Respondent will each be permitted to be accompanied by an Advisor of his or her choice at each stage of the Sexual Harassment Procedures in which the party participates. For example, a party may bring his or her Advisor to his or her own Investigation interview and to a Hearing, if one occurs. An Advisor may not appear in the place of either the Complainant or Respondent.

Aside from during the Pre-Hearing Meeting and Hearing, as described below, the Advisor role is nonspeaking. While the Advisor may provide support and advice to the parties before any meeting and/or interview and during breaks in meetings and/or interviews, outside of the hearing Advisors will not be permitted to make comments, pass notes, or otherwise disrupt any part of the Sexual Harassment Procedures process. Advisors who are disruptive during an Investigation meeting and/or interview will be required to leave.

The University will not delay the scheduling of meetings and/or interviews based on the Advisor's unavailability.

With the exception of the Hearing, as described below, the University will communicate directly with the Complainant and Respondent, not through any third party.

If a party does not have an Advisor to accompany him or her at the Hearing, the Title IX Coordinator (or designee) will appoint such an Advisor of the University's choice.

### 2. Investigation

The University will provide a prompt, fair, thorough, and impartial Investigation of the Formal Complaint. Investigations are aimed at gathering all available, relevant evidence in the form of witness interviews and other information. The Investigator(s) appointed by the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) will conduct the Investigation.

The University aims to complete all Investigations within sixty calendar days of the filing of a Formal Complaint. However, there may be some Investigations that cannot be completed within sixty calendar days. In such cases, the University will communicate to the Complainant and Respondent that the Investigation is going to take longer than sixty calendar days and, in doing so, will indicate when the University believes it will complete the Investigation.

In the course of the Investigation, both parties will be afforded an opportunity to provide relevant information, including an opportunity to identify witnesses and provide other relevant evidence. The Investigator will meet separately with the Complainant, Respondent, and other relevant witnesses, if any.

While both parties are encouraged to provide any information they believe may be relevant, evidence about a party's prior sexual conduct is ordinarily not considered relevant. Such information may be relevant in those instances where there was a prior sexual relationship between the parties and the information shared may be relevant to the issue of Consent or where such questions and evidence are offered to prove that someone other than the Respondent committed the conduct alleged. In addition, evidence of a prior consensual dating or sexual relationship between the parties, by itself, does not imply Consent or preclude a finding of sexual misconduct.

The Investigator may also gather or request other relevant information or evidence, when available and appropriate. The Complainant and Respondent will be asked to identify witnesses and provide other relevant information, such as documents, communications, photographs, and other evidence. Both parties are encouraged to provide all relevant information (including witness information) as promptly as possible to facilitate prompt resolution. In the course of the Investigation, information will be shared as necessary with people who need to know, such as Investigators, parties, and witnesses.

### 3. Investigative Report

At the conclusion of the information-gathering portion of the Investigation but before the completion of an Investigative Report, the Investigator will provide hard-copy or electronic access to all evidence obtained as part of the Investigation to both parties (and their respective Advisors, if any) for their review.

The parties will have ten calendar days to review and respond to the evidence. All responses to the evidence must be submitted by the party in writing to the Investigator. Advisors are not

permitted to submit written responses to the evidence on their own or on behalf of the party they are advising. The Investigator will consider all timely responses submitted by a party.

The parties' written responses may provide the following to the Investigator:

- comment or feedback;
- additional information, including identifying additional witnesses; and/or;
- questions for the Investigator to consider asking the other party or witnesses.

Following receipt of the parties' written responses, if any, the Investigators will review all relevant information obtained and may conduct additional interviews with the parties and/or witnesses. The Investigators will then draft an Investigative Report, which will outline each of the allegations that potentially constitutes Sexual Harassment, overview the procedural steps of the Investigation, and fairly summarize the relevant evidence, both inculpatory and exculpatory, obtained during the Investigation.

The parties, along with their respective Advisors, if any, will be provided hard-copy or electronic access to review the Investigative Report and all evidence directly related to the allegation at least ten calendar days prior to the date of the scheduled Hearing. The parties may provide a written response in advance of the Hearing.

### 4. Hearing

Upon receipt of the Investigative Report, the Assistant Vice President for the Office of Institutional Equity and Title IX Coordinator (or designee) will convene a meeting of a Hearing Board. The Hearing Board will conduct a Hearing to determine, by a preponderance of the evidence, whether the Respondent violated any provision of the Policy.

The University will provide at least ten days written notice to Hearing participants (including each party's Advisor, if any, upon the party's signed information release for their Advisor of choice), including the date, time, location, names of all hearing participants.

Prior to the Hearing, members of the Hearing Board shall be provided a copy of the Investigative Report, along with all evidence provided to the parties and all party responses to the Investigative Report, if any.

#### a. *Constituting the Hearing Board*

The Hearing Board will be composed of a Hearing Officer and the individuals specified below, depending on the identity of the Respondent. The Hearing Officer will be selected by the Assistant Vice President for the Office of Institutional Equity and Title IX Coodinator from a standing pool of Hearing Officers nominated annually by the Assistant Vice President for the Office of Institutional Equity and Title IX Coordinator and approved by the Executive Committee of the Academic Council. Students may not serve as members of the Hearing Board.

Where the Respondent is a student, there will be two additional members of the Hearing Board, selected by the Assistant Vice President for the Office of Institutional Equity and Title IX Coordinator (or designee) from a standing pool of Student Hearing Board Committee Members.

The Student Hearing Board Committee Members shall be nominated annually by the Vice President for Student Affairs, in conjunction with the Assistant Vice President for the Office of Institutional Equity and Title IX Coordinator, and appointed by the University President.

Where the Respondent is a staff member, there will be two additional members of the Hearing Board, selected by the Assistant Vice President for the Office of Institutional Equity and Title IX Coordinator (or designee) from a standing pool of Staff Hearing Board Committee Members. The Staff Hearing Board Committee Members shall be nominated annually by the Vice President of Human Resources, in conjunction with the Assistant Vice President for the Office of Institutional Equity and Title IX Coordinator, and appointed by the University President. In cases where the Respondent is a staff member and the Complainant is a student, upon the student's request, the Assistant Vice President for the Office of Institutional Equity and Title IX Coordinator (or designee) will appoint a member of the Student Hearing Board Committee to serve in an advisory role to the Hearing Board.

Where the Respondent is a faculty member, there will be three additional members of the Hearing Board. These members will be the Associate Provost for Faculty Affairs and two tenured faculty members selected by the Academic Council from a standing pool of Faculty Hearing Board Committee Members. The Faculty Hearing Board Committee Members shall consist solely of tenured faculty that do not perform a predominately administrative role for the University, nominated annually by the Executive Committee of the Academic Council, and appointed by the University President. In cases where the Respondent is a faculty member and the Complainant is a student, upon the student's request, the Assistant Vice President for the Office of Institutional Equity and Title IX Coordinator (or designee) will appoint a member of the Student Hearing Board Committee to serve in an advisory role to the Hearing Board.

### b. *Pre-Hearing Meeting*

At least three calendar days before the Hearing, the Hearing Officer will convene a Pre-Hearing Meeting among the parties and, if applicable, their Advisors. Each party must attend the Pre-Hearing Meeting and may be accompanied by his or her Advisor. Advisors will be permitted to participate actively in the Pre-Hearing Meeting. Either party may request alternative arrangements for participating in the Pre-Hearing Meeting that do not require physical proximity to the other party, including participating through electronic means that permit both parties to simultaneously see and hear each other. . The Hearing Officer will set the agenda for the Pre-Hearing Meeting, which may include the following:

- Proceeding structure and logistics, including the process that will be utilized for the presentation of witnesses and evidence
- Stipulations of fact, if any
- Witness lists and order
- Exhibit lists and admissibility
- Relevance of evidence
- Expected length of Hearing and other timing considerations

After the Pre-Hearing Meeting, the Hearing Board will send the parties a written summary of the meeting.

c. *Hearing*

The Hearing is an opportunity for the Complainant and the Respondent to address the Hearing Board in person. The Complainant and the Respondent make opening and closing statements and present relevant witnesses. It is also an opportunity for the Hearing Board to hear directly from the parties and relevant witnesses and to evaluate all relevant evidence obtained during the Investigation. The Hearing Board has the discretion to determine the specific Hearing agenda.

The Complainant and the Respondent will have the opportunity to be present throughout the entire Hearing. Either party may request alternative arrangements for participating in the Hearing that do not require physical proximity to the other party, including participating through electronic means that permit both parties to simultaneously see and hear each other. Should the Complainant or Respondent fail to attend the scheduled Hearing, the Hearing will be held and a determination will be made despite his and/or her absence. If a Complainant, Respondent, or witness does not submit to cross-examination at the Hearing, however, the Hearing Board will not rely on any statement of that party or witness in reaching a determination regarding responsibility.

An excused absence from University obligations, including academic courses, will be provided to parties and witnesses in order to attend the Hearing.

Both the Complainant and the Respondent are provided the opportunity to be heard and respond to any questions of the Hearing Board. The Hearing Board will communicate directly with the Complainant and the Respondent, not through any third party. A representative may not appear in the place of a Complainant or Respondent.

Neither the Complainant nor the Respondent will be permitted to engage in direct communication with each other before, during, or immediately after the Hearing.

d. *Role of Advisors in Hearing*

Both the Complainant and the Respondent may have an Advisor of choice present at the Hearing. If a party does not have an Advisor for the live hearing, the University will provide an Advisor of its choice to conduct cross-examination on behalf of that party. Advisors are not permitted to actively participate in the Hearing, except for communicating with the Hearing Officer about evidentiary or procedural issues and asking questions of the other party and any witnesses as described below.

e. *Evidence and Questioning*

***Access to Evidence.*** The Hearing Board will make all relevant evidence obtained as part of the Investigation that is directly related to the allegations raised in the Formal Complaint available at the Hearing and will give each party equal opportunity to refer to such evidence.

***Privileged Information.*** No person will be required to disclose information protected under a legally recognized privilege. The Hearing Officer will not allow into evidence or rely upon any questions or evidence that may require or seek disclosure of such information, unless the person holding the privilege has waived the privilege.

**Evidence and Other Procedural Matters.** At the Hearing, the Hearing Officer will rule on all procedural and evidentiary matters, including those regarding privilege, relevance, exhibits, and the testimony of Hearing participants. Either a party or an Advisor is permitted to raise such issues with the Hearing Officer.

**Requirement to Participate in Investigation.** There is a presumption that, to be considered in the Hearing, evidence or witness testimony must be part of the Investigation record. The Hearing Board has the sole discretion to permit evidence or testimony that is not part of the Investigation record to be offered in a Hearing if that evidence is relevant and was previously unknown or unavailable.

**Questioning.** The Hearing Officer may, at the Hearing Officer's discretion, ask questions during the Hearing of any party or witness and may be the first person to ask questions of any party or witness. Each party's Advisor may ask the other party and any witnesses relevant questions, including those challenging credibility. A Complainant or Respondent will not be permitted to personally ask questions of the other party or any witnesses that participate in the Hearing. Advisors may ask questions under the following procedure: The Advisor will ask a question of the applicable participant. If the Hearing Officer determines the Advisor's question is not relevant to the allegations in the Formal Complaint, then the Hearing Officer must explain any decision to exclude a question as not relevant. If the Hearing Officer allows the question as relevant, the participant will be expected to answer it.

**Cross-Examination.** If a party or witness does not submit to cross-examination at the Hearing, the Hearing Board will not rely on any statement of that party or witness in reaching a determination regarding responsibility. The Hearing Board, will not, however, draw an inference about the determination regarding responsibility based solely on a party's or witness's absence from the live hearing or their refusal to answer cross-examination questions or other questions.

      f. *Recording*

Proceedings will be recorded by the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) and may not be recorded by anyone other than the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee). The recording will be preserved for at least seven years after the conclusion of the Proceeding or as long as necessary to provide evidence should the matter be referred to legal processes.

      5. Determination and Sanctions

Following the Hearing, the Hearing Board will make a written determination as to whether, based on a preponderance of evidence, a violation of the Policy has occurred and which Sanctions, if any, shall be assigned. The Hearing Board will provide its written determination to the parties simultaneously.

The written determination will include a description of the allegations potentially constituting Sexual Harassment, findings of fact supporting the determination, conclusions applying the University's Policy to the facts, the rationale for the Hearing Board's determinations, and any opposing or additional considerations.

The Respondent in the Sexual Harassment Procedures is presumed to be not responsible. This presumption may be overcome only after a Hearing where the Hearing Board concludes that the Respondent violated University policy, based on a preponderance of the evidence (*i.e.*, whether it is more likely than not a violation occurred). The Hearing Board should strive, if possible, to arrive at a unanimous decision.

Where there is a finding of responsibility for a violation of the Policy, the Hearing Board may assign one or more Sanctions, as described below. In assigning Sanctions, the Hearing Board may consider the Respondent's past disciplinary or conduct issues, if any, which will be provided by the relevant University department. In cases where a faculty member is the Respondent, only previous findings of responsibility of Sexual Harassment by the Respondent may be considered.

The assignment of Sanctions is designed to eliminate Sexual Harassment, prevent its recurrence, and remedy its effects, while supporting the University's educational mission.

Sanctions may be assigned individually or in combination. Sanctions may include, but are not limited to, the following:

- Counseling or Education
- Verbal or Written Reprimand
- Written Warning
- Participation in an University Program or Activity
- Restorative Justice Conference
- Alcohol Assessment or Education
- Substance Abuse Treatment
- Psychological Assessment
- Ban from Campus or Specific Location(s) on Campus
- Additional Sanctions for Student Respondents
    - Loss of Extra-Curricular Privileges
    - Loss of Specific Privileges within a Residential Community
    - Loss of Opportunity to Live in Campus Housing
    - No Contact Order
    - Student Disciplinary Action
        - *Disciplinary Probation*: Defined as a specified period of observation and evaluation of a student's conduct. Any violation of University or residence hall policy committed by a student on Disciplinary Probation is a serious violation and could result in dismissal from the University. A student placed on Disciplinary Probation may not participate in an international study abroad program or any other off-site University academic program during the period of probation.
        - *Dismissal with the Opportunity to Apply for Readmission*: A separation from the University which provides the student an opportunity to apply for readmission after a specified period of time and after meeting all conditions specified at the time of dismissal. An application to the University is required to seek readmission and readmission is not guaranteed. The University

reserves the right to consider in its sole discretion, as a part of a student's application for readmission, any unresolved and/or additional reports of alleged misconduct.
- *Permanent Dismissal*: A permanent separation from the University with no opportunity for readmission.
- Additional Sanctions for Faculty and Staff Respondents
    - Transfer or Reassignment to another department, position, or schedule
    - Change of Duties and/or Responsibilities
    - Loss of Opportunity for Merit Increase
    - Removal from Positions of Leadership
    - Loss of Employment Privileges
    - Faculty and Staff Corrective Action
        - Suspension
        - Demotion, including Demotion in Academic Rank
        - Revocation of Tenure
        - Termination from Employment
        - Reduction of Individual Salary or Pay

In cases where the Respondent is a tenured faculty member, and in consideration of academic freedom and the associated protections of tenure referenced in Section 4.D above, if a Sanction selected by the Hearing Board constitutes a "Severe Sanction" (as defined by the Academic Articles), the Hearing Board must make a determination that the specific Severe Sanction selected is proportionate to the misconduct for which the tenured faculty member was found responsible.

Independent of any Sanctions, the University may also take the appropriate remedial measures to protect the Complainant. The remedial measures may include the provision of counseling, training, educational programming, accommodations, and other assistance as appropriate.

6. Appeals

Within ten calendar days of being informed of the University's full or partial dismissal of a Formal Complaint or a determination regarding responsibility by a Hearing Board, either a Complainant or a Respondent may request an appeal from by filing a written Request for Appeal.

Third parties may not file a Request for Appeal on behalf of a Respondent or a Complainant. Failure to submit a Request for Appeal within the time specified will render the University's dismissal or the Hearing Board's determination regarding responsibility final and conclusive. Unless otherwise stated, if a Request for Appeal is filed, the University's dismissal or the Hearing Board's determination will not become effective until the appeal process is complete.

An Appeal Coordinator appointed by the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) will administer the appeal process. The University will aim to resolve the appeal process within a reasonably prompt timeframe.

A Complainant and/or a Respondent must establish one or more of the following grounds for review:

- A procedural irregularity that affected the outcome of matter. The Complainant's or Respondent's Request for Appeal must describe the procedural irregularity in detail and explain how it affected the outcome of the matter.

- New evidence that was not reasonably available at the time of the determination of responsibility or the dismissal, which could affect the outcome of the matter. The Complainant's or Respondent's Request for Appeal must describe the new evidence in detail, explain why the evidence was not available prior to the dismissal or determination, and explain how it affected the outcome of the matter. Complainants or Respondents who fail to participate in the Investigation or Hearing process generally will be deemed to have waived the opportunity to present witnesses and relevant information on their own behalf. Such Complainants or Respondents generally will be deemed to have waived the opportunity to present "new evidence" through the appeal process.

- The Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee), Investigator(s), or Hearing Board member(s) had a conflict of interest and/or bias for or against Complainants or Respondents generally, or against the individual Complainant or Respondent, that affected the outcome of the matter.

- The assigned Sanction does not fall within the range of appropriate Sanctions.

To the extent that any of the foregoing grounds require an evidentiary determination, the standard of evidence shall be a preponderance of the evidence.


Requests for Appeal are screened by the Appeal Coordinator. Requests for Appeal that are not submitted by the communicated deadline, or that do not include required information concerning the specified ground(s) for review, may be denied by the Appeal Coordinator. A Complainant's or a Respondent's Request for Appeal that is submitted within the communicated deadline and that includes the required information concerning the ground(s) for review will be forwarded by the Appeal Coordinator to the other party and to the Hearing Board. The other party will have the opportunity to provide a written response to the Request for Appeal. The other party's response must be submitted within seven calendar days of receipt of the notice of the Request for Appeal. The Hearing Board will also have the opportunity to provide a written response to the Request for Appeal.

The Appeal Coordinator will then forward the Request for Appeal, any responses from the other party and/or the Hearing Board, and the case file to one of the following individuals, who will decide the appeal:

- for student Respondents, the Vice President for Student Affairs (or designee);
- for staff Respondents, the Vice President for Human Resources (or designee); and
- for faculty Respondents, a three-member advisory panel will provide a recommendation to the Provost (or designee). The panel will consist of three tenured faculty who are elected members of the Academic Council, excluding anyone who was a member of the Hearing Board. The advisory panel will forward its recommendation to the Provost (or designee). The Provost or designee will provide a recommendation to the President, to make the decision on the appeal.

The Appeal decision will be made based on a review of the Complainant's or Respondent's Request for Appeal, the case file and, where applicable, any responses from the other party and/or the Hearing Board.

In cases where a tenured faculty member asserts on appeal that any assigned Sanction that constitutes a Severe Sanction (as defined by the Academic Articles) does not fall within the range of appropriate Sanctions, in consideration of academic freedom and the associated protections of tenure referenced in Section 4.D above, the President must make a determination as to whether the specific Severe Sanction is proportionate to the misconduct for which the tenured faculty member was found responsible.

Upon review, the Vice President for Student Affairs, Vice President for Human Resources, the Provost (or designees), or the President may remand the case for additional formal proceedings, where appropriate.

The outcome of the Appeal will be communicated to the Respondent and the Complainant via written notification. The appeal decision is final and not subject to further review.

## 5. PROCEDURES FOR DISCRIMINATORY HARASSMENT AND OTHER SEX-BASED MISCONDUCT

### A. Student Procedures

In cases where a student (including a student employee) is accused of engaging in Discriminatory Harassment or Other Sex-Based Misconduct under the Policy, the procedures described in this section apply.

#### 1. Initial Assessment

After receiving a report, the Assistant Vice President and Title IX Coordinator (or designee) will gather information about the reported conduct and respond to any immediate health or safety concerns. The Assistant Vice President and Title IX Coordinator (or designee) will assess the nature and circumstances of the report to determine whether the reported conduct is within the scope of this Policy, whether the reported conduct raises a potential Policy violation, and the appropriate manner of resolution under these procedures. This will include, when possible, a discussion of the Complainant's expressed preference for manner of resolution and any barriers to proceeding. It will also take into consideration the University's obligation to maintain an environment free from harassment.

At the conclusion of the initial assessment, the University will either:

- refer the report to the Alternative Resolution process;
- refer the report to the Administrative Review process;
- refer the report to an appropriate entity to address the concerns if the conduct is not within the scope of the policy or does not raise a potential policy violation; and/or
- close the matter.

### 2. Alternative Resolution

Alternative Resolution may be available in cases alleging Discriminatory Harassment or Other Sex-Based Misconduct, so long as the University provides both parties with written notice of the allegations, explains the requirements and consequences of Alternative Resolution, and obtains both parties' voluntary and written consent to participate in Alternative Resolution as described above.

### 3. Administrative Review

Where Alternative Resolution is not pursued and an Initial Assessment determines that an investigative process is appropriate, a report of Discriminatory Harassment or Other Sex-Based Misconduct will go through an Administrative Review. In Administrative Review, the Office of Institutional Equity (or designee) will investigate complaints and determine whether or not a violation of the Policy occurred. A preponderance of the evidence standard (i.e., whether it is more likely than not a violation occurred) will be used to determine the outcome of an Administrative Review, which could result in Sanctions against a Respondent.

#### a. *Support Persons*

Student Complainants and Respondents in an Administrative Review are provided the opportunity to consult with a Support Person of their choosing. The parties may be accompanied by their respective Support Person at any meeting or interview involved in an Administrative Review, but the Support Person's role is non-speaking, and a Support Person who is disruptive may be required to leave. While a Support Person may provide support and advice to the parties before any meeting or interview and during breaks in meetings or investigative interviews, he or she s may not speak on behalf of the parties or otherwise participate in, or in any manner delay, disrupt, or interfere with any meetings or interviews involved in the process.

The University will communicate directly with the Complainant and Respondent throughout an Administrative Review, not through any third party. A representative may not appear in the place of either the Complainant or Respondent.

#### b. *Investigation*

When a report of Discriminatory Harassment or Other Sex-Based Misconduct is referred to an Administrative Review, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) will appoint an Investigator to conduct a prompt, thorough, fair, and impartial Investigation.

During an Investigation, the Investigator will meet separately with the Complainant, Respondent, and relevant witnesses, if any. Witnesses are individuals the Investigator deems to have information relevant to the allegation of a Policy violation. Witnesses may not participate solely to speak about an individual's character.

The Investigator may also gather or request other relevant information or evidence, when available and appropriate. The Complainant and Respondent will be asked to identify witnesses and provide other relevant information, such as documents, communications, photographs, and

other evidence. Both parties are encouraged to provide all relevant information (including witness information) as promptly as possible to facilitate prompt resolution.

After conducting interviews and gathering other relevant information, if any, the Investigator will prepare an Investigative Report. The Investigative Report will summarize relevant information obtained during the Investigation.

The Complainant and the Respondent will be afforded the ability to review the Investigative Report. The Investigator will designate a reasonable time for this review by the parties, not to exceed five calendar days. During the course of this review:

- All documents are property of the University and shall remain in the Office of Institutional Equity; however, the Office of Institutional Equity may provide alternative arrangements to review documents.
- Documents may not be photocopied, photographed, recorded or duplicated.
- Handwritten notes are allowed; cell phones, laptops, and all other electronic/recording devices will be collected.
- An individual participating as a witness may not be present during the review of documents.

