*FILED*

JAN 09 2026

At _____ M
Chanda J. Berta, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

BRYCE THOMAS DANIELS

      Plaintiff,

v.            Cause No. 3:22-cv-00698-GSL

UNIVERSITY OF NOTRE DAME

      Defendant.

**PLAINTIFF BRYCE THOMAS DANIELS'S
RESPONSE TO STATEMENT OF MATERIAL FACTS**

  Pursuant to N.D. Ind. L.R. 56-1(b)(2), Plaintiff Bryce Thomas Daniels ("Mr. Daniels") respectfully submits his Response to Statement of Material Facts. N.D Ind. L.R. 56-1(b)(3) exempts a *pro se* party from the verbatim-restatement requirement of the movant's Statement of Material Facts. Mr. Daniels states facts chronologically as did Notre Dame in its Statement of Material Facts in an attempt to aid the Court in identifying the immense number of factual disputes.

  1.  Mr. Daniels was a 1L at Notre Dame Law School ("NDLS") in the fall semester of 2021 until he was removed on November 5, 2021, for allegations of sexual harassment. **Ex. 1, Dec. of Michael Seamon ¶ 4 ("Dec. Seamon")** (stating that the purpose of the Threat Assessment and Management Team ("TAMT") is to "assess reports and information concerning" student "behavior"); *id.* **¶ 14** (stating that "the primary concern" with Mr. Daniels was a series of interactions "Jane Roe" depicted as romantic in nature toward her); **Ex. 2, Notre Dame Police Department Report ("NDPD Report") at 5** (Jane Roe stating she thought of her allegations

being about a romantic "relationship"); *id.* **at 6** (recording that Jane Roe "wants Title IX" to intervene).

2.    Mr. Daniels read the posted policies and procedures of Notre Dame (including the Title IX Policy, Title IX Procedures, and *du Lac*) prior to his matriculation as part of his school selection. **Ex. 3, Verified Sec. Am. Compl. ("Dec. Daniels") ¶¶ 43–45.**[1]

3.    Mr. Daniels's removal is notated on his NDLS transcript and is required to be reported in character-and-fitness questionnaires for law schools and state bars. **Ex. 4, Email with Christine Holst-Haley re next Steps at 2** (indicating that Mr. Daniels's transcript contains a withdrawal notation); **Dec. Daniels ¶ 9**.

4.    From August 2021 to November 2021, Jane Roe, a female first-year law student at NDLS, and Mr. Daniels "were largely strangers with sparse interactions." **Dec. Daniels ¶ 25**.

5.    In August 2021, Jane Roe bought food for Mr. Daniels and asked him to text her. **Dec. Daniels ¶¶ 26–29**.

6.    In September 2021, Jane Roe sat near Mr. Daniels at mass, called Mr. Daniels a liar in front of other law students at a mutual friend's house, repeatedly interjected herself into Mr. Daniels's conversations at the friend's house, and stared at Mr. Daniels for a prolonged period of time before remarking to Mr. Daniels that Jane Roe was interested in Mr. Daniels from a "philosophical and psychological perspective." **Dec. Daniels ¶¶ 30–33**.

7.    In October 2021, out of over forty other empty seats at a law-school event, Jane Roe chose to sit in front of Mr. Daniels. **Dec. Daniels ¶ 34**.

---

[1]    Mr. Daniels swore under oath at deposition, in requests for admission, and in his Declaration (ECF 149) that the Second Amended Complaint was written and reviewed only by Mr. Daniels, stated upon personal belief, and signed. Mr. Daniels's Declaration also incorporates the Second Amended Complaint as his sworn testimony. Mr. Daniels in "declaring under penalty of perjury that the complaint was true," and by signing that attestation, "converted the [factual assertions of the] complaint . . . into an affidavit." *Ford v. Wilson*, 90 F.3d 245, 247 (7th Cir. 1996). Mr. Daniels therefore cites to the Second Amended Complaint as his sworn declaration on factual allegations.

8.    On November 2, 2021, Mr. Daniels while walking with a friend in the NDLS library said "hey" to Jane Roe, Jane Roe demanded that Mr. Daniels not speak to her or she would bring down the Title IX apparatus on him and blocked him from walking in the library until Mr. Daniels agreed, Mr. Daniels agreed but said he may accidentally say "hey" as a cordial reflex, Jane Roe stated Mr. Daniels could say "hey," and Jane Roe stated to Mr. Daniels that "she had 'never felt this way before.'" **Dec. Daniels ¶ 35–37.**

9.    On November 1, 2021, John Doe, a different friend of Mr. Daniels, emailed Stella Miller, a Care and Wellness Consultant at Notre Dame, requesting resources to serve as general emotional support to Mr. Daniels in their "not sexual" or romantic relationship while repeating multiple times that Mr. Daniels was no harm to himself or anyone else. **Ex. 5, Emails from John Doe to Stella Miller at 4–5.**

10.    On November 1, 2021, Stella Miller informed Christine Caron Gebhardt, a member of TAMT, and Christine Holst-Haley, the Director of Student Services at NDLS (who provided advice to TAMT in Mr. Daniels's case), of John Doe's November 1, 2021, email and that Stella Miller would "keep [them] in the loop." **Ex. 6, Dec. of Christine Caron Gebhardt ¶ 7; Ex. 7, Dec. of Christine Holst-Haley ("Dec. Holst-Haley") ¶¶ 2, 4.**

11.    On November 1, 2021, Stella Miller suggested that John Doe call the University Counseling Center's ("UCC") after-hours hotline to discuss his thoughts. **Ex. 5, Emails from John Doe to Stella Miller at 4.**

12.    The purpose of the UCC "is to support students' mental health needs" including providing "honest" and "comprehensive" "health assessment[s]." **Ex. 8, Excerpts of Dep. Tr. of Christine Conway ("Conway Dep.") at 13:7–22.**

13.    On November 1, 2021, John Doe *did* call the after-hours hotline to discuss his thoughts, and the UCC performed a "clinical assessment" regarding Mr. Daniels. **Conway Dep. at 16:5–23**.

