UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BRYCE THOMAS DANIELS,

    Plaintiff,

    v.

UNIVERSITY OF NOTRE DAME,

    Defendant.

Case No. 3:22-CV-698-GSL

## **ORDER**

*Introduction*

On December 1, 2025, Defendant filed their Motion for Summary Judgment at [DE 161], their Statement of Material Facts at [DE 162], and their Memorandum in Support of the Motion at [DE 163]. Plaintiff responded on January 9, 2026 with his Motion in Opposition to Defendant's Motion for Summary Judgment at [DE 164], his Response to their Statement of Material Facts at [DE 165], and provided evidence, under seal, at [DE 167]. On February 2, 2026, Defendant filed their Reply to Plaintiff's Response in Opposition at [DE 168] and their Reply to Plaintiff's Statement of Material Facts at [DE 169]. Having reviewed each of the Motions and their accompanying evidence, the Court is ready to rule.

*Background*

In support of his Statement of Material Facts, [DE 165], Plaintiff cites Local Rule 56-1(b)(3), which states that where parties are unrepresented, they are not required to restate verbatim the moving party's Statement of Material Facts. N.D. Ind. L.R. 56-1(b)(3). The text of that rule reads: "In cases where any party is unrepresented, the opposing party is not required to restate verbatim the Statement of Material Facts." *Id.* This does not exempt unrepresented parties

from any of the other requirements under Local Rule 56-1(b), including that the opposing party provide a direct response to the moving party's Statement of Material Facts, and that any additional facts not presented by the moving party be placed in a separate section titled "Additional Material Facts."

Here, Plaintiff appears to misunderstand Local Rule 56-1(b)(3) as a blanket exemption from compliance with the rest of the requirements under Local Rule 56-1(b). Plaintiff provided a Statement of Material Facts which is entirely untethered to Defendant's Statement of Material Facts. As one example, Defendant's Statement of Material Facts ¶ 2 states:

> On November 1, 2021, Stella Miller, a Care and Wellness Consultant at NDLS, received a report from a male law student ("John Doe") that contained allegations about an unnamed male law student that told Doe that he was considering suicide by firearm because Doe rejected his romantic overtures. Ex. 2, Dec. of Christine Caron Gebhardt ("Gebhardt Dec.") ¶ 2, 7, ECF 161-2 at 1, 3; Holst-Haley Dec. ¶ 4, ECF 161-1 at 3.

[DE 162, ¶ 2]. Plaintiff responded with:

> Mr. Daniels read the posted policies and procedures of Notre Dame (including the Title IX Policy, Title IX Procedures, and du Lac) prior to his matriculation as part of his school selection. Ex. 3, Verified Sec. Am. CompJ. ("Dec. Daniels") 1143-45.

[DE 165, ¶ 2].

Plaintiff's noncompliant submission makes it difficult for the Court to discern where discrete factual disputes lie. Because Defendant responded to Plaintiff's Statement of Material Facts, this Court will not strike Plaintiff's submission. Plaintiff also filed his Response outside of the time permitted, but because Defendant does not contest his Response on these grounds, this Court will allow it.

The relevant facts underlying this lawsuit, insofar as the Court can discern them from the parties' respective Statements of Material Facts and submitted evidence, are as follows. Plaintiff

2

was a first year law student at Defendant's law school in the fall semester of 2021. [DE 169, Page 1]. In late October and early November of 2021, several students expressed concern for their individual well-being and the well-being of Plaintiff, their classmate. [DE 161-1, Pages 12-13; DE 161-3, Pages 11-23; DE 161-5, Pages 20-32]. These concerns included allegations of Plaintiff committing either self-harm or harm to others. [DE 161-1, Page 13; DE 161-3, Pages 12, 14, 16-18; DE 161-5, Pages 23, 25-27; DE 164-1, Pages 119-122]. There were also allegations that Plaintiff had access to firearms and that those firearms had been brought, or were threatened to be brought, to campus. [DE 161-3, Page 18; DE 161-5, Pages 21-22, 25-27]. On November 5, 2021, Plaintiff was involuntarily withdrawn from Defendant's law school. [DE 161-4, Page 57-58]. Plaintiff challenges his involuntary removal and brings claims alleging discrimination in violation of Title IX, Title III of the Americans with Disability Act and Section 504 of the Rehabilitation Act, and breach of contract.[1]

*Legal Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Osborn v. JAB Mgmt. Servs., Inc.*, 126 F.4th 1250, 1258 (7th Cir. 2025). Facts are deemed "material" when they "might affect the outcome of the suit under the governing law," and a dispute is considered "genuine" when the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Osborn*, 126 F.4th at 1258 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

---

[1] Additional facts will be addressed and discussed, as necessary, throughout the Court's discussion.

The movant "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of" the evidence "which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive a properly supported motion for summary judgment, "the nonmoving party must present evidence sufficient to establish a triable issue of fact on all elements of its case." *McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 969 (7th Cir. 2020). While the facts are construed in the light most favorable to the nonmoving party, the nonmoving party must nonetheless present sufficient evidence to place his "'version of events' beyond the level of mere 'speculation or conjecture.'" *Osborn*, 126 F.4th at 1258 (quoting *Est. of Biegert ex rel. Biegert v. Molitor*, 968 F.3d 693, 701 (7th Cir. 2020)).

When analyzing a motion for summary judgment, the Court need only consider the cited materials and need not search the record for other evidence. Fed. R. Civ. P. 56(c)(3). The Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Davis v. United States*, 400 F. Supp. 3d 745, 747 (S.D. Ind. 2019) (citing *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573 (7th Cir. 2017)). *See DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record."). With these principles in mind, the Court will now turn to Defendant's Motion for Summary Judgment.

*Discussion*

I.      Discrimination in Violation of Title IX

A plaintiff proves a Title IX claim by showing "(1) the educational institution received federal funding, (2) [the] plaintiff was excluded from participation in or denied the benefits of an

4

educational program, and (3) the educational institution in question discriminated against [the] plaintiff based on gender." *Metzler v. Loyola Univ. Chi.*, 164 F.4th 612, 617 (7th Cir. 2026) (alteration in original) (quoting *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854 (7th Cir. 2019)); *see* 20 U.S.C. § 1681(a).

To avoid summary judgment, Plaintiff must show there is enough evidence in the record from which a reasonable fact-finder could conclude the university discriminated against him on the basis of sex. *Metzler*, 164 F.4th at 617. *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019) (quoting 20 U.S.C. § 1681(a)); *accord Gash v. Rosalind Franklin Univ.*, 117 F.4th 957, 962 (7th Cir. 2024). The "ultimate inquiry must consider the totality of the circumstances." *Gash*, 117 F.4th at 962 (quoting *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 792 (7th Cir. 2022)). Consistent with this, the courts view evidence holistically to assess an overall likelihood of discrimination rather than ask whether a "particular piece of evidence proves the case by itself." *Gash*, 117 F.4th at 962 (quoting *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 924 (7th Cir. 2020)).