### c. *Acceptance of Responsibility*

If, after reviewing the Investigative Report, the Respondent wishes to formally accept responsibility for the alleged Policy violations, the Assistant Vice President for the Office of Institutional Equity and Title IX Coordinator (or designee) may decide, in his or her sole discretion, to recognize the acceptance of responsibility and forego an Equity Panel proceeding. In this situation, the Equity Panel, as described below, will be notified of the acceptance of responsibility, and, in conjunction with the Assistant Vice President for the Office of Institutional Equity and Title IX Coordinator (or designee), may assign one or more Sanctions.

### d. *Determination*

Upon receipt of the Investigative Report, the Assistant Vice President for the Office of Institutional Equity and Title IX Coordinator (or designee) will convene a meeting with and seek advice from a two-member Equity Panel. The members of the Equity Panel will be selected by the Assistant Vice President for the Office of Institutional Equity and Title IX Coordinator (or designee) and will consist of one faculty member and one non-faculty member. The Equity Panel will be selected from a standing pool of members nominated by the Assistant Vice President for the Office of Institutional Equity and Title IX Coordinator (or designee), in conjunction with the Vice President for Student Affairs and the Office of the Provost, and appointed by the University President. Students may not serve as members of the Equity Panel.

Prior to the meeting, members of the Equity Panel shall be furnished with a copy of the Investigative Report and copies of any relevant information obtained by the Investigator(s). At the meeting, the Equity Panel and the Assistant Vice President for the Office of Institutional Equity and Title IX Coordinator (or designee) will be afforded the opportunity to ask questions of the Investigator(s). Upon request, the Complainant and the Respondent will be afforded an opportunity to meet independently with the Assistant Vice President for the Office of

Institutional Equity and Title IX Coordinator (or designee) and the Equity Panel to make a brief statement and to answer any questions that they may have.

The Complainant or Respondent are not required to attend the scheduled meeting, and the meeting will be held and a determination will be made despite a party's absence. If a party chooses to attend the meeting, however, an excused absence from University obligations, including academic courses, will be provided. A representative may not appear in the place of a Complainant or Respondent; however, parties do have the opportunity to have a Support Person of choice present at the meeting. The Support Person's role is non-speaking. The Support Person will not be permitted to make comments, pass notes, or otherwise disrupt the panel proceeding. A Support Person who is disruptive during the Equity Panel proceeding may be required to leave.

Following the meeting with the Equity Panel, the Assistant Vice President for the Office of Institutional Equity and Title IX Coordinator (or designee) shall make a written determination whether a violation of the Policy has occurred.

Where there is a finding of responsibility for a violation of the Policy, the Assistant Vice President for the Office of Institutional Equity and Title IX Coordinator (or designee) may assign one or more Sanctions, as defined in Section IV above. In assigning Sanctions, the Assistant Vice President for the Office of Institutional Equity and Title IX Coordinator (or designee) may, in his or her sole discretion, consult with the Office of Community Standards.

e. *Appeals*

Within ten calendar days of being informed of a determination that results in a determination of not responsible or a Sanction, either a Complainant or a Respondent may request an appeal by filing a written Request for Appeal.

Third parties may not file a Request for Appeal on behalf of a Respondent or a Complainant. Failure to submit a Request for Appeal within the time specified will render the determination final and conclusive. Unless otherwise stated, if a Request for Appeal is filed, the determination will not become effective until the appeal process is complete.

An Appeal Coordinator appointed by the Assistant Vice President for the Office of Institutional Equity and Title IX Coordinator (or designee) will administer the appeal process. The appeal process will generally be resolved in a reasonably prompt timeframe.

A Complainant or a Respondent must establish one or more of the following grounds for review:

- A procedural defect in the Administrative Review that was substantial enough to have changed the determination. The Complainant's or Respondent's request must describe the procedural defect in detail and explain how it was substantial enough to have changed the determination; and/or
- The discovery of substantive new information that was unknown or unavailable to the Complainant or Respondent during the Administrative Review and was substantial enough to have changed the determination. The Complainant's or Respondent's request must describe the newly discovered information in detail, explain why the information

was not available during the Administrative Review, and explain how it was substantial enough to have changed the determination. Complainants or Respondents who fail to participate in the Investigation or Equity Panel meeting generally will be deemed to have waived the opportunity to present "substantive new information" through the Appeal process.

To the extent that any of the foregoing grounds require an evidentiary determination, the standard of evidence shall be a preponderance of the evidence.

The Complainant and/or Respondent may also appeal on the basis that the assigned Sanction does not fall within the range of appropriate Sanctions.

After receiving a Complainant's or a Respondent's Request for Appeal, the Appeal Coordinator will acknowledge receipt to the Complainant or Respondent via written notification. Requests for Appeal are screened by the Appeal Coordinator. Requests for Appeal that are not submitted by the communicated deadline, or that do not include required information concerning the specified ground(s) for review, may be denied by the Appeal Coordinator. Requests for Appeal that are submitted within the communicated deadline and that include the required information concerning the ground(s) for review will be forwarded by the Appeal Coordinator to the other party and the Equity Panel. The other party will have the opportunity to provide a written response to the Request for Appeal. The other party's response must be submitted within seven calendar days of receipt of the notice of the Request for Appeal. The Equity Panel will have the opportunity to provide a response to the Request for Appeal. The Appeal Coordinator will then forward the Request for Appeal, any responses from the other party and/or the Equity Panel, and the case file to the Vice President for Student Affairs (or designee), who will decide the appeal.

The Appeal decision will be made based on a review of the Request for Appeal, the case file and, where applicable, any responses from the other party and/or the Equity Panel.
Upon review, the Vice President for Student Affairs (or designee) may remand the case for additional proceedings, where appropriate.

The outcome of the Appeal will be communicated to the Respondent and the Complainant via written notification. The Appeal decision is final and not subject to further review.

### B. Faculty and Staff Procedures

In cases where a faculty or staff member is accused of engaging in Discriminatory Harassment or Other Sex-Based Misconduct under the Policy, the procedures described in this section apply.

#### 1. Alternative Resolution

Alternative Resolution may be available in cases alleging Discriminatory Harassment or Other Sex-Based Misconduct, so long as the University provides both parties with written notice of the allegations, explains the requirements and consequences of Alternative Resolution, and obtains both parties' voluntary and written consent to participate in Alternative Resolution as described above.

#### 2. Investigation

Where Alternative Resolution is not pursued, and an Initial Assessment determines that an investigative process is appropriate, the Office of Institutional Equity and Title IX Coordinator (or designee) will appoint an Investigator to investigate allegations to determine whether or not a violation of the Policy occurred. The University will provide a prompt, thorough, fair, and impartial investigation and resolution. A preponderance of the evidence standard (i.e., whether it is more likely than not a violation occurred) will be used to determine the outcome of an investigation.

During the course of an Investigation, the University may impose interim measures to protect the integrity of the process and/or to protect the parties, where appropriate. Such interim measures may include, but are not limited to, No Contact Orders and adjustments to work schedules, locations, or assignments. Any interim measures will be administered by the Office of Institutional Equity and Title IX Coordinator (or designee).

### 3. Determination and Sanctions

The University may take the appropriate remedial measures to protect the Complainant and/or to stop any misconduct by faculty or staff members, and may impose any Sanctions, as defined in Section IV above, it deems appropriate. The remedial measures may include, but are not limited to, the provision of counseling, training, educational programming, accommodations, No Contact Orders, and adjustments to work schedules, locations, or assignments.

The University's determination as to whether a violation of the Policy occurred will be communicated to the Complainant and the Respondent in writing. The University will notify the Complainant of any remedial measures or Sanctions imposed that directly relate to the Complainant.

### 4. Appeal

#### a. *Where Respondent is a Staff Member*

In cases involving allegations of Discriminatory Harassment or Other Sex-Based Misconduct against a staff member Respondent, the Complainant or Respondent may request a review of the outcome of the Investigation by submitting a written Request for Appeal to the Vice President of Human Resources within ten calendar days of notification of the outcome of the Investigation. The Request for Appeal must state with specificity acceptable grounds for seeking a review. Acceptable grounds for review are limited to the following: (1) a procedural defect that was substantial enough to have changed the outcome; and/or (2) the discovery of substantive new information that was unknown or unavailable at the time of the investigation and was substantial enough to have changed the outcome. To the extent that the foregoing grounds require an evidentiary determination, the standard of evidence shall be a preponderance of the evidence. Except in cases of Termination from Employment, the severity of the Sanction is not considered a legitimate ground for review. The Vice President of Human Resources (or designee) will provide the parties the University's written response, and this response is final.

#### b. *Where Respondent is a Faculty Member*

In cases involving allegations of Discriminatory Harassment or Other Sex-Based Misconduct against a faculty member Respondent, the Complainant or Respondent may request that the Vice President and Senior Associate Provost review the outcome of the investigation. This request must be in writing or email, must occur within ten calendar days of notification of the outcome of the Investigation, and must state with specificity acceptable grounds for seeking a review. Acceptable grounds are limited to the following: (1) a procedural defect that was substantial enough to have changed the outcome; and/or (2) the discovery of substantive new information that was unknown or unavailable at the time of the Investigation and was substantial enough to have changed the outcome. To the extent that any of the foregoing grounds require an evidentiary determination, the standard of evidence shall be a preponderance of the evidence. The Vice President and Sr. Associate Provost (or designee) will provide a written response to the party seeking a review, and this response is final.

If a Respondent faculty member wishes to appeal the outcome of an Investigation that results in "severe sanctions," as defined in the Academic Articles, that faculty member is entitled to the procedural protections (including the right of appeal) set forth in Article IV, Section 9 of the Academic Articles.

# Exhibit 16
(Ryan Dep.)

**StewartRichardson**
DEPOSITION SERVICES

800 869 0873   www.StewartRichardson.com

1                 UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF INDIANA
2                     SOUTH BEND DIVISION

3

4    BRYCE THOMAS DANIELS,              )
                                        )
5               Plaintiff,              )
                                        )
6          -v-                          )   CASE NO.
                                        )   3:22-CV-00698-PPS-JEM
7    UNIVERSITY OF NOTRE DAME,          )
                                        )
8               Defendant.              )

9
                        CONFIDENTIAL
10

11         The videoconference deposition upon oral

12   examination of HEATHER RYAN, a witness produced and

13   sworn before me, Tina M. Heideman, CSR, Notary Public

14   in and for the County of Porter, State of Indiana,

15   taken on behalf of the Plaintiff on May 30, 2025, at

16   9:59 a.m., pursuant to the Federal Rules of Civil

17   Procedure.

18

19

20

21

22

23
                 STEWART RICHARDSON & ASSOCIATES
24              Registered Professional Reporters
                        (800) 869-0873
25

1                                    APPEARANCES
2                  (All participants via Zoom conference.)

APPEARING PRO SE:
3

4           MR. BRYCE THOMAS DANIELS
            5505 Seminary Road, Unit 317N
5           Falls Church, Virginia 22041
            bryced@sas.upenn.edu

6

FOR THE DEFENDANT:
7

8           MR. STEPHEN M. JUDGE, ESQ.
            MS. KIMBERLY A. KENNEDY, ESQ.
9           SOUTHBANK LEGAL
            100 East Wayne Street, Suite 300
10          South Bend, Indiana 46601
            sjudge@southbank.legal
11          kkennedy@southbank.legal

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          harassing behavior, as well?
 2   A.     Not -- it's -- different context, I think, is
 3          important to be able to look at so -- I'm trying to
 4          think how to explain this, so give me a minute.
 5   Q.     Take your time.
 6   A.     Abusive or harassing behavior is a different bar
 7          of, like, behavior in terms of repetition and
 8          potential impact versus the actions of behavior --
 9          or sorry, standard.
10   Q.     So would you say that the abusive or harassing
11          behavior is a higher bar than the actions which
12          seemingly affect?
13   A.     Yes, but they're also not completely the same, so
14          it's not quite apples to apples.
15   Q.     Sure.  Would you care to give your assessment on
16          how much higher of a bar it is?
17   A.     I think -- so when we're looking at the
18          preponderance of the evidence and sort of those
19          pieces, we're looking at -- again, it goes back, I
20          think, to the repetition for abusive, harassing,
21          and possibly, like, threats and those type of
22          pieces versus the action and -- the action which
23          seemingly affects only the individuals involved,
24          both parts of that clause.  Those are about impact
25          within, like, smaller communities, maybe less
```

1    repetition and those pieces.  So that's sort of a

2    distinction I would make.

3         So you're right.  The information might be a

4    higher bar in terms of the behavior, but the

5    behavior is more about -- the bar is higher because

6    it's about repetition and about, like, the

7    harassing nature of it versus having an impact.

8         So, like, for clarity, the actions which

9    seemingly affect only the individuals involved

10   could be someone vomited all over something, and so

11   that's -- I think there's an important distinction

12   to be made that there are two different types of a

13   sort of behavior that we could be looking at.

14  Q.   Right.  That makes sense.  And that's a very

15       helpful answer, so thank you.  Could actions which

16       seemingly affect only the individuals involved

17       include intentionally physically prohibiting

18       someone's walkway?

19  A.   Potentially, I guess, is the point; but typically,

20       that would be related to other concerns.  There

21       would have to be some other information present.

22  Q.   What other concerns would need to be present?

23  A.   I'm speculating here, Bryce, so I don't want to --

24       I typically would be looking at other policy

25       questions.  So standing in front of someone in a

```
 1          any -- I don't know that I've had that
 2          conversation, and it's speculating about what would
 3          be happening if we had that information.
 4   Q.     So you testified earlier that these articulations
 5          within this policy are really context dependent.
 6   A.     Uh-huh.
 7   Q.     Are there any limiting principles to how far in
 8          context you can determine whether something falls
 9          into a policy violation or not?
10   A.     Can you restate that?  I'm trying to think
11          through --
12   Q.     I can restate that.
13   A.     Yeah.
14   Q.     What stops everything that's alleged as a conduct
15          violation from falling into one of these two
16          articulations we've talked about based on the
17          context?
18   A.     I think it's an initial review of possible
19          disruption, a negative impact.  I'm specifically
20          looking at those -- the language that's in that.
21   Q.     And the negative impact part of it is a subjective
22          test?
23   A.     It's looking at what would be, like, documented as
24          the impact, like, what was the actual impact of it.
25   Q.     Which could just be a student documenting via email
```

```
 1        students?
 2            MR. JUDGE:  Vague.  Confusing.
 3    Q.  What's the difference between calling someone a
 4        liar and saying "hi" to someone?
 5            MR. JUDGE:  Objection.  Vague and confusing
 6        question.
 7    Q.  For policy conduct reasons, what is the difference
 8        between calling someone a liar and saying "hi"?
 9            MR. JUDGE:  Same objection.  You can answer if
10        you understand the question.
11    A.  I'm trying to understand -- I guess I'm trying to
12        understand specifically what you're trying to get
13        at, Bryce, because I don't think it's the same
14        information.  I'm trying to understand what you are
15        trying to understand.
16    Q.  Okay.  So you previously testified that someone
17        saying that someone's a liar repeatedly in a public
18        context is not necessarily a policy violation;
19        correct?
20    A.  That's accurate.  I did say that; yes.
21    Q.  Okay.  So that same statement that I just said --
22    A.  Uh-huh.
23    Q.  -- when you change "liar" to "hi," is that
24        necessarily a policy violation?
25    A.  Yes.  And here's why:  So specific to your -- your
```

1    experience in your referral to the conduct process

2    for your behavior was that someone said to you,

3    Please don't communicate with me anymore, and you

4    said, I don't -- you know, I'll probably -- you

5    said, I don't think I can do that and then -- and

6    then saying "hi," right, reflexively is not

7    necessarily the policy violation.

8         The policy violation is not even being willing

9    to engage in not doing it, right, and so

10    articulating that.  So that's the concern.  So

11    accidentally saying "hello" to someone is not the

12    same in that sense.  I think the context of that is

13    important, Bryce, so...

14  Q.  Just to clarify, accidentally saying hello to

15      someone is not a policy violation?

16  A.  That is accurate.

17  Q.  What do you think of the phrase "I'm

18      philosophically and psychologically interested in

19      you"?  What does that phrase mean to you?

20  A.  Bryce, I don't -- I don't know what that means.

21  Q.  Okay.  That's a perfectly legitimate answer, and I

22      don't disagree with it.

23  A.  Yeah.

24  Q.  Did you or anyone in OCS ever ask third parties to

25      comment or attest on my allegations of Jane Roe's

Page 58

```
 1        inquiry with respect to what?
 2             MR. DANIELS:  The series of interactions
 3        between Jane Roe and I.
 4   Q.   So did the conduct process give you more insight
 5        into the repetitiveness of my allegations against
 6        Jane Roe?
 7   A.   It did in that it wasn't.  So I guess that's the
 8        point, Bryce, is that the information that is --
 9        you had the five interactions that you described,
10        and I think she described four because she didn't
11        describe the event -- dinner piece of it and that
12        the interactions didn't -- like, you've described
13        those pieces.
14             I don't think that they created a different --
15        can you ask the other part of it?  I'm trying to
16        understand -- like, answer the piece that you were
17        going for.  But I think we did get some clarity
18        about the incidents as you described them.
19   Q.   Sure.  Did Jane Roe ever tell you or, to your
20        recollection, convey in the Notre Dame Police
21        Department summary report that she was
22        philosophically and psychologically interested in
23        me?
24   A.   I recall you sharing that perspective, that she
25        communicated that to you, but I don't remember all
```

1    Q.    In the hearing panel process, me as the respondent,

2          am I allowed to call whoever I want as a witness?

3    A.    Students can request that folks call witnesses to

4          incidents, so to specific behavior that's being

5          alleged, and then you can work with a person for

6          that.  So we'll typically ask what that person's

7          going to be able to share so that we can understand

8          that.

9              But if it's, like, a character witness, I

10         believe it's someone's -- you know, people are good

11         people.  We make mistakes; right?  So it's a little

12         different, but it's got to be a witness to the

13         incident.

14   Q.    So to the extent that -- well, strike that

15         question.

16             Who determines whether the witness is a

17         witness to the incident?

18   A.    The primary hearing officer.  So in that case, it

19         would have been me.

20   Q.    What criteria did you use or do you use generally

21         to determine whether a witness is a witness to the

22         incident?

23   A.    Generally, were they present during the actual

24         incident.  I don't -- I don't recall specifics

25         related to your participation.  But it's typically

1      that they were actually present in some capacity.

2  Q.   Why is the limitation on witnesses limited to those

3       who are actually present at incidents?

4  A.   So folks -- so we don't have random people who

5       weren't there sharing their -- like, there's a

6       difference between -- we're trying to figure out

7       what happened in that space, and that's the purpose

8       of the hearing is what happened.  And so we want to

9       talk to people who actually have information

10      related to that.  Excuse me.

11 Q.   So it's a presumption that people who aren't in

12      that space don't really have useful information

13      regarding that interaction?

14 A.   I mean, you can -- like, were they present?  Were

15      they -- right after?  It depends.  But, yeah,

16      mostly, it's they have to be around in that space.

17 Q.   Do you think it's fair to say that witnesses who

18      were not present may have a skewed perception of

19      the actual event?

20 A.   I think -- so I would say that if a -- they

21      wouldn't have been there because -- I would want to

22      make sure that they have information of what they

23      observed because that's what we're going to ask

24      them is what they observed.

25 Q.   Yeah.  Because the presumption is that that

```
 1   Q.  What are reflective conversations, discussions, and
 2       formative outcomes?  What does that mean?
 3   A.  So it's a broad term, but it's used to describe
 4       referrals for a student to discuss, like, specific
 5       issues related to the behavior that they were found
 6       responsible for.
 7           So that purpose would be to discuss maybe
 8       language choices or discuss how to move forward,
 9       how to be successful in the future.  It really
10       depended on sort of specific behavior that a
11       student had engaged in; but, yeah.
12   Q.  Would you say that it's to help the student look
13       inside, figure out how the situation unfolded, and
14       even maybe take accountability or responsibility
15       and just move forward from the incident?
16   A.  I would agree with that assessment; yes.
17   Q.  And is that primarily what's evaluated or what
18       you're seeking or what your office is seeking in
19       having those conversations?
20   A.  The primary goal is that -- like, to your point,
21       was to sort of create that opportunity for the
22       learning and then -- so that a student could be
23       successful moving forward where they don't engage
24       in the same behavior and have maybe some tools to
25       behave in a different manner in the future.
```

Page 73

```
 1        sitting here in summer of 2025 that it was still
 2        productive to have that conversation three years
 3        ago?
 4   A.   I think it was a good outcome.  I guess I'm
 5        trying to -- I believe so.  I believe it was a good
 6        outcome.
 7   Q.   So no regret over us having that conversation?
 8   A.   No.
 9   Q.   Do you remember how many conversations I had with
10        Christine Holst-Haley?
11   A.   I recall that you had an initial conversation, and
12        then there were questions about, like, whether or
13        not that had met the criteria -- or criterion that
14        had been outlined.  So I think you met with her a
15        second time.  But I think I recall that piece of
16        it, but you ended up completing that outcome as
17        well.
18   Q.   In regard to those criteria, where would those have
19        been outlined at?
20   A.   It would have been in your decision letter.
21   Q.   And would they have been communicated to
22        Christine Holst-Haley?
23   A.   I believe so; yes.  But again, typically, that's
24        how that would play out; yeah.
25   Q.   Typically, is the decision letter that you or the
```

```
 1        there was some questions about it.
 2   Q.   But Christine Holst-Haley and I ultimately had a
 3        second conversation?
 4   A.   Yes.
 5   Q.   Did Christine Holst-Haley report that conversation
 6        as fulfilling all the criteria?
 7   A.   Yes.
 8   Q.   Included in which are taking accountability,
 9        responsibility, discussing reintegration into the
10        law school, all of that?
11   A.   I don't recall specifics of it, that you had
12        completed the meeting with her and felt like that
13        had ended where it needed to.
14   Q.   Yes.  And it had fulfilled the criteria that we
15        spoke about earlier?
16   A.   Yeah, that was outlined in your letter.
17   Q.   And then, additionally, unsure how the status of
18        that second conversation was reported to you?
19   A.   I don't recall.
20   Q.   Do you remember at the end of the process of OCS,
21        after the conduct finding, the hearing panel, if
22        the hearing panel's findings or the merits
23        decisions that OCS made -- do you remember if those
24        decisions were ever communicated to any other
25        administrative departments at Notre Dame, like
```

# Exhibit 17

(Seamon Dep.)

**StewartRichardson**

DEPOSITION SERVICES

www.StewartRichardson.com

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF INDIANA
                 SOUTH BEND DIVISION

3

4   BRYCE THOMAS DANIELS,        )

5            Plaintiff,    )

6      -v-              )   CASE NO.

7   UNIVERSITY OF NOTRE DAME,   )   3:22-cv-00698-PPS-JEM

8            Defendant.    )

9

10        The deposition upon oral examination of

11  MICHAEL SEAMON, a witness produced and sworn before

12  me, Erika L. Kessler, RPR, CRR, CSR (IL), CCR (MO),

13  Notary Public in and for the County of Crawford, State

14  of Illinois, taken on behalf of the Plaintiff,

15  remotely via Zoom, on May 28, 2025, at 8:56 a.m. CST,

16  pursuant to the Federal Rules of Civil Procedure.

17

18

19

20

21

22

23

24          STEWART RICHARDSON & ASSOCIATES
           Registered Professional Reporters

25              (800) 869-0873

Page 2

1                              APPEARANCES

2    FOR THE PLAINTIFF:

3         MR. BRYCE THOMAS DANIELS, PRO SE

4

5    FOR THE DEFENDANT:

6         MR. STEPHEN M. JUDGE, ESQ.
          MS. KIMBERLY A. KENNEDY, ESQ.
7         SOUTHBANK LEGAL
          100 East Wayne Street, Suite 300
8         South Bend, Indiana 46601
          sjudge@southbank.legal
9         kkennedy@southbank.legal

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.    And the Threat Assessment Management Team can also

2          recommend for removal people the Threat Assessment

3          Management Team is investigating, correct?

4    A.    Correct.

5    Q.    Okay.  Are there -- are there policy or procedure

6          differences in the TAMT for student investigations

7          versus faculty or staff?

8    A.    No.

9    Q.    And just to clarify, when the TAMT does recommend a

10         student for removal, how often does that removal

11         recommendation result in the removal of the

12         student?

13   A.    I'm not sure.

14   Q.    Would it be fair to say that it always results in

15         the removal of the student?

16   A.    I'm not sure.

17   Q.    If you had to approximate using your expertise.

18   A.    Very few times.  We make very few recommendations

19         for emergency removal.  Of the ones we do, I could

20         not give a percentage of how many times it results

21         in that removal.

22   Q.    Can you remember a single instance in which you or

23         the TAMT recommended a removal that did not happen?

24   A.    I don't recall.

25   Q.    Do -- would you have any idea of the gender

```
 1   A.   I did.