14.    On November 1, 2021, with John Doe including that Mr. Daniels lawfully possessed an off-campus, in-his-apartment firearm, a "well-credentialed, well-educated, well-versed in mental health" "UCC staff member" determined that Mr. Daniels exhibited "no risk related" to "Self-Injury," "Threat of Violence," or any other cause for concern. The UCC assessment identified Mr. Daniels by name and the last date the assessment was modified was the night of November 1, 2021. **Conway Dep. at 21:10–22:5; Ex. 9, UCC's Assessment of Mr. Daniels at 2–3**.

15.    Mr. Daniels was *so* innocuous in the UCC's professional view that even with the knowledge of Mr. Daniels's lawful firearm ownership and decades-old instance of suicidal ideation that it determined "[t]here was no reason to follow up with [Mr. Daniels]." **Conway Dep. at 69:21–24; Ex. 9, UCC's Assessment of Mr. Daniels at 2–3**.

16.    On November 2, 2021, John Doe once again emailed Stella Miller stating that John Doe and Mr. Daniels's talk "went very well," that John Doe believes Mr. Daniels "is in a very good place mentally," and that John Doe would speak to anyone of interest to clarify Mr. Daniels's being in a good place. **Ex. 5, Emails from John Doe to Stella Miller at 3**.

17.    On November 3, 2021, and November 4, 2021, Stella Miller and John Doe corresponded further regarding Mr. Daniels, and John Doe told Stella Miller that Mr. Daniels had several faculty mentors at NDLS in whom John Doe was confident would competently notify school officials if there ever were a concern. **Ex. 5, Emails from John Doe to Stella Miller at 1–3**.

18.    Stella Miller never provided the post-November 1, 2021, vindicating emails with John Doe to Christine Caron Gebhardt or Christine Holst-Haley. **Ex. 6, Dec. of Christine Caron Gebhardt ¶¶ 7–8; Ex. 7, Dec. of Christine Holst-Haley ("Dec. Holst-Haley") ¶¶ 4–6**.

19.    Stella Miller never provided the post-November 1, 2021, vindicating emails with John Doe even though Stella Miller, Christine Caron Gebhardt, and Christine-Holst Haley regularly met together as co-members and advisors of Notre Dame's CARE Team. **Ex. 10, Excerpts of Dep. Tr. of Christine Holst-Haley ("Holst-Haley Dep.") at 6:16–7:11**.

20.    Instead, "the substance" of the November 2, 2021 to November 4, 2021 conversations between Stella Miller, Christine Caron Gebhardt, and Christine Holst-Haley "were concerns about a complaint that another student had made that was a Title IX issue." **Dec. Holst-Haley Ex. A at 1; Holst-Haley Dep. at 7:7–11**.

21.    On November 2, 2021, after Jane Roe threatened to bring down the Title IX apparatus on Mr. Daniels because Jane Roe "never felt this way before," Jane Roe filed a formal Title IX complaint against Mr. Daniels. **Dec. Daniels ¶ 35–37; Ex. 11, ECF 21 at 2** (Notre Dame explaining of its attached exhibits that "two Title IX complaints were submitted—one against [Mr. Daniels] and one by him"); **Dec. Daniels ¶ 4** (stating that Notre Dame Police Department ("NDPD") informed Mr. Daniels that Jane Roe had filed a formal complaint against him); **NDPD Report at 6** (NDPD describing that Jane Roe "wants Title IX to" intervene); *id* **at. 14** (stating Jane Roe "filed a Title IX complaint"); **Ex. 12, Email from Jane Roe to Heather Ryan, Director of the Office of Community Standards ("OCS") at 1** (Jane Roe stating to Heather Ryan, Director of the Office of Community Standards, that NDPD confirmed Jane Roe "had raised a" formal "Title IX complaint against [Mr. Daniels]"); **Ex. 13, Christine Holst-Haley Notes** (stating she was informed by the Title IX office of a "pending Title IX case" against Mr. Daniels).

22.    Notre Dame promulgates a Title IX Policy and Title IX Procedures. **Ex. 14, Notre Dame Title IX Policy; Ex. 15, Notre Dame Title IX Procedures**.

23.    The Notre Dame Title IX Policy defines a Formal Complaint as "[a] document filed by a complainant . . . alleging Sexual Harassment against a respondent and requesting that the University investigate the allegation." **Ex. 14, Notre Dame Title IX Policy at 2–3**.

24.    Notre Dame's Title IX Policy defines "Sexual Harassment" to include "Unwelcome conduct" and "stalking." **Ex. 14, Notre Dame Title IX Policy at 3–4**.

25.    Notre Dame's Title IX Procedures state that a complainant may document a complaint either "to the University" or "to Law Enforcement" (specifically, NDPD). **Ex. 15, Notre Dame Title IX Procedures at 1–2**.

26.    Notre Dame's Title IX Procedures require that when allegations are reported to NDPD, that the documented complaint "will also be referred to" the Office of Institutional Equity ("OIE") who administers Title IX and will, in conjunction with NDPD, "investigate." **Ex. 15, Notre Dame Title IX Procedures at 2**.

27.    Notre Dame's Title IX Procedures define an "Investigation" as "a prompt, fair, thorough, and impartial investigation . . . aimed at gathering all available, relevant evidence in the form of witness interviews or other information." **Ex. 15, Notre Dame Title IX Procedures at 17**.

28.    Notre Dame's Title IX Procedures state that when OIE receives the complaint documentation from NDPD that OIE will "gather information about the reported conduct." This stage is called an "Initial Assessment." **Ex. 15, Notre Dame Title IX Procedures at 10**.

29.    Notre Dame's Title IX Procedures state that Notre Dame may "remove a Respondent on an emergency basis" only "after undertaking an individualized safety and risk

analysis and determining that there is an immediate threat to the physical health or safety of any individual arising from the allegations of sexual harassment." **Ex. 15, Notre Dame Title IX Procedures at 8–9**.