Importantly, Title IX specifically prohibits sex discrimination, not botched disciplinary proceedings. *Metzler*, 164 F.4th at 617. "…[I]nterviewing the wrong potential witnesses, or listening to too few or too many witnesses ... are of no concern under federal law unless the defendants treated men worse than women (or the reverse)." *Metzler*, 164 F.4th at 617 (citing *Doe v. Trs. of Ind. Univ.*, 101 F.4th 485, 489 (7th Cir. 2024)). For that reason, "a plaintiff cannot prove gender discrimination by merely identifying mistakes or imperfections in the process." *Metzler*, 164 F.4th at 617 (citing *S. Ind.*, 43 F.4th at 793). Just as procedural errors are themselves inadequate to support sex discrimination, so too are other sex-neutral issues, like anti-respondent bias. *Metzler*, 164 F.4th at 617. *See Gash*, 117 F.4th at 965; *Columbia Coll. Chi.*,

5

933 F.3d at 856. "[P]ro-victim or pro-complainant bias [] cannot support a claim for sex discrimination because both men and women can be victims of sexual assault." *Gash*, 117 F.4th at 965 (citing *S. Ind.*, 43 F.4th at 798 n.8).

Defendant does not dispute the first two elements; Defendant received federal funding and denied Plaintiff educational benefits by involuntarily removing him from the university. *Metzler*, 164 F.4th at 617; *See Gash*, 117 F.4th at 961. Therefore, Plaintiff's claim turns on whether there is evidence showing Defendant discriminated against him "on the basis of sex." *Metzler*, 164 F.4th at 617; 20 U.S.C. § 1681(a). *See Purdue Univ.*, 928 F.3d at 667.

Plaintiff argues that Defendant discriminated against him on the basis of his sex by not treating Jane Roe's complaint against him as a formal Title IX Complaint. As explained in great detail below, however, Plaintiff appears to conflate the investigation done by the Threat Assessment and Management Team, regarding allegations of Plaintiff committing self-harm or harm to others, with the investigation done by the Office of Institutional Equity ("OIE"), investigating the report made by Jane Roe about Plaintiff's behavior. As will be discussed, Plaintiff was removed from Defendant's law school not due to the report made by Jane Roe about Plaintiff's behavior and the investigation done by OIE, but instead, due to the allegations from at least two students, and Plaintiff's own statements, that Plaintiff may commit either self-harm or harm to others. As the Court will explain, this does not implicate Title IX.

On November 2, 2021, Jane Roe reported to the Notre Dame Police Department, ("NDPD"), that Plaintiff had been harassing her and that she wanted to file a report. [DE 161-3 Pages 1-2, 11]. Jane Roe's allegations and desire to file an NDPD report were discussed later that day at a regularly scheduled Threat Assessment and Management Team meeting. [DE 164-2, Page 62]. The Threat Assessment and Management Team coordinates Defendant's assessment of

threats, and its corresponding response, by evaluating reports and information about individuals who have engaged in concerning behavior and who pose a risk of harming themselves or others, or who may otherwise present a threat to the safety to Defendant's community. [DE 161-6, Pages 1-3]. The Threat Assessment and Management Team has the authority to recommend emergency removal. [DE 161-6, Page 3]. The Team regularly meets twice a month, but any member of the Team may call a special meeting if necessary. [DE 161-6, Page 4].

The next day, on November 3, 2021, Jane Roe called NDPD and made a second report, alleging that Plaintiff said that he intended to "bury" her if she escalated the situation. [DE 161-3, Pages 2, 12]. Jane Roe informed NDPD that two other students reported Plaintiff carrying a gun on his person while on campus, and that she was fearful of Plaintiff. [DE 161-3, Page 12]. She then requested assistance in obtaining a No-Contact Order from the Office of Institutional Equity. As a result, two separate investigations were started. [DE 161-3, Page 12]. NDPD began its own criminal investigation and involved the Threat Assessment and Management Team. As requested, NDPD referred Jane Roe's report to the Office of Institutional Equity for assistance with a No-Contact order. [DE 161-3, Page 2]. Both investigations will be discussed.

To investigate concerns that Plaintiff may harm himself or others, on November 4, 2021, and into November 5, 2021, NDPD Officer Steven Stebbins began to interview student witnesses.[2] [DE 161-3, Page 2]. The first student reported that on October 28, 2021 Plaintiff told him to join the Federalist Society, a law school student organization, so that he could vote for

---

[2] Notably, Plaintiff does not appear to contest the veracity of Stebbins' affidavit or the police report describing the interviews, and, at certain points in his Response to Defendant's Motion for Summary Judgment and his Response to Defendant's Statement of Material Facts, appears to concede that he did state many of things reported to NDPD Officer Stebbins.

Plaintiff when he ran for president.[3] [DE 161-3, Pages 2, 16]. This student went on to report that Plaintiff made a comment implying he would shoot or kill anyone who ran against him. This student shared the comments with other law school students, where he learned that Plaintiff had told other students he possessed a gun. [DE 161-3, Pages 2, 16-17]. Notably, these allegations were unrelated to the allegations made by Jane Roe in her report to NDPD about Plaintiff's behavior.

The second student NDPD Officer Steven Stebbins interviewed reported that law school students had discussed concerns that Plaintiff had a gun and had made jokes about hurting people who got in the way of his leadership goals. [DE 161-3, Pages 3, 17]. This second student reported that he had heard Plaintiff shouted at a Teaching Assistant during class when instructed to not use his cell phone. [*Id.*]. This student also shared that Plaintiff had directly stated he hated women, believed all women were liars, and that he had previously been accused of rape. [*Id.*]. Finally, this second student shared that Jane Roe had approached him to discuss her interactions with Plaintiff, but when this second student attempted to address the concerns with Plaintiff, Plaintiff replied, "is this about that evil woman [Jane Roe]?" [*Id.*]. Plaintiff allegedly went on to state that he thought it was "fun to needle her," that he would "respect her when she respects [him]," that he is "not as forgiving as our Lord Jesus Christ," and that "if she tries to escalate this," he would "bury her." [*Id.*]. Here again, many of these allegations were unrelated to the allegations made by Jane Roe in her report to NDPD about Plaintiff's behavior.

The Threat Assessment and Management Team was provided this information by NDPD and called a "special meeting" on November 4, 2021 to discuss Plaintiff and the allegations

---

[3] The genders of the students interviewed by NDPD are not known to this Court. Therefore, the pronouns he/him will be used for all student interviewees.

against him. [DE 161-3, Pages 4, 14; DE 161-6, Page 4]. This was a "special meeting" because it was not regularly scheduled, and instead, was convened specifically to discuss the ongoing situation with Plaintiff. NDPD Officer Stebbins, who had been interviewing students regarding Plaintiff's behavior, was in attendance of this meeting. [DE 161-3, Page 14; DE 164-2, Page 62]. Based on this information, the Threat Assessment and Management Team agreed that the appropriate response to the concerns involving Plaintiff's behavior would be for NDPD to continue its investigation of Jane Roe's report, and to continue interviewing student witnesses, as well as Jane Roe and Plaintiff. [DE 161-6, Page 4].