 2   Q.   Okay.  What were some of those materials?

 3   A.   It was assessments called BTAM, Behavioral Threat

 4        Assessment Management.  It was the NABITA Risk

 5        Rubric.  NABITA stands for National Behavioral

 6        Intervention Team.  Those were the main ones I

 7        recall.

 8   Q.   And did you or the TAMT members receive any

 9        training materials from the 2016-2017 training?

10   A.   Yes.

11   Q.   What were those materials?

12   A.   They'd be the similar materials as I just

13        mentioned.

14   Q.   Do you still have those materials?

15   A.   I do.

16   Q.   Did Dr. Dysinger -- and if I mispronounce his name,

17        please correct me -- ever talk about FORTifying or

18        a FORT acronym for decision-making?

19   A.   I don't recall.

20   Q.   Does Fair Objective Reasonable and Timely come to

21        mind as a principal or an acronym or a guiding

22        method he spoke about?

23   A.   I don't recall.

24   Q.   Did Dr. Dysinger train the Threat Assessment and

25        Management Team decision should not be based on
```

Page 18

1            regarding me?

2   A.    In the fall of 2021?

3   Q.    Correct.

4   A.    I recall on or about November 2, 2021 information

5            made its way to the threat team from Notre Dame

6            police and possibly OIE about a female student in

7            the law school, Jane Roe, who had approached Notre

8            Dame police about concerns about you and your

9            interaction in -- your increasing interactions with

10           her and a concern for her safety.

11   Q.    Sure.  How many meetings did the Threat Assessment

12           or Management Team have where I was a topic?

13   A.    Three to my recollection.

14   Q.    Do you remember the dates of those meetings?

15   A.    I believe November 2 and November 4.  I believe one

16           on November 2 and two on November 4 is my

17           recollection.

18   Q.    Do you -- do you know what the difference would be

19           in the TAMT context between a special meeting and

20           an emergency meeting?

21   A.    A special meeting would be a non-regularly

22           scheduled meeting, and an emergency meeting would

23           mean timeliness was of the essence to gather and to

24           assess information.

25   Q.    And do you recall who called each of the three

1   meetings?

2   A.   The first meeting was called by Notre Dame police.

3        The second meeting was called by some combination

4        of student affairs and/or the law school.  And the

5        third meeting, I cannot recall.

6   Q.   Did the Threat Assessment and Management Team

7        receive information only from the Notre Dame Police

8        Department and whatever individual experiences the

9        mention of TAMT brought to the meetings?

10  A.   Can you state that again?  I don't understand that

11       fully.

12  Q.   Sure.  I can reframe that question.

13            Did the Threat Assessment and Management Team

14       in regard to my case ever speak to witnesses

15       themselves?

16  A.   Members of Notre Dame police spoke to people,

17       witnesses, members of law school, and student

18       affairs, but I don't know what those members are or

19       who those members were.

20  Q.   But the Threat Assessment and Management Team as a

21       collective did not speak to these members?

22  A.   Correct.

23  Q.   To all of TAMT?

24  A.   Correct.  The Threat Assessment Management Team as

25       a team did not speak to members.

```
 1   Q.   And when there's a decision in the TAMT to
 2        recommend the removal of a student, all of the
 3        members who are present at these meetings vote on
 4        the removal, correct?
 5   A.   There is no official vote.  There is a consensus
 6        would have to be -- there would have to be a
 7        consensus among the group.
 8   Q.   So is it -- so it's possible that some members are
 9        voting on emergency removal recommendations without
10        having actually spoken to witnesses as other
11        members of TAMT members have; is that correct?
12   A.   Yeah, and the threat assessment team, as a whole,
13        does not speak to witnesses.  Different members of
14        different entities, be it student affairs, be it
15        OIE, be it Notre Dame police, be it colleges or
16        schools, or be it departments are the ones speaking
17        to those individuals, not the team.
18   Q.   Sure.  But you -- you said when TAMT makes a
19        recommendation for removal, it acts as a consensus,
20        correct?
21   A.   Correct.
22   Q.   So because TAMT acts as a consensus when it makes a
23        decision, are you saying that TAMT does not act as
24        a consensus when it gathers information?
25   A.   That question doesn't make sense to me.  I'm sorry.
```

1    A.    There are law enforcement members on the TAMT, but
2          to your point of if someone draws a gun to somebody
3          on campus and is threatening to kill them in
4          person, it's the responding law enforcement
5          officers who will address that situation.
6    Q.    Sure.  That's not a scenario where the TAMT does
7          three meetings and decides what happens.  That's a
8          -- that's an immediate law enforcement scenario?
9    A.    Correct.
10   Q.    And did anyone contact the police for emergency
11         assistance regarding me?
12   A.    Not to my recollection.  They contacted them of
13         growing concern for your safety and for theirs.
14   Q.    But not in the emergency sense of calling 911 and
15         seeking immediate intervention?
16   A.    I don't recall.
17   Q.    If -- if -- if a student had called 911 with
18         concerns regarding me, would the two Notre Dame
19         police department members of TAMT had been required
20         to -- to tell that to the TAMT as a whole?
21   A.    Yes.
22   Q.    Did the TAMT as a whole review the write-up
23         summaries of the NDPD interviews with the
24         witnesses?
25   A.    On case one or case two or both?

1 Q. Both.

2 A. I recall by conversation among the group.

3 Q. Okay.  Could you very explicitly, just so we're all

4   on the same page, explain what you mean by case one

5   and case two?

6 A. Sure.  Case one was Jane Roe on November 2nd, which

7   we have already described.  Case two involved John

8   Doe on November 4th, which came to Notre Dame

9   Police from the law school and/or OIE about a male

10   student, Jane Doe -- John Doe, excuse me, a male

11   student -- Notre Dame law student John Doe who had

12   approached members of the law school community

13   about concern of another male student in the law

14   school who had threatened to kill himself and had

15   mentioned having a firearm because John Doe had

16   rejected the sexual advances of the other male

17   student.  That is what we knew in the first meeting

18   on the 4th.

19    The subsequent -- sometime between first

20   meeting and second meeting, we learned that the

21   male student was Bryce Daniels, was you.  And so on

22   the evening of the 4th, we knew that you had

23   indicated you had a firearm, had indicated that you

24   were threatening to kill yourself because of the

25   rejection of the sexual advance by John Doe.  So

1    case one was November 2, case two was November 4.

2  Q.   Who -- who brought the information to TAMT

3       regarding John Doe's concerns?

4  A.   It was either student affairs on behalf of the law

5       school and/or OIE, some combination thereof.

6  Q.   So are -- so that would've been Christine

7       Holst-Haley or Erin Oliver?

8  A.   It would've been either Christine Karen Gebhardt or

9       Erin Oliver.

10  Q.   And there's no chance that Chris Conway would've

11       brought this information?

12  A.   I don't recall.

13  Q.   Regarding case two, John Doe, did the TAMT also

14       become apprised of e-mails from John Doe to Stella

15       Miller?

16  A.   I don't recall.

17  Q.   Do you think if the TAMT in November of 2021

18       would've learned that John Doe said, regarding me,

19       there's no concern, he's mentally well, we're good

20       friends, everything that was previously talked

21       about, it's resolved and done, do you think that

22       that would've been memorable?

23  A.   I don't know.

24  Q.   Do you think that information like that would've

25       changed the TAMT's perspective on how John Doe's

1         imminent threat or not?

2                 MR. JUDGE:  Object to -- object to

3         vagueness and lack of foundation regarding TAMT as

4         a collective.

5    BY MR. DANIELS:

6    Q.   When I say TAMT as a collective, I mean TAMT when

7         it meets.  So the three meetings we've discussed.

8                 MR. JUDGE:  Same objection.

9    BY MR. DANIELS:

10   Q.   Was it -- was it ever determined on the November

11        2nd TAMT meeting or on the first November 4th TAMT

12        meeting that the bury her comment, either in

13        isolation or with all the other evidence in context

14        of the facts, was a threat of imminent harm?

15   A.   It was determined it was a threat against Jane Roe.

16   Q.   A physical threat?

17   A.   Possibly.

18   Q.   Did TAMT review the Notre Dame police report on the

19        bury her comment?

20   A.   I don't recall if we read it or if someone verbally

21        shared it.  I don't recall how we reviewed it.

22   Q.   Did you know at that time the identity of the

23        student who raised the comment as a concern?

24   A.   I did not.

25   Q.   Do you remember if at either of the November 2nd

1        investigative student, that member is required to

2        bring all that information that member has about

3        the student?  Is that not true?

4  A.  What question do you want me to answer there?

5  Q.  Did you earlier state that TAMT standing members

6        are required to bring the -- all the information

7        they have regarding an investigated student to the

8        TAMT meeting body?

9  A.  Yes.

10  Q.  Okay.  So if the standing TAMT member has a

11       psychological assessment of a student being

12       investigated by the TAMT meeting body, does that

13       standing TAMT member have -- have an obligation to

14       make the standing meeting body aware of the

15       psychological assessment?

16  A.  I'm not familiar enough with counseling center

17       psychological evaluations what can be shared or

18       cannot be shared to comment on what has to be

19       brought or not based on confidentiality.

20  Q.  Sure.  So putting H.I.P.P.A. aside and all of those

21       sorts of regulations, generally, if a standing TAMT

22       member has information on an investigated student

23       has to bring the information?

24           MR. JUDGE:  Objection, vague, confusing and

25       -- yeah.  Vague, confusion -- confusing and

1    foundation.

2    BY MR. DANIELS:

3    Q.   Are there -- are you aware of any scenarios in

4         which TAMT members at meetings, TAMT meetings, have

5         intentionally withheld information regarding an

6         investigated student?

7    A.   I am not aware.

8    Q.   Okay.  Would that scenario I just described be an

9         improper withholding of information?

10             MR. JUDGE:  Objection.  Vague, confusing.

11        Incomplete hypothetical.  Lack of foundation.

12   BY MR. DANIELS:

13   Q.   Does the TAMT have a policy that TAMT members must

14        bring all information they are aware of regarding

15        investigated student to the TAMT meeting body?

16   A.   We don't have any written policy.  The

17        understanding is members bring any information that

18        is needed to look in the aggregate of a situation

19        or a person of interest for discussion with the

20        committee.

21   Q.   What do you mean by an understanding?  How is that

22        understanding understood?  I'll make this a little

23        more concrete and hopefully easier.  You said

24        earlier that there have been some rotation between

25        standing TAMT member from fall of 2021, and now