30. Regardless, Notre Dame's Title IX Procedures expressly prioritize "the Complainant's expressed preference for manner of resolution" of a complaint. **Ex. 15, Notre Dame Title IX Procedures at 10**.

31. Notre Dame's Title IX Procedures also establish that a No-Contact Order can be instituted only if there is a "Complainant" and a "Respondent." **Ex. 15, Notre Dame Title IX Procedures at 7**.

32. Notre Dame's Title IX Procedures also guarantee "Assignment of a Resource Coordinator" to Respondents of complaints. **Ex. 15, Notre Dame Title IX Procedures at 8**.

33. On November 2, 2021, Jane Roe filed a Title IX formal complaint by, as stated in the Title IX Procedures, meeting with NDPD to allege "Stalking" and "harassment"—both covered under the Title IX Policy. **NDPD Report at 1, 5; Ex. 15, Notre Dame Title IX Procedures at 1–2; Ex. 14, Notre Dame Title IX Policy at 3–4**.

34. Jane Roe's November 2, 2021, complaint to NDPD was attested to by Jane Roe, categorized as a sexual-harassment "stalking" complaint, and signed by the interviewing officer at the direction of Jane Roe. **NDPD Report at 1, 5–6**.

35. On November 2, 2021, Jane Roe provided a narrative to NDPD that included Jane Roe's buying food for Mr. Daniels, Jane Roe asking Mr. Daniels to text her, that Jane Roe "was not looking for a relationship," and that after Mr. Daniels said "hey" to her in the NDLS library with many others present that she "began to cry and called her friend." **NDPD Report at 5–6**.

36.    At the November 2, 2021, conversation with NDPD, Jane Roe omitted to NDPD: (1) her own attempts to sit near Mr. Daniels at church and social events; (2) that at a mutual friend's dinner party Jane Roe had called Mr. Daniels a liar when he told a funny anecdote, repeatedly interjected herself into Mr. Daniels's conversations, and stated that she was interested in Mr. Daniels from a "philosophical and psychological perspective;" (3) later told Mr. Daniels on November 2, 2021, that he *could* say "hey" to her; and (4) that it was Jane Roe, not Mr. Daniels, who had "never felt this way before." **NDPD Report at 5–8; Dec. Daniels ¶¶ 30–33, 35–37; Ex. 16, Excerpts of Dep. Tr. of Heather Ryan ("Ryan Dep.") at 58:7–13** (comparing Mr. Daniels's story and Jane Roe's story and that Jane Roe wholly "didn't describe the event -- dinner piece of it" to NDPD or OCS).

37.    After only Jane Roe's November 2, 2021, complaint to NDPD, NDPD presumptively determined that Jane Roe was the sexual harassment and stalking "Victim," and Mr. Daniels was her "Offender." **NDPD Report at 2**.

38.    Based only on Jane Roe's November 2, 2021, complaint alleging sexual harassment (stalking), on the same day, called a meeting of TAMT to discuss information "about a female student in the law school, Jane Roe," because NDPD had "a concern for her safety." **NDPD Report at 4–5; Ex. 17, Excerpts of Dep. Tr. of Michael Seamon ("Seamon Dep.") at 18:4–19:5, 36:10–17** (stating that TAMT's alleged "safety" concern was that Jane Roe could "possibly" receive a threat).

39.    The TAMT evaluates a student's conduct and "behavior" and makes factual determinations regarding the student's alleged conduct to make a decision against the alleged conduct. **Dec. Seamon ¶ 4; Seamon Dep. at 82:7–11** (Chair of TAMT stating that the factual allegations against Mr. Daniels were believed as true); **Conway Dep. 76:22–77:9, 64:11–14**

(acknowledging she presumed the allegations against Mr. Daniels as true and had no idea that Notre Dame's OCS department found all of the allegations unfounded).

40.    The TAMT in Fall 2021 was composed of fourteen standing members, including Michael Seamon (Chair), Crystal Garcia-Betts, Christine Conway, Erin Oliver, and Christine Caron Gebhardt. **Dec. Seamon ¶ 6**.

41.    The TAMT does not have any written policies or procedures (instead operating only by unofficial "understanding"), is not mentioned in or held accountable to Notre Dame's other policies and procedures, and has the power to recommend the removal of students—where the recommendation to remove a student is always effectuated. **Seamon Dep. at 52:16–20, 12:14–24**.

42.    The minimal training that TAMT members do receive urges a "fair, objective, reasonable, and timely" approach that prioritizes interviewing the actual subject about whom complaints are made. **Ex. 18, TAMT 2022 Training Materials at 10, 12**; **Seamon Dep. at 15:8–13** (stating the 2022 materials are substantially similar to the materials used to train TAMT prior to Mr. Daniels's removal but for an unknown reason were not retained by TAMT).

43.    The TAMT can use "whatever resources it wants" to gather information but generally makes decisions with what is brought to it by its members and knowingly makes decisions not necessarily based on the truthfulness of information provided. **Seamon Dep. 79:18–25; Seamon Dep. at 78:7–11**.

44.    Further, TAMT decisionmaking is not based on voting of standing members but instead of subjective "consensus" among whoever happens to be present on that particular day—including non-TAMT members. **Seamon Dep. at 20:5–24**.

45.     Notre Dame additionally funnels its "to the University" Title IX complaints through TAMT via its Speak Up portal. **Ex. 15, Notre Dame Title IX Procedures at 1–2**; **Ex. 19, Notre Dame Speak Up Website; Ex. 20, Notre Dame TAMT Website**.

46.     Public outrage and various parts of the federal government including the Department of Education's Office of Civil Rights ("OCR") have repeatedly, historically, and most recently in 2024, put pressure on Notre Dame for its unequal treatment of the sexes, and the OCR noticed Notre Dame that it violates Title IX by not treating a student's "initial report as a potential Title IX issue, but instead treat[ing] it as a general conduct issue" in efforts to evade Title IX protections by hiding behind a TAMT behavioral or conduct issue. **Dec. Daniels ¶¶ 127–31; Ex. 21, April 19, 2024, OCR Letter of Findings Against Notre Dame at 7**.