After this "special meeting," NDPD Captain Garcia Betts learned that another student had come forward expressing concerns about Plaintiff's behavior, specifically that Plaintiff was suicidal and had a gun. [DE 161-3, Page 4]. This student, John Doe, shared with Stella Miller, the Wellness and Care Consultant at Defendant's law school, that Plaintiff threatened to shoot himself with a gun because John Doe rejected his romantic overtures. [DE 161-6, Page 5]. Stella Miller forwarded John Doe's report to Christine Caron Gebhardt, who is a standing member of the Threat Assessment and Management Team. [DE 161-6, Page 5]. While initially John Doe did not disclose that the suicidal student was Plaintiff, after John Doe made that disclosure, and after Captain Garcia Betts spoke with and confirmed the information with John Doe, the Threat Assessment and Management Team called an "emergency meeting" to again discuss Plaintiff's behavior. [DE 161-3, Pages 4, 14; DE 161-6, Pages 4-5; DE 164-2, Page 62]. This meeting occurred around 6:30PM on November 4, 2021. [DE 161-6, Page 5].

At this "emergency meeting," the Threat Assessment and Management Team discussed that there were now two serious reports about Plaintiff's behavior, that they contained allegations that Plaintiff was engaging in escalating and concerning conduct towards at least two students

9

within a very short period of time in unrelated circumstances, and that he had made multiple references to having weapons and potentially using those weapons against himself or others. [DE 161-6, Page 5]. Based on this information, and the training and expertise of the members of the Threat Assessment and Management Team, there were significant concerns that Plaintiff was dangerous, that he posed a threat of harm to himself, and that he posed a risk to the safety of others in Defendant's law school community. [DE 161-6, Page 5]. Therefore, the Threat Assessment and Management Team unanimously decided to recommend Plaintiff's emergency removal from Defendant's university. [DE 161-6, Page 5].

With this recommendation in mind, on November 5, 2021, NDPD Officer Stebbins continued NDPD's investigation and interviewed a third student, who reported that Plaintiff had stated during a Federalist Society meeting that he carries a gun all the time even when coming to campus. [DE 161-3, Pages 4, 18]. When the third student interviewee replied to Plaintiff that guns were banned from campus, Plaintiff shook his backpack in a manner suggesting there was a gun present inside of it. [*Id.*]. This student also reported that Plaintiff had told him that he has terrible relationships with women and believes women are "evil." [DE 161-3, Pages 5, 18]. He further reported that Plaintiff appeared to have a short fuse and that Plaintiff snapped at a Teaching Assistant stating "if you ever speak to me like this again, we are going to have problems." [*Id.*]. This student then stated that he and his classmates were afraid Plaintiff would hurt them. [DE 161-3, Page 18].

After this interview, Jane Roe was interviewed by NDPD where she reiterated her initial complaints: that after attempting to distance herself from Plaintiff, he responded poorly; that Plaintiff made comments to others about carrying a gun on his person; and, that she had heard from other students that Plaintiff intended to "bury her" if she escalated the situation by filing a

report with the university. [DE 161-3, Pages 5-6, 19]. Following the conclusion of the interview with Jane Roe, NDPD Officer Stebbins interviewed Plaintiff.

Plaintiff told NDPD Officer Stebbins that he has had many experiences with "crazy women" and "awful, not good, evil hearted women," and that the situation with Jane Roe was "too close" to those experiences and he was "very paranoid about that stuff." [DE 161-3, Pages 6, 20]. He appeared to be unaware of what he had done to upset Jane Roe, but felt like Jane Roe wanted him to view her as "source of authority." [*Id.*]. He then stated that Jane Roe had repeatedly become upset when he spoke to her, even when he just said "hey." [DE 161-3, Pages 6-7, 20]. NDPD Officer Stebbins asked Plaintiff if he thought all women were evil, and Plaintiff responded he thought that was "pretty fair," but mentioned a few exceptions. [DE 161-3, Pages 7, 20]. Plaintiff also clarified that his comments about burying Jane Roe were not a physical threat, but instead were an attempt to convey that if Jane Roe impacted his time at law school, that he would "happily bury her" by "winning" the allegations she brought against him, and Plaintiff claimed he would not physically hurt her. [DE 161-3, Pages 7, 21].

Plaintiff made multiple remarks unrelated to the situation with Jane Roe that made NDPD Officer Stebbins concerned that he might harm himself. Plaintiff admitted he had thoughts of self-harm in the previous 12-13 years, and disclosed that he had a Glock 19 firearm which other students might be aware of. [DE 161-3, Pages 7, 20]. When NDPD Officer Stebbins asked if Plaintiff might harm himself, his response was, "I'm highly unlikely to intentionally hurt myself for the pure purpose of hurting myself. That's probably the best you're going to get from me." [DE 161-3, Pages 7-8]. NDPD Officer Stebbins interpreted this to mean that Plaintiff was unable to promise that he would not attempt suicide or otherwise harm himself. [DE 161-3, Page 8]. Based upon the entirety of the interview with Plaintiff, NDPD Officer Stebbins believed Plaintiff

to be a potential threat to himself and to others. [DE 161-3, Page 8]. After the interview with Plaintiff concluded, NDPD Officer Stebbins escorted Plaintiff to a conference room, where Plaintiff was removed from the University under the Defendant's Emergency Actions protocol.

Involuntary withdrawals pursuant to the Emergency Actions procedure, like in Plaintiff's case, occur very rarely. [DE 161-2, Page 2]. These types of involuntary withdrawals are done only after an assessment of the student's health and safety, the student's impact on the community, and the risk the student may pose to the health and safety of others. [*Id.*]. There are scenarios, again, like in Plaintiff's case, where a student demonstrates such an immediate threat that the assessment is completed quickly, based on the available information, and a determination is made the student must be removed immediately for the protection of the student and the University community. [*Id.*].

Plaintiff argues that the Threat Assessment and Management Team only heard and reviewed summaries of the investigation, and that these summaries omitted "exculpatory admissions by Jane Roe and inserted fabricated, inculpatory 'admissions'" by Plaintiff. [DE 164, Page 17]. However, this is untrue where NDPD Officer Stebbins, the Officer who interviewed the student reporters, attended the first Threat Assessment and Management Team meeting held at 2:00 pm on November 4, 2021 to share his findings first-hand. [DE 161-3, Page 3]. This was not just due to NDPD Officer Stebbins personally interviewing the student reporters, but also because he traditionally attended three to five meetings a year. [*Id.*]. Furthermore, in support of his argument that "exculpatory admissions by Jane Roe" were omitted, Plaintiff cites to, and provides the Court with, one paragraph of one page of a multi-page transcript which transcribed Jane Roe's interview with NDPD Officer Stebbins. [DE 164-2, Page 148]. Jane Roe appears to imply that Plaintiff is stepping down from the activities which he has in common with Jane Roe,

12

which Jane Roe takes some relief in. The Court fails to see how this is "exculpatory" to Plaintiff's allegations; it has no bearing on whether Plaintiff initially took the actions that Jane Roe alleges. Nor does the summary provided to the Threat Assessment and Management Team inserted "fabricated, inculpatory 'admissions'" by Plaintiff. The citation Plaintiff provides in support of this shows that NDPD Officer Stebbins asked Plaintiff if he thinks women are potentially evil and Plaintiff responded with "I think that's pretty fair." [DE 165, Pages 15-16]. Finally, even if Plaintiff's arguments were true, "a plaintiff cannot prove gender discrimination by merely identifying mistakes or imperfections in the process." *Metzler*, 164 F.4th at 617 (citing *S. Ind.*, 43 F.4th at 793). Therefore, this argument fails.