```
 1          information is true, correct?
 2   A.    The information comes to the TAMT through a variety
 3          of sources, from Notre Dame police, from OIE, from
 4          colleges, schools, HR, you name it, from a variety
 5          of sources, and it's filtered in, and we look at it
 6          in the aggregate and make an assessment.
 7   Q.    And the assessment is not based on the truthfulness
 8          of the information, correct?  It's based on the
 9          theoretical threat assessment?
10   A.    It's based on the information we have at the time
11          we have it.
12   Q.    So when you're making a threat assessment
13          determination, are you determining the truthfulness
14          of the information?
15   A.    We look at the information in the aggregate through
16          every lens, through interviews, through
17          conversations, through multiple sources, and we
18          make the assessment with the information that we
19          have.
20   Q.    So are you saying that you -- that the TAMT tries
21          to use context as a proxy for truth?
22                    MR. JUDGE:  Objection, vague.
23   BY MR. DANIELS:
24   Q.    Or as close to truth as the TAMT can get with its
25          limited non-omniscience?
```

1          MR. JUDGE:  Objection, argumentative.

2    BY MR. DANIELS:

3    Q.   Does the TAMT value the truthfulness of

4         information?

5    A.   The TAMT values all information that comes to it

6         and the sources and the people that bring it and

7         the departments that bring it.  We look at all the

8         information in the aggregate, and we make our

9         assessment.

10   Q.   But you won't commit to saying that the TAMT values

11        truthfulness of information?

12   A.   The TAMT will look at all information and verify

13        the information to the best of its abilities and

14        make its assessments based off of that.

15   Q.   So is it within the abilities of the TAMT to ask an

16        investigative student for his side of whatever the

17        allegations are?

18   A.   The TAMT can use whatever resources it wants to

19        gain any other information that is available.  That

20        is through Notre Dame police interviews, that is

21        through student affairs if it's a student.  It's

22        through colleges.  It's through schools.  It can

23        seek information.  It also looks at information in

24        the severity of what it comes in and then the

25        aggregate and it makes its assessment.  Information

1   BY MR. DANIELS:

2   Q.  Is there a way in which the TAMT can receive a lot

3       of seemingly severe information and instead decide,

4       no, we have to slow down and investigate further?

5   A.  The aggregate of the information will dictate to

6       the TAMT what the appropriate next steps are.

7   Q.  Okay.  And to this day, do you believe the TAMT's

8       determination regard to me was a correct one in

9       terms of the factual predicate to its decision to

10      recommend my removal?

11  A.  I do.

12  Q.  What facts do you believe to this day are true such

13      that they would've -- that they support my removal

14      in fall of '21?

15           MR. JUDGE:  Objection, vague with the

16      facts.

17           MR. DANIELS:  Whatever facts the witness

18      thinks are relevant to this determination.

19           THE WITNESS:  As stated, the combination of

20      both cases in close proximity, the combination of

21      the escalation of behavior by you to each victim,

22      the acknowledgement by you of weapons and guns, the

23      comments by you to others that you would bury

24      victim number one, the comments that you made to

25      victim number two that you were going to kill

# Exhibit 18

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior



**Campus Threat Assessment & Management:**

A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

GENE DEISINGER, PH.D.
PRESIDENT
DEISINGER CONSULTING, LLC

Provided for:
University of Notre Dame
Threat Assessment & Management Team
March 23-24, 2022

1



### Gene Deisinger, Ph.D.

Deisinger Consulting, LLC
• President & Founder
Education, Training & Certifications:
• Ph.D., Counseling/Clinical Psychology
• Licensed Psychologist (IA)
• Certified Health Service Provider in Psychology (IA)
• Certified Law Enforcement Officer (IA & VA; Retired)
Experience:
• Virginia Center for School & Campus Safety
  ‑ Threat Management Consultant
• Virginia State Police/Virginia Fusion Center
  ‑ Threat Management Consultant/Member of Advisory Board
• Virginia Tech (Retired)
  ‑ Deputy Chief of Police & Director, Threat Management
• Iowa State University (Retired)
  ‑ Deputy Chief of Police & Director, Threat Management
• Lead Author:
  ‑ Virginia School Model Policies, Procedures & Guidelines
  ‑ Handbook for Campus Threat Assessment Teams

2

### Session Agenda
• Introduction
• Overview of Threat Assessment and Management
• Overview of Workplace / Campus Violence
• The Nature and Process of Targeted Violence
• Essential Elements of a Threat Management Process:
  • Multi-disciplinary approach capable of addressing all threats;
  • Centralized awareness of concerns & engagement;
  • Thorough & contextual assessment;
  • Proactive & integrated case management;
  • Monitors & re-assesses case on a longitudinal basis;
  • Standards of practice and law;
  • Continuous improvement & adaptability.
• Case Scenarios & Applications

3



### What is Threat Assessment & Management?

A **systematic** process that is designed to:

1. **IDENTIFY** situations / subjects of concern
2. **INQUIRE**, investigate & gather information
3. **ASSESS** situation
4. **MANAGE** the situation / mitigate harm

4



### Threat Assessment & Management Process

BTAM facilitates a more objective process:

*There are no facts, only interpretations.*
— Friedrich Nietzsche

Behavior, Information Observations → Assessment & Conclusions → Strategies

Deisinger, 2017

5

### What is a "Threat"?

A threat:
• Is a concerning communication or behavior that:
  • Indicates an individual may pose a danger to the safety of campus staff or students:
    ➤ through acts of violence or
    ➤ other behavior that would cause harm to self or others
• May be expressed or communicated:
  • behaviorally      • in writing
  • orally            • electronically
  • visually          • or through any other means
• Is considered a threat regardless of whether:
  • observed by or communicated directly to the target or
  • observed by or communicated to a third party and
  • whether the target is aware of the threat

6

Provided for:
UNIVERSITY OF NOTRE DAME
Threat Assessment & Management Team
March 23-24, 2022

1

© G. DEISINGER, PhD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

1

DEF00001465

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

### Threatening Behaviors

**Threatening behaviors (examples):**
- An act that would be interpreted by a reasonable person as threatening or intimidating, such as:
  - Directly communicated threats
  - Leakage
  - Overt physical or verbal intimidation
  - Bullying that continues after interventions to stop the behavior
  - Throwing objects or other gestures intended to cause fear
  - Making inappropriate statements about harming others
  - Any statements or behaviors indicating suicidality
  - Research or planning related to carrying out violence
  - Stalking
  - Physical violence toward a person or property
  - Possession of weapons on school property or at school activities

© Deisinger, G. (2022)    The Context of Leakage in Threat Assessment    DEISINGER

7

### What is "Aberrant or Concerning Behavior"?

**Aberrant or concerning behavior:**
- Atypical for the person or situation and:
  - Causes concern for the safety or well-being of those involved
  - Involves actions, statements, communications or responses that are unusual for the person or situation or
  - actions which could lead to violence toward self or others or
  - are reasonably perceived as threatening or causing concern for the well-being of the person

© Deisinger, G. (2022)    DEISINGER

8

### Aberrant or Concerning Behavior

- Aberrant or concerning behavior (examples):
  - Withdrawal, isolation or alienation from others
  - Sudden changes to usual attire, behavior, or hygiene
  - Changes in eating or sleeping habits
  - Sullen or depressed behavior
  - Declining academic/work performance
  - Atypical interest or fascination with weapons or violence
  - Fixation on violence as means of addressing a grievance
  - Fearful, anxious, depressed, tense, reactive or suspicious
  - Atypical outbursts of verbal or physical aggression
  - Increased levels of agitation, frustration, or anger
  - Confrontational, accusatory, or blaming behavior
  - Feelings of helplessness or decreased self-esteem

© Deisinger, G. (2022)    DEISINGER

9

### Threat Assessment & Management Goal

The primary goal of the
threat assessment and management process
is to support and enhance
the health, safety, and well-being
of the organization.

© Deisinger, G. (2022)    DEISINGER

10

### Principles of Threat Management

- Threat assessment & management is about prevention, not prediction

- Threat assessment and management is a helping process, rather than punitive or adversarial

© Deisinger, G. (2022)    DEISINGER

11

### Predatory / Targeted Violence

**Targeted Violence:**
- Incident(s) of violence
- Where (a) potential assailant(s)
- Chooses a particular target(s)
- Prior to a violent/destructive act.

Adapted from: FBI (2017). Making Prevention of Violence a Reality:
Identifying, Assessing & Managing the Threat of Targeted Attacks

© Deisinger, G. (2022)    DEISINGER

12

**Provided for:**
**UNIVERSITY OF NOTRE DAME**
**Threat Assessment & Management Team**
**March 23-24, 2022**

2

© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

DEF00001466

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior



**Targeted Violence**

**Examples of Targeted Violence:**
- Public Mass Violence
- Lone Actor Terrorism / Violent Extremism
- Grievance-Based Violence Impacting:
  - Workplace, schools, & campuses
  - Houses of Worship / Faith communities
  - Government agencies / Public figures
- Domestic / Intimate Partner Violence*
- Predatory Sexual Assault / Sexual Misconduct
- Stalking
- Human Trafficking
- Gang Violence*
- Harassment / Bullying / Mobbing
- Bias and Hate Crimes
- Suicidal Behaviors*

© Deisinger, D. (2021)

13



**Homicide Rates in US, 1950-2020**

© Deisinger, G. (2022)

14

**Workplace Homicide**
Source: The Bureau of Justice Statistics

© Deisinger, G. (2021)

15

**Non-Fatal Workplace Assaults**
Rate of assaults per 10,000 employees.
Source: The Bureau of Justice Statistics

© Deisinger, G. (2022)

16



**Active Shooter Incidents in US**

Sources: FBI Study of Active Shooter Incidents in the US Between 2000-2013; FBI Studies of Active Shooter Incidents in the US Between 2014-2020.

© Deisinger, G. (2022)

17

**Incident Location Categories**

FBI Law Enforcement Bulletin: Active Shooter Events from 2000 to 2019 & Active Shooter Incidents in the United States in 2014 and 2015

A Study of 160 Active Shooter Incidents in the United States Between 2000 - 2013: Location Categories

© Deisinger, G. (2022)

18

Provided for:
**UNIVERSITY OF NOTRE DAME**
**Threat Assessment & Management Team**
March 23-24, 2022

3

© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

3

DEF00001467

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior



19



20



21



22



23



24

**Provided for:**
UNIVERSITY OF NOTRE DAME
Threat Assessment & Management Team
March 23-24, 2022

4

© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC

CONFIDENTIAL

4

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

### Factors Impacting the Threat Landscape

**Firearms Availability:**
- Background Checks
- Sales



© Deisinger, G. (2022)

25

### Modes of Violence

| Affective Violence: | | Predatory Violence |
|---|---|---|
| Intense emotion & expression | ←→ | Minimal emotion or expression |
| Violence is reactive and immediate | ←— | Violence is planned and purposeful |
| Violence against perceived threats | ←— | Violence against specified targets |
| Heightened and diffuse awareness | ←— | Heightened and focused awareness |
| Goal is threat reduction | ←— | Violence serves variable goals |
| Primarily emotional and defensive | ←— | Primarily cognitive and attack-oriented |
| Rapid displacement of target | ←→ | Minimal displacement of target; |
| Reactions are time limited | ←— | Not time limited; |

Source: Meloy (2006) Violence Risk & Threat Assessment

© Deisinger, G. (2022)

26

### Understanding Targeted Violence

- There is no demographic profile of a perpetrator of targeted violence.
- There is no profile for the type of campus that has been targeted.
- In addition to students, others engage in violence:
  - Administrators, faculty, other staff,
  - Parents/guardians of students,
  - Contractors and vendors
  - People in relationships with staff or students, and
  - People with no connection to the campus.

© Deisinger, G. (2022)

27

### Understanding Targeted Violence

- Most perpetrators act alone
  - But, in many cases, others (e.g., staff, students, peers, family members, etc.) were involved in some way:
    - Failing to report concerns
    - Failing take other steps to prevent violence
    - Encouraging violence
    - Helping with plans or preparation for violence.
- Most perpetrators of mass casualties used firearms
  - Typically acquired from home
- Over 1/3 of perpetrators used knives

© Deisinger, G. (2022)

28

### Understanding Targeted Violence

- Many perpetrators were preoccupied with violent interests, incidents or perpetrators
- Many perpetrators had a history of violence
- Most perpetrators of mass violence had a history of school disciplinary actions
- Many had prior contact with law enforcement
- Many perpetrators were suicidal in addition to their violent thoughts or acts toward others
- Suicidal behaviors are a significant and growing concern across all genders and age groups.

© Deisinger, G. (2022)

29

### Understanding Targeted Violence

- Perpetrators usually had multiple motives
  - Most common: unresolved grievance with a peer
- Many perpetrators had multiple stressors, including significant difficulties with losses or failures
- Many student perpetrators had been victims of (or participated in) prior bullying, often known to others
- Most perpetrators did not threaten their targets directly prior to engaging in violence
- Many perpetrators expressed their grievances and aspects of their thoughts or plans to others
  - Often through social media or online activities

© Deisinger, G. (2022)

30

**Provided for:**
**UNIVERSITY OF NOTRE DAME**
**Threat Assessment & Management Team**
**March 23-24, 2022**

5

© G. DEISINGER, PhD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

DEF00001469

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

### Understanding Targeted Violence

- All perpetrators exhibited concerning behavior.
- Most perpetrators had engaged in multiple behaviors that caused others to have serious concerns about their behavior and/or well-being.
- Many perpetrators had experienced psychological, behavioral, or developmental symptoms, but may not have been diagnosed with a mental health condition or benefited from adequate treatment.
- Incidents of targeted violence are rarely sudden or impulsive acts.

© Deisinger, G. (2022)

31

### Pathway to Violence



Intensity of Effort

Implementation

Preparation
- Means
- Method
- Opportunity
- Proximity

Ideation

Grievance

Adapted from: Shaw, 1990; DeBecker, 1999; Calhoun & Weston, 2003; Deisinger, 2005; Scalora, 2009

© Deisinger, G. (2022)

32

### Understanding Targeted Violence

- Prior to most incidents of targeted violence, other people knew about aspects of the individual's ideas, plans or preparations to cause harm.
- Many bystanders who had knowledge of concerning behaviors did not report them.
- Often, there were concerns about the perpetrator by others outside of the school, but the concerns were not reported to school staff.

© Deisinger, G. (2022)

33

### Violence Prevention

- Many acts of violence can be prevented.
- Information about a subject's ideas, behaviors, plans & preparations for violence can often be observed before harm can occur.
- Information about a subject's behavior, plans or preparations is likely to be scattered & fragmented.
- Keys for the community are to:
  - Recognize concerns,
  - Act quickly upon report of concerns,
  - Gather relevant information,
  - Enhance understanding of situation,
  - Facilitate intervention.

© Deisinger, G. (2022)

34

### Communication is Key

Concerned Students

Residence Life

Faculty

Health Center

DARE Team

Counseling Center

The Individual

Judicial Affairs

VA Tech Police

SOURCE: OIG Report #140-04: Investigation of the April 16, 2007 Critical Incident at Virginia Tech. Prepared by: Office of the Inspector General for Mental Health, Mental Retardation and Substance Abuse Services. Commonwealth of Virginia

© Deisinger, G. (2022)

35

### Essential Elements of an Effective Threat Assessment & Management Process

**Organizations must have a systematic process that:**

- Utilizes a robust & relevant multi-disciplinary approach to address all threats;
- Enables coordinated & early awareness of developing concerns through active community engagement;
- Facilitates a thorough & contextual assessment;
- Implements proactive & integrated case management;
- Monitors & re-assesses case on a longitudinal basis;
- Practices in accordance with relevant laws, regulations, policies, and recognized standards;
- Continuously improves & adapts to challenges & needs.

© Deisinger (1993); Deisinger & Nolan (2021)

© Deisinger, G. (2022)

36

**Provided for:**
UNIVERSITY OF NOTRE DAME
Threat Assessment & Management Team
March 23-24, 2022

6

© G. DEISINGER, PhD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

DEF00001470

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:

A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior



**TAM is a Systematic Process That:**

Utilizes a robust & relevant

multi-disciplinary approach

to address all threats

© Deisinger (1980); Deisinger & Nolan (2021)

© Deisinger, G. (2022)    DEISINGER

37

**What is Threat Assessment & Management?**

A systematic process that is designed to:

1. **IDENTIFY situations / subjects of concern**

2. **INQUIRE, investigate & gather information**

3. **ASSESS situation**

4. **MANAGE the situation / mitigate risk**

© Deisinger, G. (2022)    DEISINGER

38

**Establishing a BTAM Team:**

**Developing the Team:**
- Mission: Purpose, scope, functions & authority
- Structure:
  - Membership (Core & Ad-Hoc)
  - Leadership
  - Support
- Training:
  - Member roles, responsibilities & resources
  - Behavioral threat assessment & management process
  - Consulting/Reporting options & methods

© G. Deisinger, Ph.D.

© Deisinger, G. (2022)    DEISINGER

39

**TAM Functions**

**Define Mission, Scope & Authority**
- Enhance awareness/recognition of potential threats
- Enhance reporting
- Triage, screening, and assessment
- Case management to prevent/mitigate harm
- Guide implementation of strategies
- Re-evaluate, monitor and intervene with situation
- Build community safety & well-being
- Enhance: policy, process, practice and people*
- Enhance: **
  - Communication
  - Collaboration
  - Coordination      * © G. Deisinger, Ph.D.
  - Capitalization    ** © G. Deisinger, C. Cychosz, L. Jaeger (1993/1995)

© Deisinger, G. (2022)    DEISINGER

40

**Team Membership:**

**Multi-Disciplinary Involvement by:**
- Administration
  - Academic Affairs/Provost; Graduate/Professional Schools
  - Student Affairs; Dean of Students; Residence Life; Conduct
  - Human Resources; Employee Relations
- Police / Security (local/state law enforcement)
- Key Gatekeepers / "Boundary Spanners"
- Legal Counsel *
- Mental Health Professional *
- Threat Management Professional *
- Independent Medical/Psychological Evaluator **
      * Internal or External Resource      ** External Resource

© Deisinger, G. (2022)    DEISINGER

41

**Skills of Effective Team Members**

- Passionate about the goals of the team
- Communicates effectively
- Relates well with others
- Familiar with threat assessment & management policies, processes and practices
- Actively and effectively participates in team-work
- Demonstrates an inquisitive mindset
- Exercises judgment, objectivity, and diligence
- Demonstrates accountability
- Advocates for necessary resources

Deisinger, et al (2008) Handbook of Campus Threat Assessment & Management Teams
© Deisinger, G. (2022)    DEISINGER

42

**Provided for:**
UNIVERSITY OF NOTRE DAME
Threat Assessment & Management Team
March 23-24, 2022

7

© G. DEISINGER, PhD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

DEF00001471

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

---

### Key Dynamics of Successful Teams

**Psychological Safety:** We take risks without feeling insecure or embarrassed.

**Dependability:** We can count on each other to do high quality work on time.

**Structure & Clarity:** We are clear about our goals, roles, and execution plans.

**Meaning of Work:** We are working on something that is personally important for each of us.

**Impact of Work:** We fundamentally believe that the work we are doing matters.

Julia Rozovsky (2015) *The five keys to a successful Google team.*

© Deisinger, G. (2013)    DEISINGER

43

---

### Team Size

**Optimal Size: 5 – 9 members**

- Fewer than 4
  - Too much responsibility / stress
  - Minimal diversity of thought
- Greater than 9
  - Diminished responsibility & engagement
  - Decreased individual performance
  - Decreased communication
  - Increase of cliques

Mueller, J.S. (2012). Why individuals in Larger Teams Perform Worse. *Organizational Behavior & Human Decision Processes*, 117(1), 111-124.

© Deisinger, G. (2022)    DEISINGER

44

---

### Obstacles to Team Effectiveness

Top 5 Challenges Facing Task Forces & Committees



Source: 8 Keys to Improving Task Forces & Committees in Higher Education by Amit Mrig & Patrick Sanaghan

© Deisinger, G. (2022)    DEISINGER

45

---

### Subject Affiliation

**Subject Relation to Workplace**

- Type 1: Unaffiliated (with other criminal intent)
- Type 2: Customer/Client
- Type 3: Employee
- Type 4: Personal Relationship

Source: Occupational Safety & Health Administration, US Dept of Labor

- Type 5: Unaffiliated (without other criminal intent)

Source: G. Deisinger (2005)

© Deisinger, G. (2022)    DEISINGER

46

---

### Subjects: Address All Threats

**Perpetrator's Affiliation:**
- Student:  60%
  - Current: 45%
  - Former: 15%
- Employee:     11%
  - Current: 6%
  - Former: 5%
- Indirectly Affiliated:    20%
- No known Affiliation:     9%

U.S. Secret Service, U.S. Dept. of Education, & Federal Bureau of Investigation (2019). *Campus Attacks: Targeted Violence Affecting Institutions of Higher Education.*

© Deisinger, G. (2022)    DEISINGER

47

---

### SOURCES OF GRIEVANCES / TARGETS

**Grievance Sources / Targets:**

- Persons
- Places
- Programs
- Processes
- Philosophies
- Proxies

© Deisinger (2012)

**Chosen based on:**

- Desirability
- Availability
- Vulnerability

Source: FBI Behavioral Analysis Unit (2017)

© Deisinger, G. (2022)    DEISINGER

48

---

**Provided for:**
UNIVERSITY OF NOTRE DAME
Threat Assessment & Management Team
March 23-24, 2022

8

© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

DEF00001472

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

---

**TAM is a Systematic Process That:**

Enables coordinated & early awareness
of developing concerns through
active community engagement

© Deisinger (1998); Deisinger & Nolan (2021)

© Deisinger, G. (2022)

49

---

**Coordinated & Early Awareness**



© Deisinger, G. (2022)

50

---

**Importance of Reporting**

Key considerations:

* Reporting allows concerns to be addressed
* Earlier reporting allows greater range of options
* The threat management process is designed to help
* Goals are to maintain the health, safety and well-being of the campus community

Adapted from: NYC Metropolitan Transportation Authority
*What might create barriers to reporting?*
*How can we overcome these?*

© Deisinger, G. (2022)

51

---

**Facilitate Engagement**

For effective bystander intervention & engagement, people need to know:

* Their role and responsibility
  - GOAL: Consult and engage about concerns
* What to consult about
* Where (and with whom) to consult
* Consultations are wanted
* Something will be done
* Regular reminders of issues and process

© Deisinger, G. (2022)

52

---

**Facilitating Engagement / Reporting**

* Clear and trusted reporting mechanisms
  - Confidential
  - Anonymous
  - Anonymous with reach back
* Acknowledgement of report
* Support engagement

© Deisinger, G. (2022)

53

---

**Maintaining Awareness**

Sustain organizational knowledge about:

* Mission & function of team
  - Early intervention and assistance with situations
* Importance of consulting about concerning behaviors
  - "This may be nothing but . . ."
  - "If in doubt, shout it out!"
* Mechanisms for reporting and consultation
* Community role in maintaining safety and well-being of the community
* GOAL: Sustain a culture of care, engagement and consultation.

© Deisinger, G. (2022)

54

---

Provided for:
UNIVERSITY OF NOTRE DAME
Threat Assessment & Management Team
March 23-24, 2022

9

© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

DEF00001473

# CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

## Building Awareness

**Outreach/Awareness presentations**
- Managers, supervisors, employees
- Contractors

**Training Sessions**
- Consulting & case management process;
- Verbal de-escalation
- Incident survival

**Information: Available and sustained**
- Website
- E-mail updates/newsletters
- Social media

© Deisinger, G. (2022)

55

## Documentation

**Record keeping**
- Consult with administration and legal counsel:
  - Record creation, storage, access, sharing, and destruction
- Consider:
  - Database of threat assessment team cases
    - Documentation of the subject's exact words and actions
    - Documentation of target reactions and protective actions
    - Copies of emails, memos, voicemails, assignments, etc.
  - Agenda and minutes of team staffing and consultations.
    - Data
    - Assessment
    - Plan

© Deisinger, G. (2022)

56

## Process & Record Keeping

**FORTify the process:**
- Process and documentation should demonstrate that TAM team's decision-making process was:

Fair,

Objective,

Reasonable, and

Timely

©Deisinger (1995)

© Deisinger, G. (2022)

57

## TAM is a Systematic Process That:

### Facilitates a thorough
### & contextual assessment

© Deisinger (1998); Deisinger & Nolan (2021)

© Deisinger, G. (2022)

58

## Steps in the Threat Assessment Process

**Threat assessment team:**
- Receives report of threat
  - Intake: How you take in reports and being processing
  - Triage: Assigning urgency/priority to cases
  - Screening: Determining appropriateness for TAM
- Gathers additional relevant information
- Analyzes information and assesses threat
  - If the team decides subject poses a threat:
    - Team alerts superintendent
    - Responds to manage threat
- Monitors and re-evaluates plan
- Follow up as appropriate

© Deisinger, G. (2022) 

59

## Comprehensive Threat Assessment & Management

**Targeted Violence is the product of an interaction among multiple domains:**

S The subject of concern;

T The target or others impacted;

E The environment/systems; and,

P Precipitating events.

Deisinger (1996); Deisinger & Nolan (2021) 

© Deisinger, G. (2022)

60

**Provided for:**
UNIVERSITY OF NOTRE DAME
Threat Assessment & Management Team
March 23-24, 2022

10

© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC 

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
### A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

---

### Intake

**Upon receipt of initial report, the team obtains basic information about the situation:**

- Initial Report of Concern: Date and time reported, date and time reviewed, person receiving report
- Reporting Party: Name, affiliation, contact information, relationship to subject of concern
- Incident/Nature of Concern: Date and time occurred, location, nature of concern, weapons involved or threatened, details about concerns, and any relevant background
- Subject of Concern: Name, affiliation, contact information, relationship to reporting party or target(s)
- Identified/Identifiable Target(s): Name, affiliation, contact information, relationship to reporting party or subject

© Deisinger, G. (2022)    DEISINGER

61

---

### Imminent Situation?

**Determine if situation is emergency/imminent**

- Subject intends imminent and/or serious harm to self/others, e.g.,:
  - Has weapon on campus or campus activity, or enroute to/from either of those
  - Imminent intent to use weapon(s) or cause serious injury
  - Attempting to breach security and/or to gain access to targets
- Lack of inhibitions for using violence, indicated by:
  - Feels justified in using violence to address grievances
  - Has no perceived alternatives to the use of violence
  - Lack of concern for or desiring of consequences
  - Has the capability and willingness to cause harm

© Deisinger, G. (2022)    DEISINGER

62

---

### Imminent Situation

**If the situation is emergent or imminent, initiate crisis response procedures according to school policy, e.g.:**

- Involve law enforcement and appropriate security personnel
- Initiate relevant security protocols
- Notify key administrators
- When safe to do so, move on to screening and assessment steps to further resolve any ongoing threat posed

© Deisinger, G. (2022)    DEISINGER

63

---

### Triage and Screening

**Timely and systematic review by trained personnel**
- Consider Triage/Screening Team:
  - Minimum of two (2) members
  - Different roles/departments
- Review initial report(s)
- Consult relevant records/sources

**Triage / screening process shall:**
- Consider the nature and level of concern indicated
- Determine if existing resources and mechanisms are sufficient to address those concerns
- Determine whether the full team needs to further assess and manage the situation
- Initiate any crisis responses as appropriate

© Deisinger, G. (2022)    DEISINGER

64

---

### Inquire / Gather Information

**Review relevant records based on lawful and ethical access to information, such as:**

- Prior threat assessment team contacts
- Work performance history
- Disciplinary or personnel actions
- Law enforcement or security contacts at organization and in the community
- Critical involvement with mental health or social services
- Presence of known problems, grievances, or losses
- Current or historical grievances that may be related to the behavior of concern
- Online searches: internet, social media, email, etc.

© Deisinger, G. (2022)    DEISINGER

65

---

### Social Media Landscape



Source: www.ethority.de/weblog/social-media-prism    © Deisinger, G. (2022)    DEISINGER

66

---

Provided for:
**UNIVERSITY OF NOTRE DAME
Threat Assessment & Management Team
March 23-24, 2022**

11

© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

DEF00001475

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

### Inquire/Gather Information

**Consider interviews:**
* Initial interviews to verify report:
  * Person(s) reporting threat
  * Person(s) receiving report of threat
  * Target/Recipient(s) of threat
  * Witness(es)
  * Subject of concern
* Other potential sources:
  * Peers: Friends/Co-workers
  * Employers, teaches, other staff
  * Parents/guardians
  * Relational Partners
  * Local law or state enforcement
  * Community services

Corroboration of information across these sources will be powerful in helping to assess the level and nature of the threat. What might significant differences in the information provided by these sources reveal?

© Deisinger, G. (2022)

67

### Considerations for Interviewing

**Considerations for interviews:**
* By whom?
* With what skill set?
* In what setting?
* With what goals in mind?
  * Information gathering and assessment;
  * Redirect from violence/targets;
  * Problem solving/support
  * Set boundaries/limitations
  * Admonishment/confrontation
  * Intervention/support/referral
  * Monitoring
  * Deterrence

Are WP members adequately trained and prepared to conduct interviews?

© Deisinger, G. (2022)

68

### Triage/Initial Assessment Using STEP+

**Triage Considerations:**

**S** Is Subject engaging in behavior(s) causing concerns for violence or significant disruption or need for assistance?

**T** Are Targets or others concerned, impacted, vulnerable, taking protective actions, or need assistance?

**E** Are there **Environmental/systemic** issues impacting the situation?

**P** Are there reasonably foreseeable **Precipitating events** that may impact the situation?

**+** Are there identifiable actions to mitigate concerns?

**If yes to any, a full inquiry is recommended.**

Source: Deisinger (1990); Deisinger & Nolan (2020)

© Deisinger, G. (2022)

69

### Key Areas for Inquiry – Subject

**What situation(s) or behaviors are causing concern?**
* Does the situation or circumstance that led to these concerns still exist?
* When and where and do the behaviors tend to occur?
* Is there a pattern to the behaviors or a change in pattern of behavior that is causing concern?
* If the behaviors have occurred previously, how has the subject dealt with the grievances?
* Has subject previously come to someone's attention?
* Are the subject's behaviors causing others concern for the welfare of the subject, or others, or both?

Adapted from Fein (2017) Making Prevention Reality: Identifying, Assessing & Managing Threats of Targeted Attacks; * Meloy, et al. (2012); the Role of Warning Behaviors in Threat Assessment; U.S. Secret Service (2000) Protective Intelligence & Threat Assessment Investigations: A Guide for State & Local Law Enforcement Officials

© Deisinger, G. (2022)

70

### Key Areas for Inquiry - Subject

**Have there been any concerning, aberrant, threatening, or violent communications?**
* Were there **Directly Communicated Threats***?
* Has there been **Leakage***?
* How and to whom is the subject communicating?
  * What is relationship between subject and target?
  * What means/modes communication have been used?
* What is the **intensity of Effort*** in communications or attempts to address grievance?
* Do the communications provide insight about motives, grievances, ideation, planning, preparation, targets, etc.?
* Has anyone been alerted or "warned away"?