47.     Neither on November 2, 2021, nor at any other TAMT meeting, did TAMT ever speak directly to or hear from witnesses, including Jane Roe and Mr. Daniels. **Seamon Dep. at 19:16–25**.

48.     The TAMT members in attendance at all TAMT meetings regarding Mr. Daniels include Michael Seamon (Chair), Crystal Garcia-Betts, Christine Conway, and Erin Oliver. **Dec. Seamon ¶ 13; Ex. 22, Dec. of Detective Stebbins ("Dec. Stebbins") ¶ 14; Conway Dep. 11:1– 6; Ex. 23, Dec. of Erin Oliver ("Dec. Oliver") ¶ 6**.

49.     Instead, TAMT received Jane Roe's complaint against Mr. Daniels by Crystal Garcia-Betts, Captain of NDPD, giving an ad hoc oral summary to TAMT in a format where it is also known that "members are voting on emergency removal recommendations without having actually spoken to witnesses." **Ex. 24, Excerpts of Dep. Tr. of Erin Oliver ("Oliver Dep.") at 13:23–14:6**; **Seamon Dep. at 20:8–11, 31:22–32:2** (stating that TAMT members did not read the NDPD Report and only heard the oral presentation of it).

50.     On November 3, 2021, Jane Roe called NDPD again to report that after she had asked her friend (who also served as a witness for Jane Roe to NDPD) to accost Mr. Daniels, that Mr. Daniels had stated to him that Mr. Daniels would "bury" her with evidence if Jane Roe attempted to fabricate a story for the purpose of getting Mr. Daniels in trouble. **NDPD Report at 6; Dec. Daniels ¶ 39**.

51.     Neither Jane Roe nor her friend who accosted Mr. Daniels believed Mr. Daniels meant "bury" Jane Roe literally as in a threat of violence. **NDPD Report at 12**.

52.     On November 3, 2021, and November 4, 2021, NDPD interviewed only witnesses identified by Jane Roe who supported Jane Roe's narrative against Mr. Daniels. **Dec. Stebbins ¶ 10**.

53.     On November 3, 2021, and November 4, 2021,   Jane Roe's witnesses gave statements that "maybe" Mr. Daniels discussed firearms in the Socratic classroom context, but that no one had ever seen a firearm or heard anything more concrete than that. **NDPD Report at 12**.

54.     Additionally, on November 3, 2021, Jane Roe said to NDPD, though it was not included anywhere in the NDPD Report, that after Jane Roe's series of bizarre actions and statements about Mr. Daniels that "[b]ased on the fact that [Mr. Daniels] is seemingly stepping down from stuff that we are, you know, in close quarters with, like, that kind of is a good sign to me." **Ex. 25, Excerpts of Interview Tr. of Jane Roe on November 3, 2021, by Detective Stebbins at 2:1–4**. *See generally* **NDPD Report at 4–10**.

55.     On November 4, 2021, a No-Contact Order was issued between Jane Roe, deemed a "Complainant" under Notre Dame's Title IX Procedures, and Mr. Daniels, deemed a "Respondent" under the same. **Ex. 26, No-Contact Order Notice to Jane Roe**.

56.    At no point was Mr. Daniels provided with a resource coordinator per the Title IX Procedures requirements. **Oliver Dep. at 55:10–15**.

57.    On November 4, 2021, Stella Miller informed Crystal Garcia-Betts, TAMT member and narrator of the allegations against Mr. Daniels, of John Doe's emails reinforcing that Mr. Daniels was safe and healthy. **Ex. 5, Emails from John Doe to Stella Miller at 1**.

58.    There is no record in the TAMT meeting notes of Crystal Garcia-Betts ever relaying John Doe's emails supportive of Mr. Daniels to TAMT, and other TAMT members do not recall ever being aware those emails even existed. **Ex. 27, TAMT Notes; Seamon Dep. 33:13–15; Oliver Dep. 72:21–24; Conway Dep. 44:1–4**.

59.    On November 4, 2021, Christine Holst-Haley attended the TAMT meetings wherein Mr. Daniels was discussed and reported that Mr. Daniels's reputation in the NDLS community was "demeanor polite + no complaints" until Christine Holst-Haley learned of the Title IX complaint. **Ex. 27, TAMT Notes at 4**.

60.    At the November 4, 2021, TAMT meeting, Christine Conway, Director of the UCC, was also in attendance as a TAMT standing member with the role of looking at behaviors as a "behavioral health clinician." **Conway Dep. 11:7–9, 35:12–21**.

61.    After the first TAMT meeting regarding Mr. Daniels on November 2, 2021, and before the second TAMT meeting regarding Mr. Daniels on November 4, 2021, Christine Conway read the November 1, 2021, "risk assessment" that the UCC had done in response to John Doe's after-hours phone call in which it determined "no risk related" to "Self-Injury," "Threat of Violence," or any other cause for concern for Mr. Daniels. **Conway Dep. 6:2–12, 14:12–13; Ex. 9, UCC's Assessment of Mr. Daniels at 2–3**.

62.    In spite of the vindicating-to-Mr. Daniels risk assessment completed by the UCC, which Christine Conway directs and supervises, Christine Conway, upon learning of the Title IX complaint at the second TAMT meeting, decisively labeled Jane Roe the "victim" without ever having spoken to her or hearing from Mr. Daniels. **Ex. 28, Conway's TAMT Notes at 1; Conway Dep. 43:2–6**.

63.    To reinforce her view that Jane Roe was the "victim" and had "been harmed by some other situation" caused by Mr. Daniels, Christine Conway, despite that TAMT members "are required to bring the -- all the information they have regarding an investigated student to the TAMT meeting body," never shared the UCC's exculpatory information with TAMT and she "can't tell [anyone] why" she didn't. **Conway Dep. 43:7–25; Seamon Dep. at 51:5–8; Conway Dep. 36:9–37:22**.