Plaintiff also argues that none of his classmates actually viewed him as a threat. In his Statement of Material Facts, he states,

> On November 1, 2021, John Doe, a different friend of Mr. Daniels, emailed Stella Miller, a Care and Wellness Consultant at Notre Dame, requesting resources to serve as general emotional support to Mr. Daniels in their "not sexual" or romantic relationship while repeating multiple times that Mr. Daniels was no harm to himself or anyone else. Ex. 5, Emails from John Doe to Stella Miller at 4-5.

[DE 165 ¶ 9]. However, reviewing all the emails contained in Exhibit 5 between John Doe and Stella Miller, Plaintiff appears to mischaracterize the email evidence he cites. First, nowhere does John Doe outwardly state that he believes Plaintiff is not a risk to himself or others. [DE 164-1, Pages 61-65]. In fact, John Doe initially makes a more qualified statement, that he does not "believe there is any danger of [Plaintiff] doing anything rash in the next 24 hours or so." [*Id.* at 65]. John Doe later states "[t]here is no bad feeling remaining between us, and I believe [Plaintiff] is in a very good place mentally." [*Id.* at 63]. Second, when John Doe first reached out to Stella Miller, it was because Plaintiff had told John Doe he had "laid down in his bed for a time with a loaded gun at this side, thinking about whether he should kill himself." [*Id.* at 65].

Furthermore, John Doe explicitly stated to Stella Miller, "I share your view that the fact of the gun to some degree heightens the risk of the situation." [*Id.* at 61]. He goes on to discuss how Plaintiff had been receiving help from two law school faculty members regarding Plaintiff's "suicidal tendencies and his possession of a gun." [*Id.* at 61-62]. John Doe also said "…it began [sic] clear to me that there are a lot of unhealthy emotional and psychological factors at work in this classmate's perception of me…". [*Id.* at 65]. John Doe also states "… a couple of the things [Plaintiff] said alerted to me to how dangerous this situation is." [*Id.*] In fact, at one point John Doe asks for additional time to consider whether he should report Plaintiff to Captain Garcia Betts at NDPD. [*Id.* at 62]. Additionally, there are the student interviews, discussed above, where several students state they are concerned for Plaintiff's safety, as well as their own. Plaintiff's argument that none of his classmates viewed him as a threat is unpersuasive.

Plaintiff further cites the University Counseling Center's call summary with John Doe as evidence that Defendant and its staff members did not view him as a threat. [DE 164, Page 5 (citing 165 ¶¶ 14-15)]. However, it is unclear to the Court whether this document is a call summary of the information provided by John Doe over the phone, or if it is the staff member's assessment of the information provided by John Doe. Either way, the "On-Call Notes" state "[o]n-call will call REDACTED to get more information and will then decide if calling police for wellness check is necessary." [DE 164-1, Page 122]. The Court disagrees that this document is evidence that Defendant did not view Plaintiff or his alleged behavior as a real threat, when the note indicates calling the police was considered. And, contrary to Plaintiff's assertions in his Response to Statement of Material Facts, [DE 165 ¶¶ 13-14], in her deposition, Christine Conway denied that this call summary was a summary of a clinical assessment done on Plaintiff, and instead, clarified that this was a document simply summarizing a call to the University

14

Counseling Center's after-hours line. [DE 164-1, Pages 90-91]. This document does not indicate that Plaintiff was clinically assessed and that his behavior was found to be non-concerning, as Plaintiff asserts.

Plaintiff also provided this Court with three instances where females at the University were alleged to have made comments of self-harm or harm to others but were not removed by the Threat Assessment and Management Team. However, all three instances are distinguishable from Plaintiff's situation.

The first instance occurred in 2015, but, there is only a one paragraph summary describing the entire event, so little information is available for this Court to review. [DE 167, Page 14]. According to that paragraph, a student suffering from depression made a call to the University Counseling Center, which prompted a police welfare check. [*Id.*]. There were firearms in the student's home, and the student willingly gave up the key to the firearm cabinet where the firearms were stored. [*Id.*]. This student was a "long-term" patient of the University Counseling Center and was currently undergoing care. Notably, there were no allegations of harm to self or others. [*Id.*]. This student was voluntary hospitalized shortly after this incident, and the University Counseling Center stated it would follow-up with this student after her hospitalization. [*Id.*]. There are no other notes regarding this situation, so the Court is unclear whether this student ever returned to the University, but even if she had, the situation is still distinguishable from Plaintiff's. This situation was prompted by the student's own understanding of her mental health struggles, which she recognized and took action to correct, and did not involve threats of harm to herself or others.

The second instance, occurring in 2016, involved two Mendoza School of Business administrators reporting that a graduate student that was acting "very strangely" and was

15

"abrasive with her fellow students and faculty members." [DE 167, Page 8]. The graduate student would reportedly stand outside one of the reporting administrator's offices and stare blankly at the administrator. [*Id.*]. When the administrator would ask if the graduate student needed assistance, the student would walk away without answering. [*Id.*]. During only one of these instances did the graduate student respond, stating "I have to see a Superior!" but ultimately walked away before either of the administrators could interact with her. [*Id.*]. According to report, both administrators were very concerned about the graduate student's behavior, and one administrator began working off-campus due to how uncomfortable this graduate student made her. [*Id.*]. Critically, the graduate student was evaluated by the UCC and was found not to be a threat to herself or others, there were no allegations that the graduate student could or would commit self-harm, there were no reports of direct or implied threats, and there were no allegations that the graduate student had access to a gun and had brought, or had threatened to bring, that gun to campus. [*Id.*]. This instance is clearly distinguishable from the Plaintiff's.

The final incident cited by Plaintiff occurred in 2022. [DE 167, Page 2]. A student reporter shared that another student had made disturbing comments in class, that the student had threatened to kill or harm other students, and that this student had the ability to harm herself and others, which made the student reporter fearful for her life. [*Id.* at 2-3]. NDPD officers interviewed the student who had allegedly made statements about harming other students, and found her to be in manic state, potentially related to a recent bipolar disorder diagnosis. [*Id.*]. While NDPD officers did ask the student about the comments she made in class, her response is redacted. [*Id.*]. The student agreed to be admitted to Memorial Epworth Hospital for evaluation and care. [*Id.*]. This student received care and was later released to her family where she began

seeing a therapist. [*Id.* at 5]. After returning to campus, this student appears to have met with a Care Consultant at the University Counseling Center, where it was determined she no longer needed to be monitored. [*Id.* at 5-6].

This case is also distinguishable from Plaintiff's. First, while it was alleged that the student had the ability to harm herself and others, there were no allegations she had access to a gun. In fact, the NDPD Officer Palmer checked this student for weapons and found none and determined there was no risk to other students. [*Id.* at 3]. Furthermore, the allegations of harm to other students appear to be generalized, and were not specific or repeated, like Plaintiff's were. Additionally, the student took responsibility for her actions, received mental healthcare, and continued receiving mental healthcare until the University Counseling Center determined that was no longer necessary. Plaintiff, on the other hand, did not receive any additional care after his stay at Memorial Epworth. Finally, in this situation, only one student reporter contacted NDPD to report the generalized threats made in class by the other student. In Plaintiff's case, multiple students came forward and shared several unique incidents, which included repeated threats of harm to others and access to weapons to commit this harm. This case is distinguishable from Plaintiff's.