Adapted from: * Meloy, et al. (2012), the Role of Warning Behaviors in Threat Assessment; ** FBI (2017) Making Prevention a Reality: Identifying, Assessing & Managing Threats of Targeted Attacks; U. S. Secret Service (2000) Protective Intelligence & Threat Assessment Investigations: A Guide for State & Local Law Enforcement Officials

© Deisinger, G. (2022)

71

### Key Areas for Inquiry - Subject

**Considerations for Anonymous Communications:**
* Leakage of grievance, ideation, plans, preparation
* Pattern indicating escalation pertinent to grievance
* **Intensity of Effort**, indicated by:
  * Frequency of contact
  * Duration of contact
  * Multiple means of contact
  * Target dispersion
* **Intensity of Focus** upon a specific target / grievance
* Pathway behaviors
  * Intent or justification for violence
  * Planning or preparation
  * Diminishing alternatives

Scalora, M. (2014) Electronic Threats & Harassment, in the International Handbook of Threat Assessment

© Deisinger, G. (2022)

72

**Provided for:**
**UNIVERSITY OF NOTRE DAME**
**Threat Assessment & Management Team**
**March 23-24, 2022**

12

© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:

A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

---

### Key Areas for Inquiry – Subject

**What are the subject's motives and goals?**

- Does the subject have a major grievance or grudge?
- Against whom? What is the relationship?
- Are there other motives that support use of violence such as desire for notoriety/fame?
- What do they seem to want to achieve?
- Is the subject exhibiting *Fixation*"?
  - Increasing perseveration on person/cause or need for resolution
  - Increasingly strident and negative characterization of target
  - Angry emotional undertone, accompanied by
  - Social or occupational deterioration
- What efforts have been made to resolve the problem?

*Adapted from * Meloy, et al. (2011), The Role of Warning Behaviors in Threat Assessment; FBI (2017) Making Prevention a Reality: Identifying, Assessing & Managing Threats of Targeted Attacks; USSS NTAC (2018), Enhancing School Safety Using a Threat Assessment Model: An operational guide for preventing targeted school violence*
© Deisinger, G. (2022)                                          DEISINGER

73

---

### Key Areas for Inquiry – Subject

**Has subject demonstrated significant or novel interest in violence or other perpetrators:**

- Do they exhibit heightened interest, fascination, obsession, or fixation with acts of violence?
- Do they immerse themselves in violence?
- Is there *Identification*" (strong desire or need to emulate/be like others) with:
  - Perpetrators of targeted violence or powerful figures
  - Grievances of other perpetrators
  - Weapons or tactics of other perpetrators
  - Effect or notoriety of other perpetrators
  - Ideologies or groups that support and encourage violence

*Adapted from * Meloy, et al. (2011), The Role of Warning Behaviors in Threat Assessment; FBI (2017) Making Prevention a Reality: Identifying, Assessing & Managing Threats of Targeted Attacks; USSS NTAC (2018) Enhancing School Safety Using a Threat Assessment Model: An operational guide for preventing targeted school violence*
© Deisinger, G. (2022)                                          DEISINGER

74

---

### Key Areas for Inquiry – Subject

**Does the subject have (or are they developing) the capacity to engage in targeted violence?**

- Are there *Pathway Warning Behaviors*" ?
  - Planning
  - Preparation (Means, Method, Opportunity, Proximity)
- Where on the Pathway?
- Are there changes in activity levels or *Energy Bursts*" ?
- How organized is the subject's thinking and behavior?
- History of violence or aspects of *Novel Aggression*" ?
- Is subject developing perceived capability?

*Adapted from * Meloy, et al. (2011), The Role of Warning Behaviors in Threat Assessment; FBI (2017) Making Prevention a Reality: Identifying, Assessing & Managing Threats of Targeted Attacks; USSS NTAC (2018) Enhancing School Safety Using a Threat Assessment Model: An operational guide for preventing targeted school violence*
© Deisinger, G. (2022)                                          DEISINGER

75

---

### Key Areas for Inquiry – Subject

**Is the subject experiencing hopelessness, desperation, and/or despair?**

- Has subject experienced perceived loss, failure, injustice?
- Does subject express shame or humiliation?
- Is subject having significant difficulty coping?
- Are there indications of *Last Resort Behaviors*" ?
  - Desperation, despair, finality or action imperative
  - Violence justified to address perceived grievance
  - Lack of perceived alternatives
  - Lack of concern for, or welcoming consequences
  - Development of **legacy token**""

*Adapted from * Meloy, et al. (2011), The Role of Warning Behaviors in Threat Assessment; ** FBI (2017) Making Prevention a Reality: Identifying, Assessing & Managing Threats of Targeted Attacks; USSS NTAC (2018) Enhancing School Safety Using a Threat Assessment Model: An operational guide for preventing targeted school violence*
© Deisinger, G. (2022)                                          DEISINGER

76

---

### Key Areas for Inquiry

**Dangerousness is not a permanent state of being nor solely an attribute of a person.**

**Dangerousness is situational & based on:**

Justification;

Alternatives;

Consequences; and

Ability.



Source: Gavin de Becker (1997)
*The Gift of Fear*

© Deisinger, G. (2022)                                          DEISINGER

77

---

### Key Areas for Inquiry – Subject

**Has the subject's behavior indicated or raised concern of need for intervention or supportive services?**

- Does subject have difficulty coping?
- Symptoms of severe, acute, untreated mental illness:
  - Significant lack of contact with reality:
    - Hallucinations (especially command hallucinations)
    - Delusions (especially paranoid/persecutory or grandiosity)
    - Extreme wariness, distrust, paranoia
  - Symptoms that impact subject's perceptions of grievances or how others respond to subject
  - Significant or sustained agitation or anxiousness
  - Significant or sustained depressed mood
  - Alcohol or other drug use/abuse
  - Pervasive patterns of maladaptive behavior
- Is subject actively engaged in treatment?

*Adapted from FBI (2017) Making Prevention a Reality: Identifying, Assessing and Managing Threats of Targeted Attacks*
© Deisinger, G. (2022)                                          DEISINGER

78

---

**Provided for:**
UNIVERSITY OF NOTRE DAME
Threat Assessment & Management Team
March 23-24, 2022

13

© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

DEF00001477

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

### Mental Illness & Targeted Violence

**Mental Disorder Prevalence Across Actors**



Mass Casualty Offender — Lone-Actor — Sola-Actor — Dyad — Group Actor

Mental Disorder Prevalence in the General Population    Mental Disorder Prevalence

Source: Corner, Gill & Mason (2016)

© Deisinger, G. (2022)    DEISINGER

79

---

### Threats to Self: The Nexus Between Threat Assessment and Suicide Risk Assessment

* Benefits of utilizing the TAT in the suicide risk assessment process:
  * TAT practiced in working collaboratively to address concerns related to the health, safety, and well-being of the campus
  * Utilizing TAT for all cases that pose a threat to self or others enhances consistent application of policies, procedures, and practices across cases
  * TAT law enforcement members have access to other records and resources to supplement response

© Deisinger, G. (2022)    DEISINGER

80

---

### Threats to Self: The Nexus Between Threat Assessment and Suicide Risk Assessment

* If triage identifies any of the following concerns, in addition to, or in place of, a potential threat to self, then the TAT should assume primary responsibility:
  * Subject expresses co-occurring anger or hostility to others
  * Subject expresses ideation or intent to harm others
  * Subject's intent, preparations, or acts of harm to self would pose a threat to others, whether intended or not
  * Subject's suicidal or self-harm behaviors are responses to victimization, bias, bullying, harassment, or to other environmental/systemic issues within the campus
  * Others are, or may reasonably be, significantly impacted or feel endangered by the threat of harm to self

© Deisinger, G. (2022)    DEISINGER

81

---

### Threats to Self: The Nexus Between Threat Assessment and Suicide Risk Assessment

* If none of the above conditions are met, then no other actions are needed by the threat assessment team and the threat assessment case can be closed
  * The suicide risk assessment and interventions are completed by the Suicide Crisis Response Team as relevant for the case
* Campus or community mental health professionals retain primary responsibility for the direct assessment and mental health interventions with the subject at risk, per campus guidelines
* Other team members assist with assessment and intervention actions, and address any other concerns impacting upon the case

© Deisinger, G. (2022)    DEISINGER

82

---

### Key Areas for Inquiry – Subject

**Does the subject have protective factors, stabilizers, or buffers that inhibit use of violence?**

* Views violence as unacceptable/immoral
* Accepts responsibility for actions
* Demonstrates remorse for inappropriate behavior
* Respects reasonable limits and expectations
* Uses socially sanctioned means to address grievances
* Values life, job, relationships, freedom
* Maintains and uses effective coping skills
* Treatment compliance/engagement
* Sustains trusted and valued relationships

Adapted from: FBI (2017). Making Prevention a Reality: Identifying, Assessing and Managing Threats of Targeted Attacks; National Threat Assessment Center (2018). Enhancing School Safety Using a Threat Assessment Model: An operational guide for preventing targeted school violence.
© Deisinger, G. (2022)    DEISINGER

83

---

### Key Areas for Inquiry - Subject

**Does the subject have a trusting & sustained relationship with at least one responsible person?**

* Is subject emotionally connected to other people?
* Does subject have a friend, colleague, family member, or other person that they trust and can rely upon?
* Does that other person have skill and willingness to monitor, intervene, support subject?
* Is the relationship in jeopardy?
* Is there sustained/increased isolation or alienation?

Adapted from: FBI (2017) Making Prevention a Reality: Identifying, Assessing & Managing Threats of Targeted Attacks; U.S. Secret Service (2002) Protective Intelligence & Threat Assessment Investigations: A Guide for State & Local Law Enforcement Officials.
© Deisinger, G. (2022)    DEISINGER

84

---

**Provided for:**
**UNIVERSITY OF NOTRE DAME**
**Threat Assessment & Management Team**
**March 23-24, 2022**

14

© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

DEF00001478

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior



### Protective Factors
**Stabilizers and Buffers Against Violence Risk**
- P Positive Personal Attachments
- R Remorse is Genuine for Transgressions
- O Obeys Limits Set by Employer or Authorities
- T Takes Sanctioned Actions to Address "Wrongs" & Setbacks
- E Enjoys Life & Freedom
- C Coping Skills are Positive
- T Treatment Compliance

© Stephen G. White & J. Reid Meloy
WAVR 21 V3

© Deisinger, G. (2022)

85



### Warning Behaviors (Proximal)

86

### Key Areas for Inquiry – Target
**Are targets (or others) indicating vulnerability or concern about the subject's potential for violence?**
- Are others concerned that subject may take action?
- Are others concerned about a specific target?
- Are others concerned for the well-being of the subject?
- Are targets or others around the subject engaging in protective actions?
- Do targets have adequate support resources?
- Are targets or others experiencing stress, trauma, or other symptoms that may benefit from intervention?
- Are targets engaging in behaviors that increase their:
  - Desirability
  - Availability
  - Vulnerability

© Deisinger, G. (2022)

87

### Key Areas for Inquiry - Environment
**Are there Environmental/Systemic factors that are impacting the situation?**
- Systemic, policy, or procedural problems
- Silos, gaps, or delays in reporting of concerns
- Poor conflict management skills
- Poor supervisory skills and/or willingness to address
- Organizational climate concerns: e.g., harassment, bullying
- Lack of support resources in community
- Social influences of others in environment; e.g.
  - Actively discourage or encourage/dare use of violence
  - Deny/minimize the possibility of violence
  - Passively collude with act

Deisinger (1996); Deisinger & Nolan (2020); Ylli (2017). *Making Prevention a Reality: Identifying, Assessing & Managing Threats of Targeted Attacks.*

© Deisinger, G. (2022)

88

### Risk Factors for Workplace Violence
**Environment / Workplace Factors**
- Understaffing leading to job overload or compulsory overtime
- Frustrations from poorly defined job tasks and responsibilities
- Downsizing or reorganization
- Labor disputes and poor labor-management relations
- Poor management styles (e.g., arbitrary or unexplained orders)
- Corrections or reprimands in front of other employees
- Inconsistent discipline
- Inadequate security
- A lack of employee counseling
- A high injury rate
- Frequent grievances

Federal Bureau of Investigation (2004). *Workplace Violence: Issues in Response.*

© Deisinger, G. (2022)

89

### Key Areas for Inquiry – Precipitating Events
**Are there precipitating events that may impact the situation currently and in foreseeable future?**
- Loss, failure, harm, or injustice
- Key dates/events
- Triggers and reminders of any of the above
- Changes in support/resources
- Opportunity
- Contagion effect
- Case management interventions

Source: Deisinger (1996); Deisinger and Nolan (2021)

© Deisinger, G. (2022)

90

**Provided for:**
UNIVERSITY OF NOTRE DAME
Threat Assessment & Management Team
March 23-24, 2022

15




© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC

CONFIDENTIAL

DEF00001479

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

---

### Key Areas for Inquiry – Global

**What is the consistency and credibility and completeness of information about the situation?**
- Do sources have direct and unique knowledge?
- Are there multiple sources?
- Do collateral sources confirm or repute each other?
- Do any sources have ulterior motives?
- Are the source's statements and behavior consistent?
- What gaps exist in understanding of situation?
- What biases or misperceptions may be present?

Source: Deisinger (1996); Deisinger and Nolan (2021)

© Deisinger, G. (2022)                    DEISINGER

91

---

### Improving Decision-Making

**Protecting Against Cognitive Bias**
- Confirmation Bias
- Anchoring
- Over-Confidence
- In-group Bias
- Availability Bias
- Probability neglect
- Fundamental attribution error
- Hindsight Bias

Daniel Kahneman (2013) *Thinking Fast & Slow*

© Deisinger, G. (2022)                    DEISINGER

92

---

### Using Supplemental Assessment Tools

**Systematize data collection and assessment:**
- Workplace Assessment of Violence Risk (WAVR-21);
- Historical Clinical Risk Management-20, Version 3;
- Cawood Assessment Grid;
- MOSAIC (DeBecker);
- Stalking Risk Profile;
- Screening Assessment for Stalking & Harassment (SASH);
- Dangerousness Assessment (Campbell);
- Ontario Domestic Assault Risk Assessment (ODARA);
- Spousal Risk Assessment Guide (SARA);
- Terrorist Radicalization Assessment Protocol (TRAP 18);
- Violence Risk Assessment Guide (VRAG);
- Classification of Violence Risk (COVR);
  Note: This is a partial listing of supplemental instruments
  and not an endorsement of any particular approach.

© Deisinger, G. (2022)                    DEISINGER

93

---

### Using Assessment Tools

**Appropriate use of instruments:**
- Ensure that instrument is reliable and valid;
- Be aware of limitations of the instrument;
- Use for purpose for which it was designed.
- Stay current with new data and versions;
- Ensure evaluator is properly trained;
- Avoid reliance on instrument only;
- Integrate information with structured professional judgment.

Source: Association of Threat Assessment Professionals (2006).
*Risk Assessment Guideline Elements for Violence*

© Deisinger, G. (2022)                    DEISINGER

94

---

### Facilitating Case Discussions

- Fostering Effective Case Discussions:
- Active participation by all team members
- Keep discussion focused on the case
- Minimize bias in decision-making
  - Consider totality and context of information available
  - Consider information sources, credibility and relevance
  - Corroborate critical information; resolve discrepancies
  - Avoid generalizations or stereotypes, focus on behavior
  - Consider changes in behavior or circumstances
  - Be inquisitive and challenge assumptions
  - Consider the impact of the unknowns
- Focus on active problem-solving

© Deisinger, G. (2022)                    DEISINGER

95

---

### Decision-Making: Cognitive Load

**Enhancing Case Decision Making:**
- Organize information systematically, e.g.:
  - STEP Framework
  - Pathway model
  - Proximal warning behaviors
  - JACA
  - Timeline
  - Pending Issues/Tasks

- Use tools to support structured professional judgement
- Prepare summary for Team
- Team review case(s) before discussion
- Have a break/sleep between review and discussion

Deisinger (2018)

© Deisinger, G. (2022)                    DEISINGER

96

---

**Provided for:**
**UNIVERSITY OF NOTRE DAME**
**Threat Assessment & Management Team**
**March 23-24, 2022**                    16

© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC


CONFIDENTIAL

DEF00001480

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

### Assessment Using STEP+

**Assessment Considerations:**

S  Is Subject engaging in behavior(s) causing concerns for violence, significant disruption, or need for assistance?

T  Are Targets or others concerned, impacted, vulnerable, taking protective actions, or need assistance?

E  Are significant Environmental/systemic issues impacting the situation?

P  Are there reasonably foreseeable Precipitating events that may impact the situation?

+  Are there identifiable actions to mitigate concerns?

If yes to any, case remains open.

Source: Deisinger (1996); Oeisinger & Nolan (2021)
© Deisinger, G. (2022)

+ DCJS                                DEISINGER

97

### Prioritization

**Prioritization based on totality of circumstances:**

▪ Immediacy
▪ Severity
▪ Impact
▪ Probability / likelihood / credibility
▪ Rate of change in situation
▪ Vulnerability / reactivity of target
▪ Complexity / number of environmental factors
  ▪ Political / social influences
▪ Impact (current or impending) of precipitants
▪ Unknowns

© Gene Deisinger, Ph.D. (2010)
© Deisinger, G. (2022)

+ DCJS                                DEISINGER

98

### Priority/Level of Concern Classification



Priority 1 (Critical)
Priority 2 (High)
Priority 3 (Moderate)
Priority 5 (No Identified Concerns/Routine)

© Deisinger, G. (2022)                DEISINGER

99

### TAM is a systematic process that:

Implements proactive & integrated
case management plans

© Deisinger (2007); Deisinger & Nolan (2021)

© Deisinger, G. (2022)                DEISINGER

100

### Develop a Case Management Plan

**Develop an individualized, contextually-relevant, plan based on inquiry and assessment.**

▪ Plan is contextually relevant and situationally specific
▪ Accountability is critical
  • Assign tasks/interventions to specific person
  • Set deadline
  • Set monitoring plan
▪ Consider the STEP Domains
▪ Rapport and engagement matter
  • Consider personalities, backgrounds and skills
  • Consider use of trusted sources

Source: Deisinger (1996); Deisinger and Nolan (2021)
© Deisinger, G. (2022)                DEISINGER

101

### Subject-Based Strategies

**Implement appropriate strategies:**

▪ No further action
▪ Monitor/Watch & wait;
▪ Third party monitoring
▪ Third party intervention
▪ Direct intervention: Support, assist, referral, confrontation
▪ Administrative actions
  • No contact/communication notice, probation, suspension, expulsion/termination, no trespass/ban from premises
▪ Civil actions
▪ Mental Health interventions (voluntary or involuntary)
▪ Criminal justice interventions

Adapted from: Calhoun & Weston (2003) *Contemporary Threat Management*
© Deisinger, G. (2022)                DEISINGER

102



Provided for:
**UNIVERSITY OF NOTRE DAME**
**Threat Assessment & Management Team**
March 23-24, 2022

17

© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

DEF00001481

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
### A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

---

### Engagement

**Utilize key relationships (with subject, target and witnesses) as channel of communication for:**

- Information gathering and assessment;
- Redirect from violence / targets;
- Problem solving / support
- Set boundaries / limitations
- Admonishment / confrontation
- Intervention / referral
- Monitoring
- Deterrence

Source: Deisinger & Nolan (2020)

© Deisinger, G. (2022)    DEISINGER

103

---

### Subject Strategies: Considerations

**Leave, suspension, or termination options that focus solely on controlling the person do not address the long-term challenges of:**

- Moving person away from thoughts & plans of, and capacity for, violence and/or disruption;
- Connecting person to resources (where needed);
- Mitigating organizational/systemic factors;
- Monitoring person when they are no longer connected to organization.

**Use with intentionality, awareness of limitations, and anticipation of consequences.**

Source: Deisinger (1996); Deisinger & Nolan (2021)

© Deisinger, G. (2022)    DEISINGER

104

---

### Re-Entry Planning and Preparation

**Prepare for re-integration of subject:**

- Establish conditions for return
- Evaluate subject readiness to safely and effectively return to participate in school or work experience
- Develop proactive case management plan
  - Align ongoing interventions
  - Coach subject about re-entry
  - Anticipate environmental aspects which may impact subject
  - Prepare community for subject's re-entry
  - Consider precipitating events
- Monitor, re-assess and intervene as appropriate

Source: Deisinger (2011); Deisinger and Nolan (2021)

© Deisinger, G. (2022)    DEISINGER

105

---

### Target Management Strategies

**Coaching regarding personal safety approaches**

- Set clear limits and boundaries
- Monitor communications for changes/escalations
- Avoid contact/response
  - Document all contacts from/with subject
- Minimize reactivity to subject actions
- Minimize public information
- Maintain/enhance situational awareness
- Vary routine
- Develop contingency plans: Escape, shelter, defense
- Utilize support systems

Source: Deisinger (1996); Deisinger and Nolan (2021)

© Deisinger, G. (2022)    DEISINGER

106

---

### Target Management Strategies

**Organizational roles in reducing target vulnerability**

- Engagement with target
- Support for target
- Change work/school hours
- Change work location
- Notice to co-workers/classmates
- Enhance physical security
- Security staffing
- Safety escorts
- Fear management
- EAP/Counseling referrals

Source: Deisinger (1996); Deisinger and Nolan (2021)

© Deisinger, G. (2022)    DEISINGER

107

---

### Remembering Who We Serve

**What targets/victims want:**

- Care
- Certainty
- Consistency
- Communication

- Gavin de Becker
"The Gift of Fear"



THE GIFT OF FEAR
SURVIVAL SIGNALS THAT PROTECT US FROM VIOLENCE
GAVIN DE BECKER

© Deisinger, G. (2022)    DEISINGER

108

---

**Provided for:**
**UNIVERSITY OF NOTRE DAME**
**Threat Assessment & Management Team**
**March 23-24, 2022**

18

© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

DEF00001482

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

### Environmental Management Strategies

- Address systemic, policy, or procedural problems
- Identify/address reporting gaps/delays
- Intervene with associates that support violent behavior
- Enhance conflict management skills
- Enhance supervisory skills & accountability
- Enhance organizational climate – caring community
  - Emphasize fairness & respect
  - Effective communication
  - People rewarded, supported, and held accountable
  - Prevention & early intervention with inappropriate behaviors
  - Build engagement for mutual safety & well-being

Source: Deisinger (1996); FBI (2004); Deisinger & Nolan (2021)

© Deisinger, G. (2022)

109

### Manage Precipitating Events

- Minimize unnecessary precipitants where possible
- Consider impact of interventions
- Monitor reactions to case management/interventions
- Monitor & plan for loss / injustice
- Monitor & plan for key dates / events
- Monitor for reactions to administrative/court actions
- Consider contingency plans

Source: Deisinger (1996); Deisinger & Nolan (2021)

© Deisinger, G. (2022)

110

### TAM is a Systematic Process That:

Monitors & re-assesses
the situation
on a longitudinal basis

Source: Deisinger (1996); Deisinger & Nolan (2021)

© Deisinger, G. (2022)

111

### Threat Assessment Process



© Deisinger, G. (2022)

112

### TAM is a Systematic Process That:

Conducts all practices in accordance
with relevant laws, policies,
and standards of practice

Source: Deisinger (1998); Deisinger & Nolan (2021)

© Deisinger, G. (2022)

113

### Current Practice: Schools & IHE's

**Required by legislation:**
- Virginia:
  - Public Institutions of Higher Education (2008)
  - K-12 School Divisions (2013)
- Illinois:
  - All Institutions of Higher Education (2008)
  - K-12 School Divisions (2019)
- Connecticut: All Institutions of Higher Education (2013)
- Florida: K-12 Schools (2018)
- Maryland: K-12 Schools (2018)
- Kentucky: K-12 Schools (2019)
- Oregon: K-12 Schools (2019)
- Rhode Island: K-12 Schools (2019)
- Tennessee: K-12 Schools (2019)
- Texas: K-12 Schools (2019)
- Washington: K-12 Schools (2019)

© Deisinger, G. (2022)

114

Provided for:
UNIVERSITY OF NOTRE DAME
Threat Assessment & Management Team
March 23-24, 2022

19

© G. DEISINGER, PhD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

DEF00001483

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
### A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

### What Laws, Regulations, Rules May Apply?

- Constitutional Issues,
- Civil Rights
- Federal & State Healthcare Privacy Laws
- Federal & State Disability Laws
- Federal & State Employment Laws
- Federal & State Employee Privacy Laws
- Federal/State Intelligence/Fusion Center Privacy Policies
- State Threat Assessment Laws, Regulations, Standards
- Record-Keeping & Open Records Laws
- Standards of Practice / Tort Law
- Organizational Policies

© Deisinger, G. (2022)      DEISINGER

115

### EXERCISE: Information Sharing & FERPA

A professor approaches you (as a member of TAT) very concerned about an interaction they just had with a student after a class. During that conversation the student engaged in behaviors and made statements that lead the professor to believe that the student was a serious threat to the safety of themselves and others on campus.

Based on the information shared, you concur there appears to be a significant threat.

When you ask the name of the student and how they are doing in the class, the professor becomes very cautious and says they are not sure if they can provide that information, that they don't want to violate privacy law and be sued by the student.

What mistakes, if any, are being made?

© Deisinger, G. (2022)      DEISINGER

116

### Information Sharing: FERPA

- Is not an impediment to effective threat assessment and management.
- Protects educational records, not observations, verbal communications, direct personal knowledge, etc.
- Allows sharing with:
  - School officials with legitimate educational interest
  - Other educational settings for enrollment or transfer
  - Outside of campus to protect health or safety
- Does not govern law enforcement unit records.
- If created and maintained by law enforcement, for law enforcement purposes.
- Does not permit a private right of action.

© Deisinger, G. (2022)      DEISINGER

117

### Disclosures Allowed Under HIPAA

Disclosure of "protected health information" is allowed if provider makes good faith determination that disclosure:

- "is necessary to prevent or lessen a serious and imminent threat to the health and safety of a person or the public" and disclosure
- "is made to a person or persons reasonably able to prevent or lessen the threat, including the target of the threat"

© Deisinger, G. (2022)      DEISINGER

118

### Understanding Confidentiality

Confidentiality is right held by client, not the mental health provider.

- In cases where privacy laws apply, consider these strategies:
  - Ask subject for authorization to disclose.
  - No legal prohibition against providing information to health professionals.
  - Ask medical provider about Tarasoff - type duty to warn/protect.
  - Request and document name of provider.

© Deisinger, G. (2022)      DEISINGER

119

### Dispelling ADA Myths

Restrictions & sanctions may be imposed for misconduct, even if caused by disability IF appropriate due process is provided.

TAM teams should:

- work with conduct/judicial affairs, student affairs, human resources and counsel regarding processes;
- work with counsel on "direct threat' and "otherwise qualified" standards;

Community should understand: ADA protections should not conflict with safety of the community or individuals

© Deisinger, G. (2022)      DEISINGER

120

Provided for:
UNIVERSITY OF NOTRE DAME
Threat Assessment & Management Team
March 23-24, 2022

20

© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

---

### Disability Law Considerations

**Cautions:**

- Ensure due process
- Do not assume every threat assessment case involves mental illness
  - Caution against automatic referrals to counseling
- Understand "Direct threat: provisions
  - Elimination of "threat to self" element of definition
  - Consider whether "otherwise qualified"
- Use mental health violence risk evaluations appropriately
  - Understand limitations of forensic evaluations
    Source: Deisinger & Nolen (2019)

© Deisinger, G. (2022)    DEISINGER

121

---

### "Direct Threat"

**Direct Threat**

- A significant risk to the health or safety of others that cannot be eliminated or reduced to an acceptable level by the organization's modification of its policies, practices, or procedures, or by the provision of auxiliary aids or services.

© Deisinger, G. (2022)    DEISINGER

122

---

### "Direct Threat"

**Direct Threat**

- Based on a reasonable belief that a disability would pose a significant risk of substantial harm,
  - Risk must be identified & current, not speculative or remote
- Organization may require:
  - An individualized assessment of the individual's present ability to safely perform essential functions of the job.
  - Assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence.

© Deisinger, G. (2022)    DEISINGER

123

---

### "Direct Threat"

**Direct Threat**

- In determining whether an individual would pose a direct threat, the factors to be considered include the:
  - duration of the risk;
  - nature and severity of the potential harm;
  - likelihood that the potential harm will occur; and
  - imminence of the potential harm."
- Even if a genuine significant risk of substantial harm exists, the employer must consider whether the risk can be eliminated or reduced below the level of a "direct threat" by reasonable accommodation.

© Deisinger, G. (2022)    DEISINGER

124

---

### "True Threats"

**True Threat**

Threatener intends to communicate a serious expression of intent to commit unlawful violence against an individual or group. Threatener need not actually intend to carry out the threat.
Virginia v. Black, 538 U.S. 343 (2003)

**Considerations:**

- Content
- Context
- Target
- Intention
  FBI (2017). *Making Prevention of Violence a Reality: Identifying, Assessing & Managing the Threat of Targeted Attacks*
© Deisinger, G. (2022)    DEISINGER

125

---

### Policies to Support the Process

**Policies with TAM-related implications:**

- Workplace violence prevention
- Threat assessment & management
- Harassment & discrimination
- Crisis management
- Employee discipline
- Interim suspension
- Fitness for duty
- Direct threat evaluations
- Weapons
- Bomb threat
- Pandemic

© Deisinger, G. (2022)    DEISINGER

126

---

**Provided for:**
UNIVERSITY OF NOTRE DAME
Threat Assessment & Management Team
March 23-24, 2022

21

© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

DEF00001485

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

### Informed by Research & Practice

**Lessons from the Fabrikant File: A Report to the Board of Governors of Concordia University (1994)**

John S. Cowan

In the report which follows, I identify a substantial number of actions or omissions which I consider to be mistakes. It is, of course, vastly easier to see mistakes with a retrospectroscope. In many cases the mistakes were exacerbated or caused in their entirety by decisional processes, policies, practices and mechanisms which were never designed or contemplated to carry the burden of a like case. In such a milieu very fine people can make very poor decisions.

Available at:
https://www.concordia.ca/content/dam/concordia/offices/archives/docs/cowan-report.pdf

© Deisinger, G. (2022)

127

### Informed by Research and Practice

**Exceptional Case Study Project**



Fein, R. & Vossekuil, B. (1997) *Preventing Assassination: A Monograph. Secret Service Exceptional Case Study Project.*

Fein, R. & Vossekuil, B. (1997) *Protective Intelligence & Threat Assessment Investigations: A Guide for State & Local Law Enforcement Officials*

© Deisinger, G. (2022)

128

### Informed by Research & Practice

**The Final Report and Findings of the Safe School Initiative: Implications for the Prevention of School Attacks in the United States (2002)**

Joint Project of the:
* US Secret Service
* US Department of Education



Available at:
www.secretservice.gov/data/protection/ntac/ssi_final_report.pdf

© Deisinger, G. (2022)

129

### Informed by Research & Practice

**Workplace Violence: Issues in Response. (2004)**

U.S. Department of Justice
Federal Bureau of Investigation



Available at:
www.fbi.gov/stats-services/publications/workplace-violence

© Deisinger, G. (2022)

130

### Informed by Research & Practice

**Risk Assessment Guideline Elements for Violence: Considerations for Assessment the Risk of Future Violent Behavior (2006)**

Association of Threat Assessment Professionals (ATAP)
www.atapworldwide.org



Available at:
cdn.ymaws.com/www.atapworldwide.org/resource/resmgr/imported/documents/RAGE-V.pdf

© Deisinger, G. (2022)

131

### Informed by Research & Practice

**Campus Attacks: Targeted Violence Affecting Institutions of Higher Education (2010)**

Joint Project of the:
* US Secret Service
* US Department of Education
* Federal Bureau of Investigation



Available at:
www.fbi.gov/file-repository/campus-attacks-pdf.pdf

© Deisinger, G. (2022)

132

**Provided for:**
UNIVERSITY OF NOTRE DAME
Threat Assessment & Management Team
March 23-24, 2022

22

© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

DEF00001486

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:

A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

---

### Informed by Research & Practice

**Workplace Violence Prevention and Intervention**
**American National Standard (2011)**

ASIS International &
Society for Human
Resource Management



Available at:
www.asisonline.org/publications/sz-asfs-shrm-workplace-violence-prevention-and-intervention-standard/

© Deisinger, G. (2022)

133

---

### Informed by Research & Practice

**Task Force Report: Predicting Violent Behavior (2012)**

Department of Defense; Defense Science Board

**1.8 Recommended Strategy**
- Provide effective intervention capabilities throughout DoD using a threat management approach.
  - Increase likelihood of early detection and warning of problems to commanders, supervisors, co-workers with improved information sharing and knowledge.
  - Enhance awareness of the risk of targeted violence throughout DoD.

Available at:
www.acq.osd.mil/dsb/reports/PredictingViolentBehavior.pdf

© Deisinger, G. (2022)

134

---

### Informed by Research & Practice

**Balancing Safety and Support on Campus:**
**A Guide for Campus Teams (2013)**

Higher Education
Mental Health Alliance (HEMHA)
Led by the Jed Foundation



Available at:
www.hemha.org/campus_teams_guide-1.jpg

© Deisinger, G. (2022)

135

---

### Informed by Research & Practice

**Making Prevention a Reality: Identifying, Assessing &**
**Managing the Threat of Targeted Attacks (2017)**

US Department of Justice
Federal Bureau of Investigation
Behavioral Analysis Unit



Available at:
www.fbi.gov/file-repository/making-prevention-a-reality.pdf

© Deisinger, G. (2022)

136

---

### Informed by Research & Practice

**A Study of the Pre-Attack Behaviors of Active Shooters**
**in the United States Between 200 and 2013 (2018)**

US Department of Justice
Federal Bureau of Investigation
Behavioral Analysis Unit



Available at:
https://www.fbi.gov/file-repository/pre-attack-behaviors-of-active-shooters-in-us-2000-2013.pdf/view

© Deisinger, G. (2022)

137

---

### Informed by Research & Practice

**Protecting America's Schools: A U.S. Secret Service Analysis**
**of Targeted School Violence (2019)**

US Dept. of Homeland Security
US Secret Service
National Threat Assessment Center

Available at:
www.secretservice.gov/data/protection/ntac/usss-analysis-of-targeted-school-violence.pdf

© Deisinger, G. (2022)

138

---

**Provided for:**
**UNIVERSITY OF NOTRE DAME**
**Threat Assessment & Management Team**
**March 23-24, 2022**

23

© G. DEISINGER, PhD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

DEF00001487

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior



139



140



141



142



143

**TAM is a Systematic Process That:**

Continuously improves &
adapts to challenges & needs

Source: Deisinger (1996); Deisinger & Nolan (2021)

© Deisinger, G. (2022)    DEISINGER

144

Provided for:
**UNIVERSITY OF NOTRE DAME**
**Threat Assessment & Management Team**
March 23-24, 2022

24

© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

24    DEF00001488

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior

### Overcoming the Silo Effect

**Communication and Coordination are Critical!**
- Multiple processes that manage cases:
  - Student Assistance / CARE Team
  - Threat Assessment
  - Sexual Harassment / Title IX
  - Domestic Violence / Dating Violence / Stalking
  - Insider Threat
  - Dignitary Protection
- Mind the Gap!
  - Clarify mission/roles
  - Shared membership
  - Regular communication
  - Integrated planning
  - Designated authority and responsibility
    Source: Deisinger (2015); Deisinger & Nolan (2021)

© Deisinger, G. (2022)                    DEISINGER

145

### Building Collaboration

**Support Collaboration**
- Make it ok to ask for help, to be vulnerable
- Lead by example
- Build bridges
- Reinforce efforts to collaborate
- Support choirs



© Deisinger, G. (2022)                    DEISINGER

146

### Common Pitfalls

**Undue rush to sever connection with person of concern**
- Separation may:
  - Decrease opportunities to monitor situation
  - Decrease resources available to mitigate risk
  - Exacerbate rather than minimize threat
- Case-by-case evaluation must be done, balancing pros and cons of separation vs. continued engagement
- Anticipate separation as potential precipitating event and have plan to monitor/intervene.

Source: Deisinger (1996); Deisinger & Nolan (2021)

© Deisinger, G. (2022)                    DEISINGER

147

### Contagion Effect

**Time Between Mass Shootings, 1982-2014**



© Deisinger, G. (2022)                    DEISINGER

148

### Considerations For Community BTAM

**Challenges:**
- Subjects: Paths cross roles and jurisdictions
- Targets: Paths cross roles and jurisdictions
- Organizations:
  - Don't understand each other's roles and resources
  - Don't communicate, collaborate or coordinate
  - Under-resourced
  - Don't understand threat
  - Don't share investment

© G. Deisinger, Ph.D. (1996)

© Deisinger, G. (2022)                    DEISINGER

149

### Growing/Future Challenges

**Increased Complexity due to:**
- Strategic partnerships / collaborations
- Remote business
- Globalization

**Challenges:**
- Identifying threats
  - Distance
  - Limited contact/engagement
- Capacity and authority to address concerns
- Duty to warn/protect
- Monitoring
  Source: Deisinger (2010); Deisinger & Nolan (2021)

© Deisinger, G. (2022)                    DEISINGER

150

**Provided for:**
UNIVERSITY OF NOTRE DAME
Threat Assessment & Management Team
March 23-24, 2022

25

© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

DEF00001489

## CAMPUS THREAT ASSESSMENT & MANAGEMENT:
A Systematic Approach to Identifying, Assessing & Managing Threatening Behavior



### Violent Extremism: Domestic Trends

**Violent extremism: Broad base**
- Racial / Ethnic supremacy
- Opposition to government authority
- Misogynistic (including Incel)
- Single Issues: (e.g., abortion, animal rights)

**Redefining Extremist "Groups"**
- Groups / organizations ➡ Individuals / network
  - Activity driven more by shared goals than ideology
  - Cross over between ideology

© Deisinger, G. (2022)

151

### Violent Extremism: Global Threat

**Growth of Global Interconnectedness**
- Crowdsourcing funds online
- Sharing tactics, techniques & procedures for action
- Inspiration through sharing manifestos and livestreams
- Recruitment for direct action / combat
- Recruitment through youth scenes
  - Online
    - Social media
    - Encrypted communication
    - Gaming
  - Music festivals
  - Combat sports

Miller-Idriss, C. (2020) *Hate in the Homeland*, Princeton, NJ: Princeton University Press.

© Deisinger, G. (2022)

152



### Weaponization of Information
**Pathways:**
- Disinformation / Misinformation
- Doxing
- Conspiracy
- Voice cloning
- AI generation
- Deep fakes

© Deisinger, G. (2022)

153

### Continuous Improvement

**Team Training and Process Development**
- Basic training for new team members & backups
- Advanced/applied training
  - Interviewing
  - Domain specific (e.g., DV/IPV, Stalking, Extremism, etc.)
- Tabletop exercises / case study reviews
- Professional organization/affiliation
  - Association of Threat Assessment Professionals (ATAP)
- Review of process
  - Deisinger Consulting, LLC

© Deisinger, G. (2022)

154



### Continuing Process Development

**Prepare Foundations:**
- Review/integrate existing mechanisms & resources
- Implement/enhance structure & process
  - Authority/legitimacy
- Enhance community awareness & engagement
- Train key stake-holders in process
- Build collaborative relationships
- Implement systematized process:
  - Reporting
  - Screening/Triage
  - Operational Guidelines
  - BTAM Casework
  - Ongoing Process Review / Continuous Improvement

See resource: Self & Team Assessment Worksheet

© Deisinger, G. (2022)

155

### Contact Information:

**GENE DEISINGER, PH.D.**
President

DEISINGER
CONSULTING LLC

+1 540-392-5284
GDeisinger@DeisingerConsulting.com
DeisingerConsulting.com
@GDeisinger
Gene Deisinger

© Deisinger, G. (2022)

156

**Provided for:**
UNIVERSITY OF NOTRE DAME
Threat Assessment & Management Team
March 23-24, 2022

26

© G. DEISINGER, PHD (2022)
DEISINGER CONSULTING, LLC



CONFIDENTIAL

DEF00001490

# Exhibit 19

# Speak Up



The University of Notre Dame is deeply committed to ensuring students, faculty, and staff from all backgrounds can succeed. Here, we strive to foster an inclusive campus environment that embraces the talents and achievements of all individuals regardless of race, color, national or ethnic origin, religion, sex, sexual orientation, disability, veteran status, age, or genetic information.

The University encourages students, faculty, and staff to report all incidents of bias, discrimination, hazing and hazing-like initiation, and/or harassment so that the University can take appropriate action to assist the students, faculty and/or staff involved and improve the campus climate. The course of action taken by the University will depend on the facts and circumstances of each report.

**Use the Speak Up online form to report an issue or incident to the University administration.**

**All information submitted via the online form will be reviewed during University business hours (Monday - Friday, 8 a.m. - 5 p.m.).**

Submit a Report

OFFICE OF COMMUNITY STANDARDS ›



# Speak Up

306 Main Building
Notre Dame, IN 46556 USA
Phone 574.631.5551
ocs@nd.edu
© 2025 University of Notre Dame

# Exhibit 20

USDC IN/ND case 3:22-cv-00698-GSL    document 164-2    filed 01/09/26    page 105 of 155

12/17/25, 8:54 AM          Concerning Behavior: Assessment and Response | Crime Prevention & Safety | Notre Dame Police Department | University of Notre Dame

UNIVERSITY OPERATIONS, EVENTS, AND SAFETY

# Notre Dame Police Department

---

# Concerning Behavior: Assessment and Response

## See Something, Say Something, Do Something

If this is an imminent threat, call 574-631-5555 from a cell phone or 911 from any campus phone.

NDPD is available 24 hours a day, 7 days a week, 365 days a year

## What is the Threat Assessment and Management Team (TAMT)?

The TAMT reviews reports of concerning behavior to determine whether an individual poses a threat or could potentially pose a threat to themselves or others.

## Who are we?

The TAMT is a multidisciplinary team of University employees with the expertise to review and investigate reports of concerning behavior. The TAMT includes members from:

- Campus Safety & University Operations
- Police Department
- Emergency Management
- Office of the Provost
- Student Affairs
- Center for Student Support & Care

- Graduate School
- Human Resources
- Office of Institutional Equity
- Office of General Counsel
- University Counceling Center
- Wellness Center

# What is concerning behavior?

Concerning behavior is any communication or conduct that causes another person to feel reasonable fear of violence or harm, whether to themselves or others.

# Warning signs for concerning behavior may include:

- Directly communicated threat of concerning behavior
- Noticable change in behavior
- Physical or emotional withdrawal from class, work or social life
- Sudden thinking or emotional changes

# To report concerning behavior (not imminent):

- Speak with a police officer (call 574-631-5555 or visit Hammes Mowbray Hall)
- Email reportthreats@nd.edu
- Use the Speak Up online form
- Call the Integrity Line (800-688-9918) - anonymous
  - Please note that with the anonymous reporting method, we are unable to contact you if additional information is needed.

# Resources

- Center for Student Support & Care
- University Counseling Center
- Wellness Center

If this is an imminent threat, call 574-631-5555 from a cell phone or 911 from any campus phone.

*NDPD is available 24 hours a day, 7 days a week, 365 days a year*

UNIVERSITY OPERATIONS, EVENTS, AND SAFETY ›



# Notre Dame Police Department

Hammes Mowbray Hall

Notre Dame, IN 46556 USA

Phone (574) 631-5555

Fax (574) 631-9873

police@nd.edu

© 2025 University of Notre Dame

# Exhibit 21



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

230 SOUTH DEARBORN ST., 37ᵀᴴ FLOOR
CHICAGO, IL 60604

REGION V
ILLINOIS
INDIANA
IOWA
MINNESOTA
NORTH DAKOTA
WISCONSIN

April 19, 2024

Reverend John I. Jenkins, C.S.C.
President
University of Notre Dame
Sent via email only to president@nd.edu

Re:    OCR Complaint #05-15-2508
       OCR Complaint #05-16-2093

Dear Reverend Jenkins:

This letter is to notify you of the disposition of the above-referenced complaints that were filed with the U.S. Department of Education, Office for Civil Rights (OCR), against the University of Notre Dame (University), alleging discrimination on the basis of sex. A consolidated resolution letter is being issued for the two complaints because both complaints involved one respondent.

- In Complaint #05-15-2508, OCR investigated whether, during the [Redacted Content] academic year, the University failed to respond promptly and equitably to a report of sexual harassment of a female undergraduate student (Student A) by a male University student (Student B) of which it had notice.

- In Complaint #05-16-2093, OCR investigated whether the University failed to respond promptly and equitably to a [Redacted Content] report by a female undergraduate student at a nearby college (Student C) that she had been sexually assaulted by Student B on the University campus in [Redacted Content] and threatened by him in [Redacted Content].

OCR is responsible for enforcing Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681-1688, and its implementing regulation at 34 C.F.R. Part 106. Title IX prohibits discrimination based on sex in any educational program or activity operated by a recipient of federal financial assistance. As a recipient of federal financial assistance from the Department, the University is subject to this law.

OCR investigated these complaints by reviewing information provided by the attorneys for Student A and Student C, reviewing information provided by the University, and interviewing Student A, Student C, and University personnel. Prior to the completion of OCR's investigation, the University expressed an interest in resolving the complaints. The University signed the enclosed Resolution Agreement (Agreement) to resolve the complaints. The basis for this conclusion is set forth below.

**Applicable Legal Standards**

The alleged sexual harassment that is the basis of these complaints occurred prior to August 2020 (when the 2020 Title IX regulation took effect). OCR therefore applied the Title IX

The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.

www.ed.gov

Page 2 – Reverend Jenkins

regulation in effect during that time in evaluating the University's compliance with Title IX. Citations in this section are to this prior regulation, and the legal standards discussed below were in effect during the academic years at issue in the individual allegations. For more information about Title IX, including the new Title IX regulation and related resources, visit OCR's website.

The regulation implementing Title IX, at 34 C.F.R. § 106.31(a), states as follows: "Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance."

While the Title IX regulation in effect during the academic years under review did not reference sexual harassment, OCR interpreted Title IX to require recipients to respond to complaints or other notice of sexual harassment involving students and employees.

Sexual harassment is a form of sex discrimination prohibited by Title IX. Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature, such as sexual assault or acts of sexual violence.

When the recipient has actual or constructive notice of sexual harassment, it must take immediate and appropriate action to investigate or otherwise determine what occurred. The specific steps in a school's investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors. In all cases, however, the inquiry should be prompt, thorough and impartial. It may be appropriate for a school to take interim measures prior to or during the investigation of a complaint. For instance, if a student alleges that the student has been sexually assaulted by another student, the school may decide to place the students immediately in separate classes or in different housing arrangements on a campus, pending the results of the school's investigation.

If a school determines that sexual harassment has occurred, it should take reasonable, timely, age-appropriate, and effective corrective action, including steps tailored to the specific situation. Appropriate steps should be taken to end the harassment. Responsive measures should be designed to minimize, as much as possible, the burden on the student who was harassed.

The Title IX regulation also contains procedural requirements, including a requirement that recipients publish a notice of nondiscrimination covering Title IX and adopt and publish procedures that provide for the prompt and equitable resolution of student and employee complaints alleging any actions prohibited by Title IX and its implementing regulation. See 34 C.F.R. § 106.9(a); see also 34 C.F.R. § 106.8(b). Regardless of whether harassment occurred, a school violates this requirement of the Title IX regulations if it does not have those procedures and policy in place.

A school's sex discrimination grievance procedures must apply to complaints of sex discrimination in the school's education programs and activities filed by students against school employees, other students, or third parties.

Page 3 – Reverend Jenkins

OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the procedures provide for: notice to students, parents of minor students, and employees of the procedure, including where complaints may be filed; application of the procedure to complaints alleging harassment carried out by employees, other students, or third parties; adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; designated and reasonably prompt timeframes for the major stages of the complaint process; notice to the parties of the outcome of the complaint; and an assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.

**Facts**

Student A alleged in her OCR complaint that the University failed to conduct a prompt and equitable investigation regarding her complaint of sexual harassment, failed to provide her with interim support services, and failed to provide her with equitable rights during a disciplinary hearing.

Student C alleged in her OCR complaint that the University failed to convene a hearing for her complaint because Student B was suspended from the University for another matter.

Student A informed OCR that after her "intimate relationship" with Student B ended in [Redacted Content], Student B was verbally abusive toward her and threatened to [Redacted Content]. On [Redacted Content], Student A made a report to the University's Office of Community Standards (OCS) via an online reporting system, alleging that Student B threatened to [Redacted Content] and called her sexually derogatory names.

On [Redacted Content], the University's Director of Community Standards (DCS) met with Student A regarding her report. He told OCR that, at that meeting, he pulled up Student A's report to ask for additional context so he could determine the appropriate way to handle her report. The DCS told OCR that Student A confirmed that she was not alleging dating or domestic violence and that all the sexual relations between her and Student B had been consensual. He also said that while the initial report referenced [Redacted Content], he does not recall that he and Student A discussed [Redacted Content] at the initial meeting. Student A told OCR that she could not recall what specific incidents were discussed at the meeting, whether she said all the sexual relations between her and Student B were consensual, or whether there was a separate discussion of [Redacted Content]. She asserted to OCR that because [Redacted Content] were referenced in the online report, the University was aware of her concerns about Student B's threats to [Redacted Content].

The DCS informed Student A via a [Redacted Content], email that the University would address her report about Student B's threatening communications and conduct through the OCS conduct process. The DCS did not share the complaint with the Title IX Coordinator at the time.

Student A was informed on [Redacted Content], by an email from the DCS that a hearing was scheduled for [Redacted Content], pursuant to the conduct process, and that she was invited to participate as a witness. In a follow-up e-mail, the DCS advised Student A that she was not entitled to an advisor or an opportunity to call witnesses. On the same day, the DCS met with

Page 4 – Reverend Jenkins

Student B and emailed Student B a notification letter informing Student B of the allegations
against him, that a hearing was scheduled for [Redacted Content], and of the University conduct
process. The written notice said the applicable section of the Standards of Conduct were
"Violence or Threat of Violence," "Abusive or harassing behavior," and "Willful Damage to the
reputation or psychological well-being of another."

Student A said the University did not notify her of available supportive services, so she had to
contact her professors to ask not to be assigned to work in the same group as Student B. Student
A informed OCR that the professors complied with her requests; she said that because there was
only one section of each class in which she and Student B were enrolled, it was not possible to
switch her schedule.

The University held a hearing on [Redacted Content], to determine whether Student B violated the
three University standards of conduct referenced in the [Redacted Content] letter. According to the
DCS, Student A made new allegations during the hearing and at a follow-up meeting he had with
her on [Redacted Content] that: (1) Student B had [Redacted Content] (2) Student B had [Redacted
Content]; and (3) Student B sexually assaulted Student C in [Redacted Content]. The University
reported, and Student A confirmed to OCR, that at this time Student A was made aware of local
resources such as the Family Justice Center and their services, in addition to options related to
protective orders.

The DCS informed the Associate Vice President for Student Services (Associate VP), who was
responsible for overseeing the University's Title IX process, of the allegations Student A made at
the [Redacted Content] meeting, and the Associate VP then notified the Deputy Title IX
Coordinator of these allegations on [Redacted Content].

The Deputy Title IX Coordinator, who is no longer employed by the University, emailed Student
A on [Redacted Content], to arrange a meeting about "some incidents friends of yours experienced
that you may have been a witness to." The meeting between the Deputy Title IX Coordinator and
Student A took place three days later on [Redacted Content]. The Deputy Title IX Coordinator's
notes of this meeting said Student A[Redacted Content].

On [Redacted Content], Student A emailed the DCS requesting the results from the [Redacted Content]
hearing and noted ongoing concerns. Specifically, she wrote, "I am a bit concerned for my safety
from [Student B] if he decides to retaliate in some way (physically or otherwise). I am also very
concerned that [Redacted Content].

The University notified Student A and Student B in writing on [Redacted Content], that Student B
was found responsible for "abusive or harassing behavior, including unwelcome
communication" with Student A. The letter to Student B outlined sanctions and instructed him to
have "no contact, either directly, indirectly or through third parties" with Student A through her
graduation from the University scheduled for [Redacted Content].

In response to a telephone call from the Deputy Title IX Coordinator on [Redacted Content],
Student C emailed the Deputy Title IX Coordinator on [Redacted Content], to report that Student B
sexually assaulted her in [Redacted Content] in a dormitory room on the University's campus,
including that he[Redacted Content].

Page 5 – Reverend Jenkins

By letter dated [Redacted Content], the Deputy Title IX Coordinator informed Student C that the reported incidents may violate the University's sexual misconduct and sexual harassment policies and submitted Student C's complaint to an outside investigator. On [Redacted Content], the University also notified Student B by letter that the University would hold a conduct hearing on [Redacted Content], concerning a report it received of a [Redacted Content] incident involving Student B and a different female student (Student D) that may be a violation of the University's sexual misconduct and sexual harassment policies.

The outside investigator interviewed Student C on [Redacted Content]. The notes of the interview reflect that Student C reported that Student B sexually assaulted her [Redacted Content] and [Redacted Content]. The investigator interviewed Student B on [Redacted Content], and he denied sexually assaulting Student C. The notes of the [Redacted Content], interview did not address the allegation about [Redacted Content] Student C.

The University opened a separate Title IX complaint on [Redacted Content], based on the report from [Redacted Content] that Student B [Redacted Content]. A summary sheet in the file for this complaint identifies Student A as the complainant and Student C as a witness, but the Deputy Title IX Coordinator's notes identify Student C as another complainant; the file does not explain why the complaint was not opened immediately upon receipt of the report in [Redacted Content]. Between [Redacted Content], the Deputy Title IX Coordinator conducted interviews with Student A and Student C and two other students.

Student A emailed the Deputy Title IX Coordinator on [Redacted Content], to ask why her initial [Redacted Content] report was not considered a Title IX complaint. The Deputy Title IX Coordinator replied that Student A would have to talk with the DCS as the OCS was a "separate process" from the Title IX office. OCR did not receive any information that indicated that Student A followed up with the DCS regarding this question.

The DCS notified Student C via email on [Redacted Content], that a hearing that would occur the following week focused on the [Redacted Content] incident and that "[a]ny other issues that arose through the Administrative Investigation would be managed separately (e.g., your concern that you mentioned to me that [Student B] shared pictures of you)."

On [Redacted Content], in connection with his conduct toward Student D, Student B was found responsible for "violence or the threat of violence," "abusive or harassing behavior," "behavior which . . . infringes upon the right and well-being of others," and a violation of the University's intoxication policy. Student B was temporarily dismissed from the University, through the end of the [Redacted Content].

The investigator submitted her report regarding the alleged sexual assault of Student C to the Deputy Title IX Coordinator on [Redacted Content]. The report summarized the testimony of Student B, Student C, and other witnesses, but did not make any recommendations or include any findings, consistent with the University's procedures at that time.

The DCS emailed Student C on [Redacted Content], regarding arrangements for her to review a copy of the final investigation report for the Title IX investigation and the hearing, which was scheduled for [Redacted Content]. Student B received a similar email dated [Redacted Content].

Page 6 – Reverend Jenkins

However, on [Redacted Content], the DCS notified Student C that the hearing was cancelled. By letter dated [Redacted Content], the Deputy Title IX Coordinator notified Student C that Student B had been dismissed from the University, that he could not enter campus and could not apply for readmission until [Redacted Content], and that readmission was not guaranteed. The letter also said the hearing regarding her sexual assault allegations would be held immediately if Student B was ever readmitted to the University.

After completing the initial interviews in connection with Student A's complaint, the Deputy Title IX Coordinator informed Student A on [Redacted Content], that the University would be "starting the investigation soon" because the conduct she reported was a possible violation of the University's sexual harassment and/or sexual misconduct policy. The letter did not specify the exact conduct that would be investigated or inform Student A that the investigator would be assigned. By a second letter the same day, the Deputy Title IX Coordinator informed Student A that Student B had been dismissed and banned from campus due to another disciplinary matter. The Deputy Title IX Coordinator informed Student A that the University would complete its investigation concerning Student A's complaint but there would be no hearing concerning the charges against Student B unless he was readmitted. On [Redacted Content], Student A received written information about her rights to access resources on campus including counseling and academic support.

Student B was informed in writing by a letter dated [Redacted Content], of the complaint that alleged he [Redacted Content] and also informed him the case would be "put on hold" since he was no longer a student.

The investigator interviewed Student C on [Redacted Content], regarding [Redacted Content], as part of the investigation of Student A's complaint. Student C indicated that Student B had [Redacted Content]. Student C said Student B [Redacted Content].

The outside investigator submitted her report on [Redacted Content], to the University concerning Student A's Title IX complaint against Student B regarding [Redacted Content]. The report listed testimony and evidence provided by relevant witnesses but did not state any conclusions. The Deputy Title IX Coordinator informed Student A by email dated [Redacted Content], that the investigation process was complete and that a hearing would be conducted immediately if Student B returned to the University.

The DCS told OCR that he talked about the pending Title IX matters and the allegations about Student B with other University administrators, including the Associate Vice President for Student Development, the Associate Vice President in the Office of Student Affairs, the Vice President for Student Affairs, and the Associate General Counsel, but did not otherwise seek to coordinate a response to other students concerning their allegations against Student B.

The University's Standards of Conduct no longer specify that the Title IX process is automatically suspended when a student leaves the University, although they do not specifically state what will occur if a student has been suspended. The University updated its Title IX policies in fall 2020 following issuance by OCR of revised Title IX regulations and reports to OCR that it reviews its policies on an annual basis and revises them as necessary to ensure

Page 7 – Reverend Jenkins

compliance with Title IX. OCR reviewed the policies and determined that they are consistent with the 2020 Title IX regulations.

Student A graduated from the University in [Redacted Content]. Student C graduated from another university in [Redacted Content]. To date, Student B has not attempted to reenroll at the University.

The University informed OCR that, in the 2015-2016, 2016-2017, 2018-2019, 2020-2021, and 2022-2023 academic years, it administered climate surveys "to assess the knowledge, perceptions, and experience of [University] students in relation to sexual assault, sexual misconduct, dating and domestic violence, stalking, and other conduct that creates a sexually hostile environment." The University publishes the results of these surveys on its website. The University also informed OCR that, in the academic years it did not conduct a climate survey, it conducted focus groups to further explore issues, concerns or trends identified in the climate surveys, and the results of the focus group sessions were shared with the University's Committee on Sexual Assault Prevention and other campus offices that have the means of influencing changes to University policies and procedures.

**Analysis and Conclusion**

OCR determined that it is appropriate to resolve the sexual harassment allegations in these two cases prior to making a finding.

With respect to Student A, OCR has concerns that the University did not treat Student A's initial report as a potential Title IX issue, but instead treated it as a general conduct issue. OCR also has concerns that the University did not provide Student A with interim support services upon receipt of the initial report. Finally, OCR also is concerned that Student A was not treated equitably in the [Redacted Content] conduct hearing (e.g., Student B was permitted to have an advisor of his choice attend the hearing and was permitted to call witnesses, but she was not).

With respect to Student C, OCR has concerns because the University did not include in its initial investigation of Student C's complaint that Student B had [Redacted Content].

OCR also has concerns about the University's failure to complete the pending Title IX cases after the University temporarily dismissed Student B, by suspending the resolution process dependent on Student B's choice whether to seek readmission to the University, and failure to determine whether the reported conduct created a hostile environment for Student A and Student C (and other students) for which the University should have provided redress under Title IX.

The enclosed Agreement, when fully implemented, will address all of the allegations investigated and the identified concerns. The provisions of the Agreement are aligned with the allegations in the complaint and the information obtained during OCR's investigation to date and are consistent with the applicable regulations. OCR will monitor the implementation of the Agreement.

This concludes OCR's resolution activities regarding the complaint and should not be interpreted to address the University's compliance with any other regulatory provision or to address any issues other than those addressed in this letter. The letter sets forth OCR's determination in two OCR cases. This letter is not a formal statement of OCR policy and should not be relied upon,

Page 8 – Reverend Jenkins

cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.

Please be advised that the University may not harass, coerce, intimidate, or discriminate against any individual because he or she has filed a complaint or participated in the complaint resolution process. If this happens, the individual may file another complaint alleging such treatment.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. In the event that OCR receives such a request, we will seek to protect, to the extent provided by law, personally identifiable information, which, if released, could reasonably be expected to constitute an unwarranted invasion of privacy.

The Complainant may file a private suit in federal court, whether or not OCR finds a violation.

If you have any questions, please contact Salina Lopez, Senior Equal Opportunity Specialist, at 312-730-1627 or by email at Salina.Lopez@ed.gov.

Sincerely,

Jeffrey Turnbull
Team Leader

Enclosure

cc: Todd Dvorak (sent via email only to tdvorak2@nd.edu)
  Brian Guarraci (sent via email only to bguarra1@nd.edu)

# Exhibit 22
## (Dec. Stebbins)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BRYCE THOMAS DANIELS,                )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )      CAUSE NO.: 3:22-CV-00698
                                     )
UNIVERSITY OF NOTRE DAME,            )
                                     )
          Defendant.                 )

## DECLARATION OF STEVEN STEBBINS

I, Steven Stebbins, do hereby swear that the following statements are true and correct to the best of my knowledge, information, and belief, and that I would competently testify as follows if called upon to do so:

1.    I am over eighteen (18) years of age and I am fully competent to make this Declaration.

2.    I have been an officer with the Notre Dame Police Department ("NDPD"), formerly the Notre Dame Security Police, since May 2009. I am currently a detective and have been since October 2015. I was first employed at Notre Dame in June 2004, as a security officer.

3.    On November 3, 2021, I was assigned to investigate a case that NDPD had initiated the day prior (November 2, 2021) about Notre Dame law student Bryce Daniels. The report of that investigation is attached as Exhibit A.

4.    This case was initiated when a female Notre Dame student, "Jane Roe," made a report to NDPD Officer Adam Rollins on November 2, 2021, that a classmate, Bryce Daniels, had gotten her number at the beginning of the semester and asked her out on a date. Jane Roe claimed that she declined and blocked his number. She also reported that, on November 2, 2021, Daniels made rude comments about Jane Roe in the hallway and then approached her and told her that he

would not stop saying "hi" to her. Jane Roe told Officer Rollins that she wanted to make a report of Daniels' harassment to NDPD.

5.      Jane Roe called NDPD again the next day, November 3, 2021, requesting to speak with an officer and was transferred to NDPD Captain Crystal Garcia Betts. Jane Roe told Captain Garcia Betts that she had learned from another student that Bryce had said, "if [Jane Roe] escalates this" situation, Daniels would "bury" her. Jane Roe also reported that two other students heard Daniels bragging about having a gun on him. Jane Roe said she was in fear of Daniels, requested assistance in obtaining a No-Contact Order, and requested assistance from the University's Title IX office (formally known as the Office of Institutional Equity or "OIE"). Following this call, Captain Garcia Betts forwarded a report to OIE, advising them that Jane Roe had requested that OIE be involved and that NDPD was currently investigating Jane Roe's allegations.

6.      Officer Rollins and Captain Garcia Betts recorded written summaries of the reports Jane Roe made to them. I reviewed those summaries when I was assigned to be the detective on this case. Those summaries are included as part of my investigation report (Exhibit A).

7.      Early the morning of November 4, 2021, I emailed Jane Roe and the three students she had identified to Captain Garcia Betts, to set up interviews with them. Those interviews were scheduled for November 4 and November 5, 2021, based on the students' availability.

8.      I met with two student witnesses in the morning of November 4, 2021. The first student witness ("Student 1") reported that during class on October 28, 2021, Daniels told Student 1 that he should join the Federalist Society so that he could vote for Daniels when he ran for president of that club and then made a comment to Student 1 that referred to shooting or killing anyone who ran against him. Student 1 told some friends about this comment on October 29, 2021, and learned that Daniels previously had told those persons that he had a gun.

9.      The second student witness ("Student 2") reported that other students had come to
Student 2 with concerns that Daniels had a gun and had made jokes about hurting people who get
in the way of his leadership goals. Student 2 reported that he had also heard that Daniels had
shouted at a TA during class when he was instructed to not use his cell phone. Student 2 told me
that Daniels had previously said to Student 2 that he hates women, that all women are liars, and
that he had previously been accused of rape.

10.      Student 2 also reported that Jane Roe had described her interactions with Daniels
to Student 2 on November 2, 2021, and that Student 2 later that same day approached Daniels to
discuss them. Student 2 said that Daniels asked him, "is this about that evil woman [Jane Roe],"
and then said it was "fun to needle her," that he would "respect her when she respects [him]," that
he is "not as forgiving as our Lord Jesus Christ," and that "if she tries to escalate this, I will bury
her."

11.      Following these interviews, I emailed Daniels at approximately 11:30 am on
November 4, 2021, to set up a time to speak with him. We scheduled a meeting for 1:30 pm on
November 5, 2021.

12.      At 1:30 pm on November 4, 2021, I learned that the result of a weapons check was
that Daniels had a permit to carry guns in the state of Texas.

13.      A Threat Assessment and Management Team ("TAMT") meeting was held at 2:00
pm on November 4, 2021, specifically to discuss Daniels. Captain Garcia Betts, who is in charge
of the detective bureau at NDPD, typically attends TAMT meetings, although I attend three to five
meetings a year, including when she is not available. I recall that I attended this meeting because
I had spoken with Student 1 and Student 2 about Daniels. In advance of the TAMT meeting, I gave
Captain Garcia Betts an update on my investigation and informed her of the information I had

obtained thus far. Both Captain Garcia Betts and I spoke with the other members of TAMT during the meeting about what we had learned about Daniels.

14.     Around this same time on November 4, 2021, NDPD was made aware that a male law student ("John Doe") had sent an email to Stella Miller with concerns about an unnamed male student who had a gun and was potentially suicidal. Captain Garcia Betts emailed John Doe to ask that he disclose the identity of the student with a weapon.

15.     Captain Garcia Betts spoke with John Doe that day. By 5:30 pm on November 4, 2021, John Doe had disclosed that the student about whom he had made the previous report was Daniels. Captain Garcia Betts shared this information with NDPD Chief Keri Kei Shibata, who called for an emergency TAMT meeting, which was held that evening. I did not attend that meeting, but both Chief Shibata and Captain Garcia Betts were present to share the information known to NDPD.

16.     In the morning of November 5, 2021, I interviewed the third student witness ("Student 3"). Student 3 reported that Daniels had stated during a Federalist Society meeting that he carries his gun all the time and that when Student 3 made reference to the fact that guns are banned from campus, Daniels shook his backpack in a manner that suggested to Student 3 he may have had his gun in the backpack. Student 3 said that he had heard from Student 1 that Daniels had said he would kill anyone who gets in his way during Federalist Society elections.

17.     Student 3 also reported that Daniels told him that he had, prior to law school, dated a woman who was now a law student, and that student had begged Daniels not come to Notre Dame for law school and not to move into the same apartment complex as her. Daniels told Student 3 that this other female student was afraid that Daniels was going to hurt her. Student 3 also reported that Daniels had disclosed to him that he has terrible relationships with women and

believes woman are "evil." Student 3 said that Daniels told him that he had asked Jane Roe to lunch and said that Daniels was really upset when Jane Roe told him to never text her again.

18.    Student 3 described Daniels as having a "short fuse" and said that he snapped at a TA and told him, "if you ever speak to me like this again, we are going to have problems" when the TA reminded the class that students were not allowed to use cell phones. Student 3 reported that he and his classmates were afraid that Daniels was going to hurt them.

19.    I interviewed Jane Roe on the morning of November 5, 2021, as well. This was her third interview with NDPD. She again reported what she had previously disclosed: Early in the semester while in line for donuts at a church event, Daniels had asked for her phone number for the purpose of adding her to a Federalist Society list, and, during that conversation, she initially bought him a donut because he did not have any money on him but then she picked up "bad vibes" from him so decided to avoid him in the future; she then got a text message from him stating he owed her lunch, she responded stating he should only use her number for Federalist Society contact, he asked why, and she blocked him; they later saw each other at an off-campus party; on October 29, 2021, she heard from friends about their concerns about Daniels, which included that he was making comments to others about having a gun on his person; on November 2, 2021, she saw Daniels on campus, he said "Hey, [Jane Roe]" to her, she kept walking, and Daniels said that she was rude; immediately thereafter, she was talking to Student 2 when Daniels walked by once more and said "Hey, [Jane Roe]" to her again; and Jane Roe responded to Daniels by telling him to leave her alone, to which Daniels responded "I'm going to say hi to you" and asked her, "What are you going to do, file a Title IX complaint against me?"

20.    Jane Roe also reported to me that she then asked Student 2 to speak to Daniels on her behalf, and Student 2 told her that Daniels said to him that if Jane Roe escalated things, he would "bury" her.

21.    Jane Roe said that she had not heard anything from Daniels since that incident. She told me that a No-Contact Order was imposed on November 4, 2021, and she was hoping that it would not aggravate Daniels.

22.    I then interviewed Daniels early in the afternoon of November 5, 2021. He agreed to let me search his backpack for weapons and disclosed that he had a knife.

23.    I asked Daniels what had transpired between Jane Roe and him. He said that they had an interaction at an off-campus mass and when he texted her, she replied, "Don't talk to me again," and then never answered when he asked her if he had done something to offend her. Daniels told me that he has had many experiences with "crazy women" and "awful, not good, evil hearted women." He said that this situation with Jane Roe was "too close" to those experiences and he was "very paranoid about that stuff." He then told me that he and Jane Roe had an interaction at a party and that he told her, "I don't know what your hang-up is, but if I have done anything to offend you, I'm sorry."

24.    Daniels and I then talked about what had occurred the past week. He said that on either Monday or Tuesday, he said, "Hi, [Jane Roe]," to Jane Roe in the stairwell of the library, and Jane Roe did not reply. He said he then later saw Jane Roe talking to Student 2, and that he said, "Hey, [Jane Roe]," to her again. Daniels reported that Jane Roe then asked him to obey her request to not speak to her. Daniels told me that he felt like Jane Roe wanted him to view her as "source of authority." Daniels said that he told Jane Roe that he just said "hey" and that she should "relax," and that he then walked away. He reported that Jane Roe then approached him in the

library and told him, "You are going to listen to me and never talk to me again." Daniels told me that he responded to Jane Roe by stating that he did not have a desire to converse with her but that he had just said "hey" and that she was blowing it out of proportion. He said that Jane Roe responded to him by saying, "You can say 'hey' but nothing else."

25.    Daniels confirmed that he had talked to Student 2 about Jane Roe. Daniels reported that he told Student 2 that he (Daniels) is paranoid and would leave Jane Roe alone.

26.    I asked Daniels about his comment earlier in the interview about his previous bad experiences with women. He responded by asking, "Evil women?" I then asked Daniels if he thought that all women were evil, and he told me, "I think that's pretty fair." He mentioned a few women in particular that were the exception.

27.    I also asked Daniels about whether he had stated he would "bury" Jane Roe. He confirmed that he made this statement, but explained he did not mean the term physically. Rather, according to Daniels, he meant that if Jane Roe destroyed his time at law school, he would "happily bury her" by "winning" the allegations she brought against him. He claimed he would not hurt her.

28.    Daniels made multiple remarks that made me concerned that he might hurt himself. I told him that many students were concerned about him, and Daniels asked me if I was talking about John Doe and said, "Please don't stress [John Doe] out." I asked him if he ever had thoughts of harming himself, and he said that he had been thinking of hurting himself on-and-off for the past 12 or 13 years. He disclosed that he had a Glock 19 handgun and that John Doe and other students may have known this. Near the end of our interview, after we had been talking for about an hour, I asked Daniels if he felt like he might harm himself and Daniels told me, "I'm highly unlikely to intentionally hurt myself for the pure purpose of hurting myself. That's probably the

best you're going to get from me." I interpreted this to mean that he was unable to promise me that he would not attempt suicide or otherwise harm himself.

29.    Based on my interview of him, I believed that Daniels was a potential threat to himself and to others.

30.    I typed up the summaries of my interviews with Student 1, Student 2, Student 3, Jane Roe, and Daniels. These summaries are contained in the report attached as Exhibit A. The interviews were also video recorded.

31.    After speaking with Daniels, I escorted him to a conference room, where he spoke with University administrators. I understand that he was removed from the University on an emergency basis at that time. I was not involved in that meeting.

32.    I know that Daniels also spoke to a counselor from the University Counseling Center. After Daniels spoke with the counselor, Captain Garcia Betts and I were told that Daniels had agreed to go to Memorial Epworth Hospital.

33.    When Daniels' meetings with the University administrators and counselor were over, Captain Garcia Betts and I spoke to Daniels again. We issued a No Trespass Order barring him from campus. Daniels also consented to relinquish his weapons to NDPD at that time. Accordingly, we drove Daniels to his apartment, where Daniels gave us two weapons: a Glock 19 handgun and a rifle.

34.    Captain Garcia Betts and I then drove Daniels to Memorial Epworth Hospital. On the way to Epworth, Daniels told me that he did not mind going there to get things straightened out. Once there, Daniels admitted himself to Epworth.

35.    On or about November 12, 2021, NDPD closed its investigation of this matter and referred it to the University's Office of Institutional Equity and Office of Community Standards for further review under the University's policies.

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct and is based on personal knowledge.

Dated: December 19, 2023

DocuSigned by:

*Steve Stebbins*

OFFB4B99BA5B4B0...

Steven Stebbins

# Exhibit 23

## (Dec. Oliver)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BRYCE THOMAS DANIELS,          )
                               )
        Plaintiff,             )
                               )
    v.                         )        CAUSE NO.: 3:22-CV-00698
                               )
UNIVERSITY OF NOTRE DAME,      )
                               )
        Defendant.             )

## DECLARATION OF ERIN OLIVER

I, Erin Oliver, do hereby swear that the following statements are true and correct to the best of my knowledge, information, and belief, and that I would competently testify as follows if called upon to do so:

1.      I am over eighteen (18) years of age and I am fully competent to make this Declaration.

2.      I am the Assistant Vice President for Institutional Equity and Title IX Coordinator at the University of Notre Dame ("Notre Dame" or the "University"). I oversee the Office of Institutional Equity ("OIE"). In addition, I am a regular, standing member of the University's Threat Assessment and Management Team ("TAMT").

3.      I have been employed at the University since June of 2019. I have a bachelor's degree from Notre Dame, a law degree from Michigan State University, and am a member of the Indiana state bar.

4.      OIE provides oversight of the University's efforts to comply with all applicable laws prohibiting discrimination, harassment, and retaliation, including Title IX of the Education Amendments of 1972 ("Title IX"). OIE is also responsible for oversight of the University's compliance with its own policies prohibiting discrimination, harassment, and retaliation, including

the Policy on Discriminatory Harassment, Sexual Harassment, and Other Sex-Based Misconduct

("Title IX Policy") (attached hereto as Exhibit A).

5.      The Title IX Policy prohibits sexual or discriminatory harassment and sexual

misconduct. Reports of violations of the Title IX Policy are addressed using the Procedures for

Resolving Concerns of Discriminatory Harassment, Sexual Harassment, and Other Sex-Based

Misconduct ("Title IX Procedures") (attached hereto as Exhibit B).

6.      I first learned of Bryce Daniels on or about November 4, 2021. I was in attendance

at TAMT meetings on November 2, 2021, and on November 4, 2021, at which two reports

ultimately discovered to be about Daniels were discussed. As a general matter, I recall that one

report was about a male law student who was in possession of a gun and who had threatened to

kill himself due to his unrequited romantic interest in another male law student. The other report

was from a female law student who was concerned she was being harassed and potentially stalked

by a male law student. Once the TAMT realized these two reports were both about Daniels, a third

meeting was scheduled for the evening of November 4, 2021.

7.      In the meantime, OIE received a report from the Notre Dame Police Department

("NDPD") on the morning of November 4, 2021. This report was from the same female law student

identified in Paragraph 6 above, "Jane Roe." Jane Roe spoke with NDPD regarding her concerns

about Daniels. NDPD referred the report to OIE for assistance and to facilitate the implementation

of a no contact order.

8.      The University's Deputy Title IX Coordinator, Amber Monroe, sent

communication to both Jane Roe and Daniels imposing a mutual No-Contact Order in the

afternoon of November 4, 2021 (attached hereto as Exhibit C).

2

9.     Approximately twenty minutes after Monroe issued the No-Contact Order, Daniels filed a formal complaint against Jane Roe with OIE (attached hereto as Exhibit D). Therein, Daniels stated, "[Jane Roe] has repeated interjected herself into my conversations with friends in private settings, called me a liar in a legally cognizable defamatory manner in aforementioned contexts, and physically prohibited me from my walkway in the Law Library until she was able to coerce me into saying what she wanted." Daniels alleged that this conduct constituted stalking.

10.    The TAMT met for a third time in the evening of November 4, 2021. The members of the TAMT discussed the reports made regarding Daniels. At this point, there were multiple students – including but not limited to Jane Roe and the male law student referenced above – who had reported that Daniels had made comments about having a weapon and who had reported having troubling interactions with Daniels. Due to the seriousness of these reports and the significant safety concerns raised, TAMT concluded that Daniels was a threat to himself and others and decided to recommend Daniels' emergency removal from the University and the implementation of a No Trespass Order.

11.    Pursuant to the University's Emergency Actions procedure (attached hereto as Exhibit E),

> When the Assistant Vice President for Student Services, or their designee is advised by a University department or committee (including but not limited to the Center for Student Support and Care, the University Counseling Center, University Health Services, and/or Campus Safety) that a student (graduate, professional, undergraduate, or unclassified) is incapable of properly functioning in this community, or that he/she could cause harm to himself/ herself or to others, the student may be withdrawn from the University by the Assistant Vice President for Student Services, or their designee with or without the student's consent or permission.

12.    The Assistant Vice President for Student Services at the University, who also is a standing member of TAMT, is Dr. Christine Caron Gebhardt. However, Dr. Caron Gebhardt was

going to be out of the office on November 5, 2021, and asked that I serve as her designee. As her

designee, I effectuated the recommendation from TAMT to withdraw Daniels.

13.     I do not typically act as the designee for Dr. Caron Gebhardt under the Emergency

Actions procedure. However, there were multiple persons out of the office at that time, including

not only Dr. Caron Gebhardt but also Margaret Morgan, Director of the Center for Student Support

and Care, who more regularly serves as Dr. Caron Gebhardt's designee in such contexts. I was

asked to serve as Dr. Caron Gebhardt's designee here because I was an Assistant Vice President

in a student-facing role, a TAMT member, and was privy to the background information.

14.     On November 5, 2021, Christine Holst-Haley, who is the Student Services Program

Manager at the Notre Dame Law School, and I met with Daniels in-person to deliver the news of

his withdrawal. He was provided a letter documenting the reasons for this withdrawal (attached

hereto as Exhibit F). Holst Haley and I discussed the contents of the letter with him and the fact

that the University had determined it needed to take emergency action to withdraw him. We also

informed him of his ability to appeal the withdrawal. My conversation with Daniels was short, as

he asked that I leave so he could speak to Holst Haley alone.

15.     I understand that Daniels did submit an appeal of his emergency action and that his

appeal was denied, but I was not involved in that decision. I was copied on the appeal denial letter

sent by Rev. Gerard J. Olinger, Vice President for Student Affairs (attached hereto as Exhibit G).

16.     After his withdrawal, OIE continued to consider Daniels' formal complaint against

Jane Roe. Ultimately, OIE concluded that Daniels' complaint against Jane Roe did not implicate

the Title IX Policy. In other words, even if everything Daniels had alleged was true, Jane Roe's

conduct was not a violation of the Title IX Policy because it was not sexual harassment, sexual

misconduct, or otherwise discriminatory harassment (*e.g.*, harassing conduct on the basis of a

4

protected characteristic). I sent Daniels notice on November 23, 2021, that OIE was dismissing the formal complaint he filed and referring it to the Office of Community Standards ("OCS") for further consideration (attached hereto as Exhibit H).

17.    Although Jane Roe's report to NDPD about Daniels was referred by NDPD to both OIE and OCS, Jane Roe did not at any point file a formal complaint with OIE about Daniels. The Title IX Procedures, as well as Title IX itself, require that a formal complaint be filed, either by the person who experienced the conduct or by the Title IX Coordinator, in order for an investigation occur. A formal complaint is not required to impose a No-Contact Order, and as described above, OIE did impose a mutual No-Contact Order. However, OIE at no point conducted an investigation of Daniels. In the notice I sent Daniels on November 23, 2021, regarding the dismissal and referral of his complaint, I also stated that OCS would be addressing Jane Roe's allegations against Mr. Daniels.

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct and is based on personal knowledge.

Dated: December 19, 2023

DocuSigned by:

Erin Oliver

588551C888334AD

Erin Oliver

# Exhibit 24
## (Oliver Dep.)

StewartRichardson
DEPOSITION SERVICES

www.StewartRichardson.com

1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF INDIANA
2                       SOUTH BEND DIVISION

3

4      BRYCE THOMAS DANIELS,                 )
                                             )
5               Plaintiff,                   )
                                             )
6          -v-                               )   CASE NO.
                                             )   3:22-CV-00698-PPS-JEM
7      UNIVERSITY OF NOTRE DAME,             )
                                             )
8               Defendant.                   )

9
                            CONFIDENTIAL
10

11          The videoconference deposition upon oral

12     examination of ERIN OLIVER, a witness produced and

13     sworn before me, Tina M. Heideman, CSR, Notary Public

14     in and for the County of Porter, State of Indiana,

15     taken on behalf of the Plaintiff on May 29, 2025, at

16     9:57 a.m., pursuant to the Federal Rules of Civil

17     Procedure.

18

19

20

21

22

23
                    STEWART RICHARDSON & ASSOCIATES
24                  Registered Professional Reporters
                         (800) 869-0873
25

Page 2

1                            APPEARANCES
                  (All participants via Zoom conference.)
2
   APPEARING PRO SE:
3
        MR. BRYCE THOMAS DANIELS
4       5505 Seminary Road, Unit 317N
        Falls Church, Virginia 22041
5       bryced@sas.upenn.edu

6
   FOR THE DEFENDANT:
7
        MR. STEPHEN M. JUDGE, ESQ.
8       MS. KIMBERLY A. KENNEDY, ESQ.
        SOUTHBANK LEGAL
9       100 East Wayne Street, Suite 300
        South Bend, Indiana 46601
10      sjudge@southbank.legal
        kkennedy@southbank.legal
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    A.    Not so much decision-making, but I assisted in

2          communicating -- communicating the decision that

3          was made.

4    Q.    Sure.  Do you remember if Christine Caron Gebhardt

5          was present at the meetings regarding me?

6    A.    I know, yes, at least at the second meeting that --

7          where we kind of made the decision -- that the

8          threat team made the decision to recommend the

9          emergency action, she was there.

10   Q.    Do you remember the reason why the threat

11         assessment and management team decided to recommend

12         my removal?

13   A.    I'm not sure about a specific like this was the one

14         reason, but it was a lot of conversation about just

15         the multiple reports, multiple concerns coming in,

16         the type of information that was reported and an

17         assessment that an emergency action was appropriate

18         for the moment.

19   Q.    So on those multiple reports that you just stated

20         in your own words as multiple reports, were any of

21         them not oral?

22   A.    I'm not sure I understand the question.

23   Q.    So you testified in the beginning that the way in

24         which you recall information regarding me being

25         presented to the TAMT body overall is through oral

1    report, that there weren't really paper handouts or

2    summaries or physical reports handed out to people.

3        Are you saying that that's true regarding what

4    you're describing as multiple reports regarding me

5    as well?

6  A.  Yes, I believe.  Yes.

7  Q.  What were some of the conversations orally, I'm

8    assuming, that happened regarding these multiple

9    reports at both of the meetings?

10 A.  I don't recall any specifics of the conversation.

11 Q.  Do you remember emergency services or 911 being

12    called or any sort of immediate emergency

13    intervention?

14 A.  I don't recall.

15 Q.  Are there ever threat assessment and management

16    team scenarios in which it's investigating a

17    student or it's monitoring a student and there's a

18    clear imminent threat -- Sally's going to shoot

19    Billy at 4:00 p.m. today -- and the threat

20    assessment and management team or the NDPD officers

21    as part of it choose to call 911 instead of

22    meeting?  In your experience, has that ever

23    happened?

24 A.  I can't --

25        MR. JUDGE:  Object to lack of foundation.

1  in -- typically, it results in some kind of outcome

2  of a policy violation and sanctions, if applicable.

3       I don't think there's an informal complaint so

4  much, like as a report.  So that would be

5  information that we received, that we would assess.

6  We would make sure resources -- impacted parties

7  were connected with resources and that they

8  understood opportunities -- that they had access to

9  the procedures and knew what spaces that they could

10  participate in if they chose to.

11  Q.  Right.  And for clarity, for purposes of my case,

12      did you have any reason to believe that Jane Roe

13      were (sic) not the student raising allegations or

14      complaints at least respective to her to the NDPD?

15  A.  I'm sorry.  Can you repeat that?

16  Q.  Did you believe that, at least in my case, that

17      when the NDPD orally reported to the TAMT meetings,

18      including Jane Roe's allegation of misconduct or

19      whatever the allegations were -- did you have any

20      reason to believe that it wasn't actually her

21      complaining of those allegations?

22  A.  I don't recall.

23  Q.  In the world in which there's a TAMT investigation

24      into a student and there is a formal Title IX

25      complaint, how do those two pieces intersect?

1   A.   They don't.  They're separate processes.  We might

2        provide that information, just knowledge that there

3        is a Title IX investigation or complaint, but that

4        would be separate and distinct from any kind of

5        action the threat team would be recommending.

6   Q.   Would you share the information you learned in the

7        course of the -- investigating the formal complaint

8        with the TAMT meetings?

9   A.   Possibly.  I think it would, again, depend on what

10       that information was.

11  Q.   But to the extent it's relevant to what the TAMT is

12       investigating, you would bring it to the TAMT

13       meetings?

14  A.   Yes.

15  Q.   Okay.  In a formal complaint scenario -- so a

16       formal complaint's been filed, everyone agrees it's

17       a formal complaint -- what possibilities are

18       contemplated under Title IX procedures for removing

19       a student who is deemed a threat to himself or to

20       others?

21  A.   We would -- we use the same -- we use the emergency

22       removal process that's set out in du Lac for those

23       decisions.

24  Q.   Are those decisions also assessed through the TAMT?

25  A.   Yes.

1   Q.   So how does one discern the difference between an

2        emergency removal under Title IX procedures versus

3        an emergency removal under an OCS conduct violation

4        or some other section of Notre Dame policy?

5   A.   It's going to depend upon what conduct is being

6        considered.  So if it was an open Title IX matter,

7        a formal investigation in our space and the conduct

8        was leaning towards the consideration of removal,

9        it would be through the Title IX removal process.

10            If it is under general student conduct,

11       welfare, things that fit within the other space,

12       those are Student Affairs' decisions.

13  Q.   So to the extent both of them are present in a

14       student who's being investigated by the TAMT, does

15       the Title IX process trump the -- the other conduct

16       processes in the sense of the TAMT, and you were

17       required to follow the Title IX process before you

18       could then follow the procedures of the OCS

19       process?

20  A.   Can you -- I'm not sure I --

21  Q.   I can ask that a little differently.  So let's

22       imagine there's a student who is under TAMT

23       investigation; and there's both an emergency

24       removal part of it from the Title IX side, and then

25       there's a contemplated emergency removal part of it

1    from OCS or the conduct side.  If both of those

2    pieces exist in the same student being

3    investigated, how do the Title IX procedures

4    interact in that scenario?

5  A.  If there would be a need for an emergency removal,

6    whether it was an active Title IX process in play

7    or -- we would use the Title IX -- we would ensure

8    that it complied with the Title IX procedures in

9    order to do that emergency removal.

10  Q.  What do the Title IX procedures require be done

11    when there is a formal complaint triggering

12    Section 4 before an emergency removal can be

13    effectuated?

14  A.  Gosh.  I'd have to look at the specific procedures

15    in order to be sure.  I don't think I can answer

16    that without referring to them.

17  Q.  That's fine.  Does the phrase "an individualized

18    risk and safety assessment" sound familiar?

19  A.  Yes.

20  Q.  So that would have to be done before a Title IX

21    emergency removal could be effectuated?

22  A.  Correct.

23  Q.  What does that consist of?

24  A.  That's actually a role that the TAMT plays, and so

25    it would be bringing that information to that group