64.    Christine Conway believed that her "ethics" would prevent the disclosure of exculpatory information about Mr. Daniels to TAMT but also stated that she would disclose Mr. Daniels's health information in a "casual" conversation if it were part of a "consult" "with other professionals" because that "team" dynamic was different than how the Threat Assessment and Management *Team* functions. **Conway Dep. 47:10–48:18**.

65.    Christine Conway stated she was "of course" familiar with HIPAA. **Conway Dep. 11:20**.

66.    The TAMT training materials explicitly instruct that HIPAA urges disclosure of exculpatory medical information for the purpose of a "safety" investigation. **Ex. 18, TAMT 2022 Training Materials at 20; Seamon Dep. at 15:8–13** (stating the 2022 materials are substantially similar to the materials used to train TAMT prior to Mr. Daniels's removal but for an unknown reason were not retained by TAMT).

67.      Regardless, when the student being investigated by TAMT is *female*, Christine Conway and the UCC, per TAMT practice, have over the last decade disclosed a multitude of UCC and mental-health information to TAMT. **Ex. 29, TAMT Record of Female *Not Removed* at 1** (investigated for "threatening to kill and harm students"); **Ex. 30, TAMT Record of Female 2 *Not Removed* at 1** (permitted to remain a student because of a vindicating UCC assessment); **Ex. 31, TAMT Record of Female 3 *Not Removed* at 1** (UCC information disclosed about suicide attempts and firearm possession).

68.      Without a multitude of available vindicating information and assessments, and with TAMT unwilling to speak to Mr. Daniels, TAMT recommended the removal of Mr. Daniels on November 4, 2021. **Dec. Seamon ¶¶ 19, 20**.

69.      TAMT's decision to recommend the removal of Mr. Daniels was made even though Detective Stebbins, who advised at each TAMT meeting regarding Mr. Daniels, believed it would be *unfair* to remove a student before everyone (including Mr. Daniels) had "the opportunity to, to tell me what -- their thought process and what's going on." **Dec. Stebbins ¶ 4–7;  Ex. 32, Excerpts of Interview Tr. of Mr. Daniels on November 5, 2021, by Detective Stebbins at 2:1–7.**

70.      TAMT's decision to recommend the removal of Mr. Daniels was also made regardless of the fact that Christine Conway, Director of the UCC and TAMT standing member, knows and has conveyed to TAMT that "you can't base someone's risk on someone else's report of a behavior." **Conway Dep. 70:10–12**.

71.      TAMT's decision to recommend the removal of Mr. Daniels was also made with the knowledge that Notre Dame can evade Title IX procedural protections if a complaint is treated as though it arises "under general student conduct" with a "separate process[]" as opposed to behavior covered by Title IX. **Oliver Dep. 40:23–41:5, 42:1–12**.

72.     Additionally, if there are both Title IX aspects and general-student-conduct aspects, the Title IX protections are required to be observed. **Oliver Dep. 43:5–9**.

73.     The allegations against Mr. Daniels by Jane Roe were maintained as Title IX allegations in OIE's Maxient system. **Oliver Dep. at 52:13–16** (testifying as the Director of Notre Dame's Title IX office that her office viewed the allegations against Mr. Daniels as implicating Title IX).

74.     TAMT ignored these principles (and Title IX protections) by recommending Mr. Daniels's removal on November 4, 2021, before even speaking to Mr. Daniels or permitting Mr. Daniels to get his witnesses' statements in front of TAMT as had been permitted of Jane Roe. **Oliver Dec. ¶ 10**; **Dec. Stebbins ¶ 10**.

75.     On November 4, 2021, Detective Stebbins reached out to Mr. Daniels for an interview, to which Mr. Daniels eagerly responded his willingness to speak as soon as possible. **Ex. 33, November 4, 2021, Email from Detective Stebbins to Mr. Daniels at 2**.

76.     On November 5, 2021, Detective Stebbins conducted Mr. Daniels's interview in which Mr. Daniels denied the litany of allegations stemming from Jane Roe and her proffered witnesses about harassing and "bury[ing]" Jane Roe and denied that any of the alleged comments about firearms ever occurred. **NDPD Report at 14–16**.

77.     Detective Stebbins reported that when he asked Mr. Daniels if he thought all women were evil that Mr. Daniels responded, "I think that's fair." **Stebbins Dec. ¶ 26; NDPD Report at 16**.

78.     Per the audiovisual recording that Detective Stebbins created and had access to, Detective Stebbins's actual question was: "are you looking at that [sic] every woman out here is potentially evil and I'm going to distance myself from them"? Mr. Daniels's response, to the latter

part of the question, was "I think that's pretty fair. I think my presumption is avoid . . . ." **Ex. 32, Excerpts of Interview Tr. of Mr. Daniels on November 5, 2021, by Detective Stebbins at 2:17– 3:5;** *compare with* **Ex. 25, Excerpts of Interview Tr. of Jane Roe on November 3, 2021, by Detective Stebbins at 2:1–4** ("[b]ased on the fact that [Mr. Daniels] is seemingly stepping down from stuff that we are, you know, in close quarters with, like, that kind of is a good sign to me.").

79.    On the basis of Mr. Daniels's statements to Detective Stebbins on November 5, 2021, and those statements alone, Mr. Daniels was ultimately vindicated by Notre Dame's OCS to have not engaged in any of the alleged conduct—another piece of vindicating evidence that Notre Dame possessed in Fall 2021 that it refused to consider. **Ex. 34, OCS Conduct-Reporting Letter; Oliver Dec. ¶ 10; Dec. Stebbins ¶ 10**.

80.    Immediately following Mr. Daniels's November 5, 2021, interview with Detective Stebbins, Mr. Daniels was noticed of his pre-determined removal by Erin Oliver and Christine Holst-Haley, and Christine Holst-Haley told Mr. Daniels she "presumed the allegations as true and told [Mr. Daniels] she suspected he would never be a lawyer." **Dec. Daniels ¶ 104; Ex. 35, Tr. of Christine Holst-Haley and Mr. Daniels Partnership Meeting 15:46** (agreeing the same was said).