Plaintiff's situation is distinguishable from the three he identified for comparison. Multiple students, largely unrelated to the harassment that Jane Roe had alleged, reported that Plaintiff had access to guns, that Plaintiff himself had both implied and directly stated he had brought those guns to campus repeatedly, and that Plaintiff had directly threatened to harm himself and to harm others if they did not comply with his wishes. Those allegations are not present in any of the three instances above.

17

Additionally, Plaintiff asserts that his removal is unexplainable but-for sex discrimination because the Threat Assessment and Management Team "blind[ed] itself" to Plaintiff's statement, which would eventually, in his opinion, vindicate him. [DE 164, Page 17 (citing DE 165 ¶¶ 74, 79)]. However, the statements he believes vindicate him are statements he made to NDPD Officer Stebbins. *See* [DE 165 ¶¶ 74, 79]. These statements, made directly by Plaintiff himself, were concerning to NDPD Officer Stebbins, caused NDPD Officer Stebbins to believe Plaintiff may harm himself or others, and supported the Threat Assessment and Management Team's recommendation for Plaintiff's removal. [DE 161-3, Page 7 ¶¶ 28-29].  To reiterate, the Threat Assessment and Management Team's recommended Plaintiff's removal because there were reports Plaintiff was a threat to himself and others, it appeared Plaintiff was engaging in escalating and concerning conduct towards at least two different students within a very short period of time in unrelated circumstances, and that Plaintiff had made multiple references to having weapons and potentially using those weapons against himself and others. [DE 161-6, Page 5].

Separate from the investigation done by NDPD and the Threat Assessment and Management Team, NDPD, per Defendant's official procedures, referred Jane Roe's report about Plaintiff's behavior to both the Office of Institutional Equity ("OIE") and Office of Community Standards ("OCS"). OIE and OCS have separate and distinct roles. OIE has authority over Defendant's policy and procedures under Title IX. [DE 162, Page 2 ¶ 7]. OCS, on the other hand, has authority to enforce Defendant's Standards of Conduct. [DE 161-5 Page 1 ¶ 3]. Defendant's Procedures for Resolving Concerns of Discriminatory Harassment, Sexual Harassment and Other Sex-Based Misconduct outline how reports of alleged sex-based harassment are to be handled. [DE 161-4, Pages 13-43].

18

> Reported violations of the Policy allegedly committed by a student, faculty, or staff member that are reported to the Notre Dame Police Department will also be referred to the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee), who will follow-up and investigate as appropriate…The University's process and procedures are distinct from the criminal investigation as a result of the University's obligation under Title IX and other laws pertaining to equal opportunity and access to ensure that it is providing an environment free from discrimination for all members of the University community.

[DE 161-5, Page 14]. As the policy makes clear, any investigation done by Defendant is distinct from any investigation done by NDPD. [*Id.*].

NDPD appropriately followed Defendant's Procedures, above, by referring Jane Roe's report about Plaintiff's behavior to OIE and OCS. [DE 161-4, Page 2 ¶ 7]. According to Defendant's Procedures, after receiving a report of sex-based harassment, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator, or their designee, will assess the report to determine whether the reported conduct falls within the scope of the Title IX Policy, or whether, instead, the reported conduct raises a potential violation Defendant's internal policies, like its Standard of Conduct, and use that information to determine the appropriate manner of resolution. [DE 161-4, Page 22]. There are two avenues of action which may occur based on the initial assessment of the report. Notably, the initial assessment is based on the report itself, and does not involve any investigation into the alleged actors implicated in the report, although, a discussion with the Complainant about their preferred method of resolution is permitted. [DE 161-4, Page 22].

> ● If the report alleges conduct that falls within the [Title IX] Policy, the Assistant Vice President of the Office of Institutional Equity and Title IX Coordinator (or designee) will inform the Complainant of what processes are available and the applicable procedures; or
> ● If the report does not fall within the [Title IX] Policy, the Assistant Vice President of the Office of Institutional Equity and

> Title IX Coordinator (or designee) will refer the report to an appropriate entity to address the concerns or close the matter.

[DE 161-4, Page 22]. Here, the latter occurred.

If the initial assessment indicates that the alleged conduct falls within Title IX Policy, Defendant's Title IX Procedures, as well as Title IX itself, require that a formal Title IX Complaint be filed, either by the person who experienced the conduct or by the Title IX Coordinator. [DE 161-4, Page 26; Page 5 ¶ 17]. This formal Title IX Complaint prompts a Title IX investigation. [DE 161-4, Page 26; Page 5 ¶ 17]. Here, because the initial assessment of Jane Roe's report about Plaintiff's behavior was found to not have violated Title IX Policy, Jane Roe never filed a formal Title IX Complaint and OIE never conducted a Title IX investigation into Plaintiff. [DE 163, Pages 6-7; DE 161-4, Page 5 ¶ 17].

In the notice that Erin Oliver, the Assistant Vice President for Institutional Equity and Title IX Coordinator who oversees OIE, sent Plaintiff on November 23, 2021, regarding the dismissal and referral of his complaint lodged against Jane Roe, Oliver also stated that OCS, not OIE, would be addressing Jane Roe's allegations against Plaintiff. [DE 161-4, Page 5 ¶ 17]. This was because, again, the initial assessment of Jane Roe's complaint involving Plaintiff was found to not have violated Title IX Policy, and there was no formal Title IX Complaint filed. [DE 163, Page 7]. Therefore, it was instead appropriate for OCS to investigate whether a violation of Defendant's Standards of Conduct had occurred. [DE 163, Page 7].

Plaintiff contests that Jane Roe never filed a formal Title IX Complaint. In doing so, he points to three pieces of evidence: the NDPD report from November 3, 2021, where Officer Garcia-Betts states that Jane Roe would like Title IX to get involved, [DE 164-1, Page 14]; an internal note from Christine Holst-Haley created on November 4, 2021, where she states there is a pending Title IX case against Plaintiff, [DE 164-2, Page 2]; and an email on April 13, 2022

from Jane Roe to Heather Ryan, where Jane Roe references raising a Title IX Complaint, [DE 164-1, Page 136]. However, nowhere does Plaintiff, or Defendant for that matter, provide this Court with any formal Title IX Complaint. Because neither of the parties have provided us with evidence of a formal Title IX Complaint, the Court has nothing to review. And, according to Defendant's Procedures, a formal Title IX Complaint requires a digital or physical signature; emails do not suffice, as there is no digital or physical signature. [DE 161-4, Page 26].

OCS began their investigation into Plaintiff's behavior to see if it violated Defendant's Standard of Conduct on November 19, 2021. [DE 161-5, Page 3]. In addition to Jane Roe's report regarding Plaintiff's behavior, there were also allegations Plaintiff threatened to "bury" or "kill" other students, if, for example, they failed to comply with his wishes or vote for him in student elections, and that Plaintiff may have brought firearms onto campus. [DE 161-5, Page 4]. OCS investigated these reports and engaged with Plaintiff according to OCS policies and procedures throughout March and April 2022. [DE 161-5, Pages 2-6].