```
 1        anyone?

 2   A.   Not that I recall.

 3   Q.   Do you remember anyone from the administration or

 4        anyone who also works at Notre Dame, like other

 5        faculty, administration, staff, asking about my

 6        case after --

 7   A.   No, I don't recall.

 8   Q.   When files are uploaded to Maxient, who uploads the

 9        files to Maxient?

10   A.   Whoever on my team is managing the matter.

11   Q.   But it's not necessarily you?

12   A.   No.  It's rarely me.

13   Q.   Do you know if the allegations by Jane Roe against

14        me are in the Maxient system?

15   A.   I would assume they are.  That's where we would

16        have kept -- where we would keep any information.

17   Q.   Do you know how that information would be

18        categorized in my case?

19   A.   I'm not sure I understand the question.

20   Q.   Sure.  I can ask a -- a first question.  How is the

21        information in Maxient generally categorized for

22        your uses, your office's uses?

23   A.   I'm sorry.  What do you mean by "categorized"?

24   Q.   So is the information in Maxient -- when you open

25        Maxient -- it's a software; correct?
```

```
 1   Q.   Does the Title IX statute or the 2020 guidance draw
 2        a distinction between a formal complaint and just a
 3        report to your knowledge?
 4             MR. JUDGE:  Object to the extent it calls for
 5        a legal conclusion.
 6             But you can answer the question.
 7   A.   It's very clear about a formal complaint.  I don't
 8        think I can answer how they define a report or if
 9        they define a report without reviewing.
10   Q.   Sure.  And just to be clear, in my case, in regard
11        to the Title IX aspect of it and the initial
12        assessment, whatever else was around it, I wasn't
13        provided with a resource coordinator; correct?
14   A.   Correct.  That resource coordinator would have been
15        assigned after an initial assessment.
16   Q.   Okay.  Was Jane Roe --
17   A.   Can I -- I'm sorry.  Can I clarify that, though?
18        To that point, Amber Monroe serves in that capacity
19        for all students.  At that time, she was serving in
20        that capacity.
21   Q.   But when she serves in that capacity, she's serving
22        as a resource coordinator, not as Title IX
23        coordinator or whatever her other office title is?
24   A.   Correct.  It's just ensuring if somebody needs a
25        point of contact to obtain some kind of campus or
```

1  Q.  Do you remember if Christine Holst-Haley was at any

2      of the TAMT meetings regarding me?

3  A.  Not that I recall.  She's not a standing member of

4      that team, but I don't recall.

5  Q.  Sure.  Does the TAMT sometimes solicit or invite

6      the opinions or members of -- nonstanding members

7      to come to TAMT meetings?

8  A.  That's happened occasionally.  Occasionally, I can

9      recall situations where someone would invite

10     someone who might have pertinent information.

11 Q.  What would be the function of inviting someone

12     who's not a TAMT standing member to a TAMT meeting?

13 A.  For kind of informational purposes, right, if

14     they're the ones who received a report or concern,

15     possibly.  I can't think of a specific -- I know

16     we've done it.  I can't think of a specific time as

17     to when that occurred.

18 Q.  But that's unusual?  Usually it's just the TAMT

19     standing members?

20 A.  Correct.

21 Q.  Do you remember at any of the TAMT meetings a

22     discussion of emails with myself and the male

23     student John Doe?

24 A.  I do not recall.

25 Q.  Do you remember at any of the TAMT meetings

# Exhibit 25



------------------------------------------------------------

\*\*\* AUDIO TRANSCRIPTION \*\*\*

Dt. Stebbins and ▮▮▮▮▮▮▮ Cut

for Bryce Thomas Daniels v. University of Notre

Dame

\* \* \*

------------------------------------------------------------

Transcribed

By:  Sam Tinega

Job No.: 201031

LEXITAS

MS. ▓▓▓▓:  Based on the fact that he is seemingly stepping down from stuff that we are, you know, in close quarters with, like, that kind of is a good sign to me.

(End of audio recording.)

LEXITAS

CERTIFICATE OF TRANSCRIPTIONIST

I, SAM TINEGA, do hereby certify:

That said audio transcription is a true record as reported by me, a disinterested person.

I further certify that I am not interested in the outcome of said action, nor connected with, nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS THEREOF, I have hereunto set my hand this 5th day of December, 2025.

_____
Sam Tinega

LEXITAS



LEXITAS

# Exhibit 26

Message

| | |
|---|---|
| **From:** | Amber Monroe [Amber.K.Monroe.25@nd.edu] |
| **on behalf of** | Amber Monroe <Amber.K.Monroe.25@nd.edu> [Amber.K.Monroe.25@nd.edu] |
| **Sent:** | 11/4/2021 3:41:56 PM |
| **To:** | |
| **BCC:** | Deputy Title IX Coordinator [deputytitleixcoordinator@nd.edu] |
| **Subject:** | No Contact Order from the Office of Institutional Equity |

Dear 

Per your request as a supportive interim measure a No Contact Order is being issued between you and Bryce Daniels to alleviate further concerns.

Therefore, to mitigate interaction and to ensure the safety and well-being of all involved, the following mutual No Contact Issue is being issued:

> You may not have contact, either directly, indirectly, or through third parties, with Bryce Daniels until further notice. "Third parties" include friends, family, attorneys, and other individuals acting on behalf of a student who has been issued a No Contact Order. "Contact" includes, but is not limited to, email, social media, instant messaging, text messaging, phone calls, voicemail, or direct visits.

Bryce Daniels is expected to abide by the same requirements until further notice. Unintentional contact is not considered a violation of the no contact order.

The University also prohibits retaliation and intimidation. Any actual or threatened retaliation or any act of intimidation to prevent or otherwise obstruct the reporting of an incident or the participation in proceedings relating to an incident by a respondent, witness, or other individual will be addressed by the University. Students are encouraged to report concerns about retaliation as soon as possible. For more information, see "Reporting and Response Procedures for Reports of Retaliation, Violations of No Contact Orders, and/or Violations of Terms of Interim Measures"

Please feel free to outreach to our office with any further questions and/or concerns.

As a reminder, here are resources we discussed that may prove helpful:

University Policy and Procedures - https://equity.nd.edu/equity-resources/sexual-and-discriminatory-harassment/policy/
University Formal Complaint - https://cm.maxient.com/reportingform.php?UnivofNotreDame&layout_id=7
Protective Order Project - https://www.sjcindiana.com/Directory.aspx?DID=111
Non-Retaliation - https://policy.nd.edu/assets/185253/non_retaliation_revision.pdf
University Counseling Center - https://ucc.nd.edu/contact-the-ucc/
Notre Dame Police Department - https://police.nd.edu/about-ndpd/contact/
Family Justice Center - https://www.fjcsjc.org/

Sincerely,
Amber

**Amber K. Monroe**
Program Manager Title IX Services/Sr. Deputy Title IX Coordinator
Office of Institutional Equity and Human Resources

CONFIDENTIAL

DEF0000603

University of Notre Dame 305 Main Building Notre Dame, IN 46556
http://titleix.nd.edu/

574-631-7728 (phone)

CONFIDENTIALITY NOTICE: This email and any attachments are for the exclusive and confidential use of the intended recipient. If you are not the intended recipient, please do not read, distribute or take action in reliance upon this message. If you have received this in error, please notify me immediately by return email and promptly delete this message and its attachments from your computer system.

No one has to do everything, but everyone has to do something. What is your greeNDot today?