81.    NDPD then let Christine Conway into the room, and she told Mr. Daniels that she found it concerning that Mr. Daniels was not crying and distraught. **Dec. Daniels ¶ 71–74**.

82.    Mr. Daniels stated his focus was on submitting an appeal of his removal decision and was then threatened by Crystal Garcia-Betts to admit himself at a psychiatric hospital, Memorial Epworth, or else NDPD would notate in Mr. Daniels's record, should he appeal the removal decision, that he was an uncooperative safety concern. **Dec. Daniels ¶¶ 71–74**.

83.    At the time of Mr. Daniels's removal, Christine Holst-Haley, Crystal Garcia-Betts, Detective Stebbins, and all of TAMT knew that nothing "had really seriously happened" and there was no "legitimate threat of violence" or else Mr. Daniels would have been arrested or brought up on criminal charges. **Ex. 35, Tr. of Christine Holst-Haley and Mr. Daniels Partnership Meeting 15:46**.

84.    Additionally, TAMT, and its members, knew that Mr. Daniels did not warrant police/emergency-services intervention because such measures were never taken and *would have* been taken had Mr. Daniels actually been a threat. **Seamon Dep. at 31:1–21**.

85.    Desperate to not have a prejudicial appeal notation, Mr. Daniels agreed to NDPD's coercive demand of admitting to psychiatric hospital Memorial Epworth and was driven to the hospital by Crystal Garcia-Betts and Detective Stebbins. **Dec. Daniels ¶ 74**.

86.    Mr. Daniels was admitted because, as he later learned from a social worker at Memorial Epworth, "Christine Conway called Dr. Nasr while [Mr. Daniels] was being escorted by NDPD to Epworth and asked Dr. Nasr to admit [Mr. Daniels] regardless of what he presented to Epworth." **Dec. Daniels ¶ 76**.

87.    Mr. Daniels stayed at Memorial Epworth from November 5, 2021, to November 9, 2021, because Notre Dame refused to return Memorial Epworth's calls requesting collateral information. **Ex. 36, Memorial Epworth Records at 7**; **Ex. 37, UCC Note on Collateral**.

88.    While at Memorial Epworth, Mr. Daniels was frequently told by providers at Memorial Epworth that what Mr. Daniels stated "would not be grounds for [expulsion] . . . or for admission to the hospital," that Mr. Daniels's "attitude is cooperative," and Mr. Daniels "interacts well with staff members and peers," "understand[s] the difference between right and wrong," and has a "euthymic mood." **Ex. 36, Memorial Epworth Records at 7–8**.

89.     Finally, on November 9, 2021, just four days after Notre Dame's alleged concern for Jane Roe's "safety," Memorial Epworth and Notre Dame's UCC "were in agreement with plan for discharge" of Mr. Daniels. **Ex. 36, Memorial Epworth Records at 8**.

90.     Mr. Daniels's "plan for discharge" included no recommendations, much less requirements, for additional care because Memorial Epworth and Notre Dame "were in agreement" that Mr. Daniels did not need psychological care and was nothing but healthy. **Ex. 36, Memorial Epworth Records at 8, 19–21**.

91.     After Mr. Daniels's release from Memorial Epworth, NDPD then forwarded the allegations against Mr. Daniels to Notre Dame's OCS. **Dec. Stebbins ¶ 35**.

92.     On November 15, 2021, Mr. Daniels's appeal of his removal decision was denied. **Dec. Daniels ¶ 7; Dec. Oliver ¶ 15**.

93.     On November 23, 2021, not three weeks after Notre Dame removed Mr. Daniels from school, Notre Dame's Title IX department, OIE, dismissed Jane Roe's formal complaint against Mr. Daniels as not implicating Title IX via its "Dismissal of Formal Complaints of Sexual Harassment" provision of its Title IX Procedures. **Ex. 11, ECF 21 at 2** (Notre Dame stating same in string cite); **Ex. 15, Notre Dame Title IX Procedures at 14; Ex. 38, Title IX Closing Letter**.

94.     In November of 2021, Christine Holst-Haley was informed by Jane Roe that in her conversations with other students about Mr. Daniels after his removal, that Jane Roe was giving NDLS students and faculty her thoughts on how she viewed Mr. Daniels. **Ex. 39, Emails About Jane Roe, Students, and NDLS Faculty; Ex. 40, November Emails between Holst-Haley and Jane Roe**.

95.     In that same email, Christine Holst-Haley told Jane Roe that "I'm sorry you've had to deal with this situation!" **Ex. 40, November Emails between Holst-Haley and Jane Roe**.

96.     Later in November of 2021, Christine Holst-Haley acknowledged Jane Roe's amassing of rumors regarding Mr. Daniels and that "students' minds simply create possibilities, most of which are probably worse than the truth." **Ex. 41, November Emails between Holst-Haley and Ali Wruble**.

97.     The paranoia caused by Jane Roe's gossip, as acknowledged by Christine Holst-Haley, led to Christine Holst-Haley pre-approving a message sent by a student organization in November 2021 stating that Mr. Daniels was handled by "university student conduct" and that Christine Holst-Haley thought the student message "looks great." **Ex. 42, November Emails between Holst-Haley and Student Group**.

98.     By December 2021, Christine Holst-Haley was informed that the November 2021 student-group message that Christine Holst-Haley said "looks great" was actually creating more gossip and student concern than anything Mr. Daniels had actually said or done and told a student, a month after Mr. Daniels was allegedly removed for "safety," that Christine Holst-Haley felt fully confident Mr. Daniels was not a threat or risk of harm to anyone at Notre Dame. **Ex. 43, December Emails between Holst-Haley and Student**.

99.     In December 2021, the gossip that Jane Roe and Christine Holst-Haley had stoked was so intense that students were reporting false sightings of Mr. Daniels enjoying lunch at the law-school cafeteria—when he was actually 1,000 miles away in Texas. **Ex. 44, Email from Holst-Haley to Student Body; Dec. Daniels ¶ 81**.

100.     From November 2021 until March 2022, Mr. Daniels emailed Heather Ryan, Director of OCS, multiple times about the OCS process and how to vindicate his name and received radio silence. **Dec. Daniels ¶ 82**.