An OCS Hearing was held on April 22, 2022 before a three-person Hearing Panel. [DE 161-5, Page 8]. Although OCS invited Jane Roe to participate in the hearing, Jane Roe opted not to, which Plaintiff takes issue with, however, this is irrelevant. [DE 161-5, Pages 6-8]. Defendant and its internal OCS procedures do not guarantee students the right to confront the individuals who make allegations against them. [DE 161-5, Page 6]. Second, and as this Court continues to reiterate, this was not a hearing on whether Plaintiff violated Title IX, because the initial assessment determined the conduct did not fall within the Title IX Policy and as a result, Jane Roe never filed a formal Title IX Complaint against Plaintiff. This was a hearing to determine if Plaintiff violated Defendant's Standards of Conduct.

The Hearing Panel found Plaintiff violated Defendant's Standard of Conduct, not due to comments made about "burying" Jane Roe, or "killing" persons who failed to vote for Plaintiff in student elections, or even allegedly possessing weapons on campus, but instead, because he failed to respect or even consider Jane Roe's request to not communicate with her and responded by stating that he could not promise not to contact her. [DE 161-5, Pages 9, 21, 36; DE 165, Page 2 ¶ 110-111]. The Hearing Panel found that these were "actions which seemingly affect only the individual(s) involved but which may have a negative or disruptive impact on the University community and/or concern a student's personal and academic growth." [DE 161-5, Page 36]. Plaintiff was informed of the Hearing Panel's findings by letter on June 3, 2022. [DE 161-5, Page 34].

The June 3, 2022 letter also outlined the process for requesting a review of the outcome, which had occur within 7 days; in Plaintiff's case, that date was June 10, 2022. [DE 161-5, Pages 34-37]. OCS issued minimal sanctions requiring Plaintiff to only complete two conversations with OCS regarding boundaries, and a conversation with Christine Holst-Haley, Director of Student Services at Defendant's law school, to discuss Plaintiff's development as a successful law student. [DE 161-5, Pages 36-37]. Both of these had a deadline to be completed by July 15, 2022. [DE 161-5, Page 37].

On June 28, 2022, Defendant sent another letter to Plaintiff, because Plaintiff requested that the narrative of the letter be updated to clarify his perspective and response to a specific interaction with the Federalist Society. [DE 161-5, Page 39]. The June 28, 2022 letter contained the updated section as requested by Plaintiff. [*Id.*]. On August 3, 2022, Defendant sent a third letter to Plaintiff, because Plaintiff made an additional request that the narrative of the letter be updated. [DE 161-5, Page 44]. The August 3, 2022 letter also contained an updated section

22

reflecting the changes as requested by Plaintiff. [*Id.*]. Notably, in this third letter, Defendant indicated that while Plaintiff met with Christine Holst-Haley as requested in June of 2022, Christine Holst-Haley reported that Plaintiff's engagement was not "focused on the required topic of [his] development as a successful student in the Notre Dame community," and as such, the outcome was still pending. [DE 161-5, Page 47]. Defendant provided a new deadline to meet with Christine Holst-Haley and accomplish that conversation by September 2, 2022. [*Id.*]. Plaintiff was sent a fourth letter on August 15, 2022, indicating he had satisfied the first requirement of two conversations with OCS regarding boundaries. [DE 161-5, Page 49].

Despite the back and forth between Plaintiff and Defendant regarding the narrative of the letter, there is no evidence that Plaintiff ever requested a formal case review within the deadline of June 10, 2022. The OCS process clearly indicates that Plaintiff was not removed from Defendant's university based on the finding that he violated Defendant's Standard of Conduct, or any alleged violation of Title IX. Furthermore, while OIE was able to quickly work with Jane Roe on November 4, 2026 to issue the mutual No-Contact Order between Jane Roe and Plaintiff, which did not require a formal Title IX Complaint, the investigation into Plaintiff's behavior by the OCS did not even begin until after he was formally removed from the University, and therefore, could not have been the reason for his removal. [DE 162, Page 2; DE 161-5, Page 3; DE 161-4, Pages 57-58].

Plaintiff also argues that Defendant discriminated against him on the basis of his sex during the OCS process, because the response to Jane Roe's report was to "remove [Plaintiff] from school," and the response to Plaintiff's report was to "ignore it as 'potentially retaliatory.'" [DE 164, Page 20]. However, as discussed above, Plaintiff was not removed via the OCS investigation. Furthermore, the behavior alleged by Jane Roe against Plaintiff was found by

Defendant to be "significantly more severe" than the allegations made against Jane Roe by Plaintiff. Plaintiff provides no evidence that this finding was based on his sex. This argument fails.

Platiniff also argues that the UCC's decision to not recommend him for readmission also discriminated against him on the basis of his sex, but fails to provide any evidence in support of this argument. [DE 164, Page 22]. Plaintiff asserts that Christine Conway "presumptively labeled Jane Roe the 'victim' and Plaintiff her offender," but *Gash* makes clear that "pro-victim" bias "cannot support a claim for sex discrimination." *Gash*, 117 F.4th at 967. Plaintiff argues that Christine Conway ignored OCS's findings stating he was "wholly vindicated," but as discussed above, Plaintiff was not "wholly vindicated" and OCS did find he committed a violation. Plaintiff also points to the fact that he was told the mental health information he provided was "acceptable" and "sufficient." However, Plaintiff's own exhibits show that Rebecca Gillespie, a UCC Department Administrator, stated that it was "sufficient" for Plaintiff to email, not physically mail, the Authorization of Release, which allowed Epworth Memorial Hospital to share Plaintiff's medical records with Defendant. Rebecca Gillespie did not state that those records were "sufficient" evidence for Plaintiff to be readmitted. [DE 164-3, Page 184]. Plaintiff provides no evidence that the UCC's decision was made on the basis of his sex, so these arguments fail.

In conclusion, Defendant did not convert a Title IX complaint into an informal report that the Threat Assessment and Management Team would handle to avoid Title IX requirements. Plaintiff was removed by the Threat Assessment and Management Team and its emergency removal powers and procedures. The initial assessment of Jane Roe's report of Plaintiff's behavior complaint was not found to have violated Title IX Policy, so she never filed a formal

24

Title IX Complaint and the matter was referred to OCS. And again, the OCS investigation did not even begin until after Defendant was already removed from the University. Finally, Plaintiff has provided this Court with no evidence that the UCC based its decision on Plaintiff's sex. Simply put, there is no evidence that Defendant discriminated against Plaintiff on the basis of his sex, and for this reason, each of his Title IX claims fail.

II.     Breach of Contract

Indiana courts regard the relationship between a student and an educational institution as "contractual in nature," but out of deference to "the subjective professional judgment of trained educators," they do not "apply contract law rigidly." *Doe v. Butler Univ.*, 696 F. Supp. 3d 520, 526 (S.D. Ind. Sept. 23, 2023) (citing *Neel v. Ind Univ. Bd. of Trs.*, 435 N.E.2d 607, 610-11 (Ind. Ct. App. 1982)) (internal quotations and citations omitted). *See Daniels v. Univ. of Notre Dame*, 2023 U.S. Dist. LEXIS 247856, at *16 (N.D. Ind. Aug. 25, 2023).