101.    On March 24, 2022, Heather Ryan finally met with Mr. Daniels and informed him that the OCS allegations against him came solely from the NDPD Report. **Ex. 45, Tr. of March 24, 2022, Call with Heather Ryan at 2**.

102.    After Heather Ryan questioned Mr. Daniels on Jane Roe's "weird" dinner-party interactions with Mr. Daniels, Heather Ryan wanted to "follow up" with Jane Roe about those interactions that Jane Roe omitted to NDPD. **Ex. 45, Tr. of March 24, 2022, Call with Heather Ryan at 8, 15; Dec. Daniels ¶ 85**.

103.    At the end of the March 24, 2022, call, Heather Ryan discussed how the OCS formal hearing process unfolded and informed Mr. Daniels that Jane Roe would "be participating in her own capacity" as a witness at the formal hearing. **Ex. 45, Tr. of March 24, 2022, Call with Heather Ryan at 16**.

104.    In April of 2022, Heather Ryan spoke to Jane Roe about her omitted "weird" dinner-party interactions at Mr. Daniels, confirmed to Mr. Daniels than Jane Roe admitted to Mr. Daniels's depiction of them, and that there were no factual discrepancies between Mr. Daniels and Jane Roe. **Dec. Daniels ¶ 89**.

105.    Later in April of 2022, Mr. Daniels was attempting to identify and name witnesses for OCS's formal-hearing process and a number of proposed witnesses were disallowed by Heather Ryan because they were not present at the scene as required by the OCS Policy in the sole and subjective view of Heather Ryan. **Dec. Daniels ¶ 89–92; Ex. 45, Tr. of March 24, 2022, Call with Heather Ryan at 14; Ryan Dep. at 61:1–62:24**.

106.    Heather Ryan believed that witnesses not "actually present" to an event "have a skewed perception of the event" and were unreliable even though all of the witnesses that Jane Roe was able to present to OCS via the NDPD report were not themselves present to any alleged

misconduct and only allegedly heard about it from others—namely Jane Roe. **Ryan Dep. at 61:1–62:24; NDPD Report at 11–13**.

107.    The OCS Hearing Procedures require that an accused student (Mr. Daniels) will be told whether the complainant (Jane Roe) will participate "at least three (3) calendar days in advance" of the Hearing. **Ex. 46, OCS Procedures at 6–7**.

108.    Mr. Daniels's formal hearing occurred on April 22, 2022, and Jane Roe was not present contrary to Heather Ryan previously stating multiple times that Jane Roe would attend. **Dec. Daniels ¶ 90–92**.

109.    The hearing panel determined that there was no merit to any accusation against Mr. Daniels of threats of harm to himself or others in any capacity and that no stalking or harassing interaction occurred toward Jane Roe (or anyone else). **Ex. 34, OCS Conduct-Reporting Letter at 2**.

110.    OCS did find one "violative" action by Mr. Daniels though—one not even alleged or complained of at any point in the TAMT or OCS processes—that Mr. Daniels was "responsible for engaging in a brief verbal interaction where . . . Bryce agreed to not communicate in the future" but said he "could not promise not to accidentally say hello" in cordial reflex. **Ex. 34, OCS Conduct-Reporting Letter at 2**; *see generally* **NDPD Report** (lacking this interaction at all).

111.    When asked to explain how Mr. Daniels's promising to not say "hey" to someone but acknowledgment he may *accidentally* say "hey" out of passing reflex was a policy violation, Heather Ryan stated "[t]he policy violation is not even being willing to engage in not doing it"— even though Heather Ryan's own report stated that Mr. Daniels was willing to not do it. **Ryan Dep. at 44:16–45:13**.

112.    Even more clearly, Heather Ryan said it is accurate that "accidentally saying hello to someone is not a policy violation" unless it is Mr. Daniels doing it to Jane Roe. **Ryan Dep. at 45:14–16**.

113.    Jane Roe was not investigated by OCS for her conduct as reported by Mr. Daniels which included Jane Roe calling Mr. Daniels a liar, interjecting herself into his conversations, stating that she was interested in Mr. Daniels from a "philosophical and psychological perspective," and Jane Roe's following and physically accosting Mr. Daniels in the NDLS library. **Dec. Daniels ¶¶ 30–33, 65, 112–13; Dec. Ryan ¶ 12**.

114.    Heather Ryan did not investigate Mr. Daniels's against Jane Roe because Heather Ryan believed that "accidentally saying 'hello' to someone" has a more egregious community "impact" than Jane Roe's series of "weird" interactions at Mr. Daniels. **Ryan Dep. at 44:21– 45:13, 31:17–32:7, 37:4–24**.

115.    Despite Mr. Daniels's policy violation that Heather Ryan admitted was not a policy violation, Mr. Daniels was assigned two community-partnership discussions as part of his OCS-specific sanctions—one with Heather Ryan as a community partner and one with Christine Holst-Haley as a community partner. **Ex. 34, OCS Conduct-Reporting Letter at 2**.

116.    Mr. Daniels completed his community-partner talk with Heather Ryan without problem. **Ryan Dep. 73:4–8**.

117.    Mr. Daniels attempted to complete his required conversation with Christine Holst-Haley on June 13, 2022, but Christine Holst-Haley refused to certify the conversation as complete because Christine Holst-Haley accused Mr. Daniels of not taking the conversation "seriously" by not declaring himself at fault "for the fact that like we got here" even though OCS found Mr.

Daniels to have *not* been at fault. **Ex. 35, Tr. of Christine Holst-Haley and Mr. Daniels Partnership Meeting 9:41**.

118.    Mr. Daniels was therefore required to have an additional conversation with Christine Holst-Haley—wherein Mr. Daniels did not change his views that he was wholly vindicated—and *that* conversation was certified by Christine Holst-Haley as meeting the OCS partnership criteria of taking responsibility and Notre Dame-community-reintegration readiness. **Ryan Dep. at 77:5–16; 70:12–16**.