Accordingly, Indiana courts have adopted "a very flexible approach to the scope of contractual promises between students and universities . . . exercis[ing] the utmost restraint in applying traditional legal rules to disputes within the academic community." *Butler Univ.*, 696 F. Supp. 3d at 526 (citing *Neel*, 435 N.E.2d at 611). *See Daniels*, 2023 U.S. Dist. LEXIS 247856, at *16. Thus, a student's burden in a breach-of-contract action against his university is twofold: First, he must identify the contractual promise breached by the university, *Ross v. Creighton Univ.*, 957 F.2d 410, 417 (7th Cir. 1992); and, second, he must allege facts to support a conclusion that the university acted "illegally, arbitrarily, capriciously, or in bad faith," *Amaya v. Brater*, 981 N.E.2d 1235, 1240 (Ind. Ct. App. 2013). *Butler Univ.*, 696 F. Supp. 3d at 526.

Because terms of the contract are rarely delineated, a student must "point to an identifiable contractual promise that the defendant failed to honor." *Butler Univ.*, 696 F. Supp.

25

3d at 527 (quoting *Ross*, 957 F.2d at 417). Generally, a university's "catalogues, bulletins, circulars, and regulations [that are] made available to the matriculant become part of the contract." *Butler Univ.*, 696 F. Supp. 3d at 526 (citing *Ross*, 957 F.2d at 416). *See Daniels*, 2023 U.S. Dist. LEXIS 247856, at \*16. Only the "specific promise[s]" contained therein constitute the terms of the contract. *Butler Univ.*, 696 F. Supp. 3d at 526 (citing *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009)).

Out of judicial deference to academic institutions, courts deem their "sole function" as determining "whether the educational institution acted illegally, arbitrarily, capriciously, or in bad faith." *Butler Univ.*, 696 F. Supp. 3d at 526 (citing *Amaya*, 981 N.E.2d at 1240) (citations omitted); *see Chang v. Purdue Univ.*, 985 N.E.2d 35, 47 n.2 (Ind. Ct. App. 2013) (noting that bad faith is required for breach-of-contract claims against a university for deviations from policies relating to student disciplinary proceedings). "Literal adherence by a university to its internal rules will not be required when the dismissal of a student 'rests upon expert judgments as to academic or professional standards and such judgments are fairly and nonarbitrarily arrived at.'" *Butler Univ.*, 696 F. Supp. 3d at 527 (quoting *Neel*, 435 N.E.2d at 613).

Plaintiff contends Defendant's Motion for Summary Judgment fails for multiple reasons, but each reason is unsupported by caselaw of this Circuit. First, Plaintiff argues that Defendant violated its own Title IX Procedures by not providing him with a "resource coordinator" after Jane Roe filed a formal Title IX Complaint, and that he was entitled to "the protections of Title IX procedures." [DE 164, Page 23]. However, as discussed above, Jane Roe never filed a formal Title IX Complaint, so Plaintiff was not entitled to a "resource coordinator," and because a Title IX investigation was never done, he was not entitled to any protections under Title IX. Furthermore, there is simply no evidence provided by Plaintiff that Defendant acted in bad faith

26

in making the determination that Jane Roe's report about Plaintiff's behavior did not implicate Title IX. *See Butler Univ.*, 696 F. Supp. 3d at 527 (citing *Amaya*, 981 N.E.2d at 1240) (citations omitted); *see also Chang*, 985 N.E.2d at 47 n.2. This argument fails.

Plaintiff next argues that Heather Ryan "promised" Plaintiff that Jane Roe would be available as a witness for Plaintiff to examine at his OCS hearing, that Plaintiff was not informed that Jane Roe would not attend the hearing, and that Jane Roe was permitted to "benefit from 'character witnesses'" but that Plaintiff was not afforded that opportunity. [DE 164, Pages 23-24]. Confusingly, Plaintiff also argues that Heath Ryan stated that character witnesses were unpermitted by policy. [*Id.*].

Plaintiff's citation in support of the assertion that Heather Ryan "promised" Plaintiff that Jane Roe would be available as a witness for Plaintiff to examine at his OCS hearing does not state that Jane Roe would be available as a witness. [DE 164, Page 24 (citing DE 165, Page 21 ¶¶ 107-08)]. Instead, it states that the OCS Hearing Procedures require that an accused student be told whether the complainant will participate. [*Id.*]. Therefore, regardless of what Heather Ryan allegedly "promised," there is no policy violation for Jane Roe to not have participated in the hearing, since the policy Plaintiff himself included in his Statement of Facts does not require she do so. [*Id.*]. And, as discussed above, Defendant and its internal OCS procedures do not guarantee students the right to confront the individuals who make allegations against them. [DE 161-5, Page 6]. Insofar as Plaintiff was not provided notice that Jane Roe would not attend the hearing, Plaintiff failed to present any evidence that Defendant acted in bad faith in doing so.

Plaintiff cites the NDPD report as evidence that Jane Roe was permitted to present disallowed character witnesses at the OCS hearing. But this is not evidence that Jane Roe was given an opportunity to present the allegedly disallowed character witnesses at the OCS hearing;

the NDPD report was simply a summary of the NDPD's findings as background information for the referral to OCS. Plaintiff provides no evidence that *at the OCS hearing,* Jane Roe presented character witnesses.

Finally, Plaintiff argues that Heather Ryan admitted that the OCS finding of a policy violation was a "subjective (arbitrary) determination" and that Plaintiff's sole violation of stating he may accidentally say "hey" to Jane Roe is not actually a policy violation. [DE 164, Page 24]. However, that statement misconstrues the evidence Plaintiff cites in support. First, he provides no evidence that OCS was "arbitrary" in its decision to find a policy violation. Defendant, through OCS, did not find that Plaintiff saying "hey" to Jane Roe was a policy violation. Instead, Defendant, again, through OCS, found that Plaintiff had violated its policy by not being willing to respect Jane Roe's request that Plaintiff not speak to her. [DE 161-5, Page 9; DE 161-5, Page 36; DE 165, Page 21 ¶ 110-11]. The Hearing Panel found that this was "[an action] which seemingly affect[sic] only the individual(s) involved but which may have a negative or disruptive impact on the University community and/or concern a student's personal and academic growth." [DE 161-5, Page 36]. Defendant identified the policy that his action violated, and therefore, that decision was not "arbitrary."

Plaintiff cites Heather Ryan's deposition where she explains that exact position – that "not even being willing to engage" in Jane Roe's request that Plaintiff not speak to her, and stating as much in response to the request, is the policy violation. [DE 164-2, Pages 48-49]. This does not support his argument that his "sole violation of stating he may accidentally say 'hey' to Jane Roe is not actually a policy violation." This is also why his next citation does not support his argument. *See* [DE 164, Page 24 (citing DE 165, Page 22 ¶ 112)]. The policy violation is the

28

failure to respect Jane Roe's request to not speak to her; Plaintiff is permitted to speak to others, as no one else had requested he not do so.