119.    With OCS-specific sanctions fulfilled, Mr. Daniels attempted to reapply for admission to NDLS in spring of 2024 for prospective readmittance in Fall 2025. **Dec. Daniels 114–15**.

120.    A requirement of readmission into NDLS is mental-health clearance by the UCC. **Dec. Daniels 114–16**.

121.    The UCC application includes open-ended questions regarding the circumstances of departure from the University, how those issues are resolved, why the applicant feels he is ready to return, and if the applicant believes he needs additional treatment while at the University. The UCC also requires the disclosure of medical records of a licensed mental-health provider and provides a standard-form questionnaire for mental-health providers to fill out and return to the UCC. **Dec. Daniels ¶ 116; Ex. 47, UCC Clearance Application and Notes at 8**.

122.    Christine Conway, in reviewing and approving the no-clearance recommendation by Amy Spanopoulos, a UCC counselor, believed that Mr. Daniels "made comments to other people" (that OCS had determined he in fact had not) that Christine Conway believed Mr. Daniels should have admitted to in order to "tak[e] responsibility for any aspect of what happened," and if he didn't, then Mr. Daniels lacked "any understanding of what the situation was." **Ex. 47, UCC**

Clearance Application and Notes at 30–32; Conway Dep. at 75:19–77:25; Ex. 34, OCS Conduct-Reporting Letter at 2.

123.    Mr. Daniels included the OCS findings that he in fact never made any alleged harassing or threatening comments in his UCC clearance application, but Christine Conway willfully ignored that part of Mr. Daniels's application. Ex. 47, UCC Clearance Application and Notes at 22–23; Conway Dep. at 77:4–22, 82:13–20.

124.    Christine Conway also approved a derogatory note that Mr. Daniels had not listed examples of demonstrated behavioral changes—even though the UCC clearance application did not ask for, or necessitate, that. Ex. 47, UCC Clearance Application and Notes at 31, 8.

125.    Christine Conway also approved a note recommending against UCC clearance because of Mr. Daniels's "[a]bsence of expected step-down to lower levels of care to address precipitants to mandated withdrawal." Ex. 47, UCC Clearance Application and Notes at 31.

126.    However, no expectation of step-down care was ever communicated to Mr. Daniels, and it is instead an uncommunicated, "internal" preference of the UCC. Conway Dep. 53:6–54:24, 66:1–8 (admitting that no explicit requirements were communicated to Mr. Daniels).

127.    The UCC reached out to Christine Holst-Haley at NDLS to see if the requirements letter for readmission that was given to Mr. Daniels included step-down care, and Christine Holst-Haley informed the UCC that "there are no specific mental health treatment requirements." Ex. 47, UCC Clearance Application and Notes at 33–36; Ex. 48, Email from Margaret Morgan to Mr. Daniels at 1 (stating NDLS's requirements letter would detail any specific mental-health requirements).

128.    Instead, Christine Conway declined to give Mr. Daniels UCC clearance because she believed "something within" Mr. Daniels was creating mental distress and that Mr. Daniels

suffered from the "big deal" of forcible removal from Notre Dame that impaired his ability to function in the school environment and that Mr. Daniels "needed" mental healthcare to address an impairment that Christine Conway believed is "always going to be there for [Mr. Daniels]." **Conway Dep. 60:4–61:10, 87:22–24, 90:13–25, 68:4–17.**

129. Christine Conway's decision was not made on the basis of lacking sufficient documentation of step-down care because the UCC told Mr. Daniels that the Memorial Epworth health records he provided were "acceptable" and "sufficient." **Ex. 47, UCC Clearance Application and Notes at 40–41; Ex. 49, Email from UCC to Mr. Daniels re Clearance at 1** (conveniently omitted from UCC's own records).

130. Christine Conway also testified that she and the UCC "had enough information to evaluate" Mr. Daniels's UCC-clearance application. **Conway Dep. 95:18–96:4.**

131. Further, the UCC, at the time of Mr. Daniels's discharge from Memorial Epworth, agreed with the Memorial Epworth discharge and follow-up care instructions of no further treatment necessary or recommended. **Ex. 36, Memorial Epworth Records at 8, 19–21.**

132. The UCC denied clearance to Mr. Daniels and communicated such to the NDLS readmissions committee. **Ex. 47, UCC Clearance Application and Notes at 49.**

133. Christine Holst-Haley serves as one-third of the readmissions committee and— before Mr. Daniels's readmission application—spoke to the other two members off the record about Mr. Daniels. **Holst-Haley Dep. 28:19–22; Ex. 50, Christine Holst-Haley Email to Marisa Simon at 1; Ex. 51, Christine Holst-Haley Email to Jenny Fox.**

134. The NDLS readmissions committee denied Mr. Daniels's application because he did not receive UCC clearance and "[a]dditionally" because the readmissions committee did not

believe Mr. Daniels took adequate accountability for the allegations against him in Fall of 2021. **Ex. 52, Readmission Denial Letter**.

135.    The failure to take "accountability" determination was made in light of Christine Holst-Haley certifying to OCS that Mr. Daniels took responsibility and accountability in light of the finding that all of the allegations against Mr. Daniels were found to not have been true. **Ryan Dep. at 77:5–16; 70:12–16; Holst-Haley Dep. 43:16–44:12** (stating that "accountability" for Christine Holst-Haley is fulfilled by Mr. Daniels denying allegations and being confused how they arose).

Date: January 9, 2026

Respectfully submitted,

Bryce Thomas Daniels
5505 Seminary Rd.
Unit #317N
Falls Church, VA 22041
(214) 909-2108
bryced@sas.upenn.edu

*Plaintiff pro se*

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2026, I sent via USPS Mail the foregoing document to

be filed with the clerk of court and via email to the following counsel of record:

STEPHEN M. JUDGE
SOUTHBANK LEGAL
100 E Wayne Street, Suite 300
South Bend, IN 46601
Tel: 574-968-0760
sjudge@southbank.legal

*Attorney for the University of Notre Dame*

Bryce Thomas Daniels

*Plaintiff pro se*