Plaintiff's next citation is equally unhelpful, because that citation is solely about Jane Roe's behavior and does not support nor is it relevant to his argument that Heather Ryan admitted that the OCS finding of a policy violation was a "subjective (arbitrary) determination" and that Plaintiff's sole violation of stating he may accidentally say "hey" to Jane Roe is not actually a policy violation. [DE 164, Page 24 (citing DE 165, Page 22 ¶ 113)]. Neither do his next citations support his argument. [*Id.* at ¶¶ 114-15].

Nowhere does Plaintiff provide this Court with any evidence that Defendant's behavior or decision-making was arbitrary or in bad faith, which is required for a breach of contract claim in this setting. *See Butler Univ.*, 696 F. Supp. 3d at 527 (citing *Amaya*, 981 N.E.2d at 1240) (citations omitted); *see also Chang*, 985 N.E.2d at 47 n.2 (noting that bad faith is required for breach-of-contract claims against a university for deviations from policies relating to student disciplinary proceedings and professional misconduct alike). As a result, each of Plaintiff's breach of contract claims fail.

III.     Discrimination in Violation of Title III of the Americans with Disability Act and Section 504 of the Rehabilitation Act

Plaintiff argues that Defendant discriminated against him not because he was in-fact disabled, but because Defendant *regarded him* as disabled and that therefore he was unable to return to full-time study at Defendant's law school. In support of his argument, Plaintiff alleges that the letter he received outlining the requirements for his return did not mention "step-down care or any form of mental healthcare," and that there was not a "single piece of evidence indicating step-down care was a requirement of UCC clearance because no such requirement was

ever communicated to [Plaintiff]." [DE 164, Page 25]. Defendant disputes this. However, both Plaintiff and Defendant agree that the appropriate standard for "regarded as" ADA and Rehabilitation Act claims, a plaintiff must show that "(1) the decision-maker regarded him as having an impairment; and (2) she made her . . . decision on the basis of that perception." *Silk v. Bd. of Trustees, Moraine Valley Cmty. Coll.*, Dist. No. 524, 795 F.3d 698, 707 (7th Cir. 2015).

While the Court agrees that the letter Plaintiff received outlining the requirements for his return did not explicitly mention "step-down care or any form of mental healthcare," the Court disagrees that the requirement Plaintiff receive additional mental healthcare was not communicated to him. On June 13, 2022, Margaret Morgan emailed Plaintiff stating "…as a quick summary, the Law School will manage all readmission requests according to their processes and deadlines. The only addition to this process is the requirement of mental health clearance as a part of your readmission application." [DE 161-1, Page 15].

On June 27, 2022, Heather Ryan had a telephone call with Plaintiff, where these requirements were discussed. [DE 161-9]. While the Court was not provided with a transcript of the full call, several parts are relevant to Plaintiff's claim here. Towards the beginning of the call, Plaintiff said, "Margaret [Morgan] made the point that if I do ever have an opportunity to come back, that I have to, you know, just get some sort of clearance from a mental health professional." [DE 161-9, Page 3]. Later in the call, Heather Ryan asked "… are you ready to do the things that Margaret needed you to do as well? Like, the readiness to return stuff as well?". [*Id.* at 5]. Plaintiff responded "[Margaret] -- so like -- so she really just kind of emphasized that, like, you need an okay from a mental health professional –". [*Id.* at 5]. After discussing how Plaintiff had the notes from the stay at Epworth Memorial Hospital immediately following his removal, Plaintiff then stated he asked Margaret "if those [notes] were sufficient, she gave, like,

30

a tentative yes, but she also seemed to indicate that she would probably want something more current." [*Id.* at 6]. Based on these comments, Plaintiff appeared to understand providing the notes from his stay at Epworth Memorial Hospital immediately following his removal would likely be insufficient, and that a more current assessment was required. The Court is unpersuaded that Plaintiff was unaware of the requirement that Plaintiff receive additional mental healthcare.

Plaintiff's understanding that he needed "more current" mental health evaluation is in-line with the testimony provided by Christine Conway, the Director of the UCC, during her deposition. There, when asked by Plaintiff why he was not granted readmission, Conway stated, "[t]here was no treatment provider record that indicated that you had -- that gave an assessment of your mental health at the time of your application or that indicated the steps that you had taken to address the issues that led to your leaving the university." [DE 161-8, Page 4].

Furthermore, on March 28, 2024, before any review of the mental health aspect of Plaintiff's application was done, Amy Spanopoulos reached out to Plaintiff with questions about the medical records included with his readmission reapplication. [DE 164-3, Page 169-171]. Amy Spanopoulos asked if Plaintiff participated in any treatment after his inpatient hospitalization. [DE 164-3, Page 169]. Plaintiff responded that he did not receive any further treatment after his discharge from inpatient hospitalization because his medical records "stated that further treatment was not recommended, and [he] did not have any instructions or suggestions to seek such upon [his] discharge." [DE 164-3, Page 170]. However, Plaintiff's medical records indicate the contrary. The "PSY DISCHARGE SUMMARY" from Epworth Memorial Hospital included a plan which stated "… continue individual, group and mileu therapy." [DE 164-3, Page 47]. The plan also included a directive to "follow up with psychotherapy…". [*Id.*].

Defendant's decision to involuntarily withdraw Plaintiff under emergency procedures was based on the Threat Assessment and Management Team's determination that Plaintiff posed a risk to the safety of himself and others—a situation that justified his removal regardless of whether his behavior was caused by a mental impairment or otherwise. To determine whether Plaintiff needed to be removed from the emergency, Defendant did not look at "the person's mental health issues. We're looking at behaviors." [DE 161-8, Page 3]. There's simply no evidence that Defendant ever even regarded Plaintiff as disabled, or that Defendant used that rational to deny Plaintiff readmission to Defendant's law school.

Finally, the letter from Defendant's law school denying Plaintiff's readmission stated that in addition to not receiving UCC clearance, that the essay part of Plaintiff's application did not adequately address how he had taken accountability for the impact his actions had on Defendant's law school community prior to his emergency action withdrawal, how he would avoid similar issues if readmitted, and how returning to Defendant's law school would help him achieve his academic and professional goals. [DE 161-10]. Plaintiff was not prevented from reapplying in the future, and instead, was reinvited to apply for a future term. [*Id.*]. For all of the foregoing reasons, Plaintiff's argument that he was denied readmission to Defendant's law school because Defendant regarded him as disabled fails.

*Conclusion*

Plaintiff challenges his involuntary removal from Defendant's university and brings claims alleging discrimination in violation of Title IX, Title III of the Americans with Disability Act and Section 504 of the Rehabilitation Act, and breach of contract. Defendant's moved for summary judgment on those claims. For all the foregoing reasons, Defendant's Motion for

32

Summary Judgment, at [DE 161], is GRANTED in its entirety. The Clerk is DIRECTED to enter judgment for Defendant and against Plaintiff. Plaintiff takes nothing by his Complaint.

SO ORDERED.

ENTERED: May 28, 2026

/s/ GRETCHEN S. LUND
Judge
United States District Court